## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**B-BAR TAVERN INC**,

        Debtor.

Case No.  **12-60228-11**

**B-BAR TAVERN INC**,

        Plaintiff.

-vs-

**PRAIRIE MOUNTAIN BANK**,

        Defendant.

Adv No.  **12-00043**

## MEMORANDUM OF DECISION

At Butte in said District this 2nd day of August, 2013.

Pending in this adversary proceeding is the motion for summary judgment (Docket No. 57) filed by Defendant Prairie Mountain Bank ("PMB"), which seeks summary judgment in its favor on all counts of Plaintiff's complaint, plus costs and attorney's fees.  Plaintiff filed a response in opposition and statement of genuine issues.  The Court heard oral argument on PMB's motion at Great Falls on August 2, 2013.  Attorneys James A. Donahue ("Donahue")and John P. Paul ("Paul") of Great Falls appeared representing PMB, and James A. Patten ("Patten") appeared on behalf of the Plaintiff/Debtor.  At the conclusion of oral argument the Court denied the motion for summary judgment on the grounds that there remain genuine issues of material

1

fact.

This Court has exclusive jurisdiction of the above-captioned Chapter 11 bankruptcy case under 28 U.S.C. § 1334(a).  This adversary proceeding is related to the above-captioned Chapter 11 case under § 1334(b).  The parties' pleadings agree that this is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O).

Plaintiff's complaint avers seven (7) interrelated claims for relief:  Count I (Plaintiff's Objection to PMB's Proof of Claim No. 1); Counts Two and Three (for declaratory judgment invalidating the real estate trust indenture (hereinafter "TI") executed by Plaintiff in favor of PMB as beneficiary); Count Four (Statute of Frauds); Count Five (seeking avoidance of PMB's lien under 11 U.S.C. § 544(a)); Count Six (alleging that the assignment of rents is valueless and provides no security pursuant to 11 U.S.C. § 506(a)(1)); and Count Seven (seeking attorneys' fees and costs under Mont. Code Ann. ("MCA") §§ 27-8-311 and 28-3-704).  PMB's answer denies liability under all 7 claims for relief, asserts affirmative defenses under the doctrines of estoppel, laches, waiver, release, asks for costs and attorney's fees, asks that its secured claim be allowed, and asserts a counterclaim.

PMB's counterclaim requests that the Court revise or reform the TI to include the name of a non-debtor, Barnes, Inc., under MCA § 28-2-1611 based on mistake, and that the Court enter judgment declaring that the TI and assignment of rents are valid and enforceable to secure the debt owed to PMB, or in the alternative that the TI constitutes an equitable lien[1].  Plaintiff

---

[1]PMB's counterclaim and Plaintiff's defenses thereto are not the subject of PMB's motion for summary judgment, which concerns Plaintiff's claims for relief.  Therefore, this Memorandum of Decision does not address the parties' contentions regarding PMB's counterclaims.

answered the counterclaim denying there was a mutual mistake or that PMB is entitled to reformation[2] of the TI, asserting its own affirmative defenses, including but not limited to duress, failure of consideration, estoppel, waiver and statute of frauds, and otherwise denying the material allegations of the counterclaim.

**FACTS**

PMB filed a "Statement of Uncontroverted Facts" (Dkt. 59) ("SOUF") in support of its motion as required by Montana Local Bankruptcy Rule 7056-1(a)(1) governing summary judgments.

PMB's SOUF (Dkt. 60) at pages 2-10 sets forth the following facts:

1. Jack Barnes was the sole shareholder of Barnes, Inc. (Jack Barnes Deposition, App. 25, p. 8, ll. 14-16), which owned and operated a bar, restaurant and casino doing business as the Prospector. (This will be described as the "Prospector on Smelter".)

2. In September 2007, a fire completely destroyed the Prospector on Smelter. (App. 25, p. 10, ll. 12-18)

3. At some time prior to the fire, Jack Barnes had approached the Bank about obtaining financing to purchase another property known as the J-Bar T property. Those discussions were ongoing at the time the fire destroyed Prospector on Smelter. (App. 25, p. 10, l. 19 to p. 11, l. 3)

4. After the fire, Jack Barnes continued discussions with the Bank about purchasing the J-Bar T property and about pursuing financing to rebuild Prospector on Smelter.

5. Shortly before or in January of 2008, Jack Barnes applied to the Bank to obtain a $500,000.00 line of credit to "get started with" rebuilding the Prospector on Smelter and to pay ongoing expenses. (App. 25, p. 15, l. 16 to p. 16, l. 3) The Bank approved the $500,000.00 line of credit evidenced by a promissory note dated January 24, 2008. (App. 1; App. 24, ¶ 3)

---

[2]PMB's reply states that reformation is not at issue with respect to the instant motion.

6. Jack Barnes applied for a construction loan in the amount of $1.8 million in April, 2008, for continued rebuilding of Prospector on Smelter. The Bank approved the loan. The loan is evidenced by a promissory note dated June 24, 2008, made, executed and delivered by Barnes, Inc., the operating entity of Prospector on Smelter. (App. 2; App. 24, ¶ 4)

7. In the fall of 2008, Jack Barnes told the Bank that there were overages on the construction loan and that Barnes, Inc., would need additional financing to complete construction. (App. 25, p. 24, l. 16 to p. 26, l. 18) The Bank told Jack that additional collateral was needed in order to loan more money to Barnes, Inc. (Vukasin Affidavit, App. 24, ¶ 6; App. 25, p. 26, l. 19 to p. 27, l. 6; App. 25, p. 32, ll. 21-24)

8. Jack Barnes contacted his brother, Richard Barnes, to determine if Richard would furnish the additional collateral. (Richard Barnes Deposition, App. 3, p. 43, ll. 5-8; p. 48, ll. 15-22) Richard Barnes is the sole shareholder of Plaintiff (App. 3, p. 13, ll. 13-19) Plaintiff operates a bar, restaurant and casino doing business as the Prospector. (This Prospector will be referred to as "Prospector on Tenth".)
Richard Barnes agreed to secure the loan with Prospector on Tenth. (Richard Barnes Deposition, App. 3, p. 35, l. 24 to p.36)

9. Richard Barnes signed and delivered to the Bank a Guaranty for the loan requested by Barnes, Inc., which the Bank subsequently made (See paragraph 10). (App. 4) Richard Barnes confirmed this Guaranty in his deposition. (App. 3, p. 55, ll 8-14) Later the loan was refinanced in the amount of $741,041,10 and Richard Barnes signed a Guaranty Agreement for that refinanced loan in March of 2009.

10. The Bank approved the loan request and made a loan in the amount of $850,000.00, evidenced by a promissory note dated October 8, 2008, made, executed and delivered to the Bank by Barnes, Inc. (App. 5; App. 25, ¶ 8)

11. The collateral for the $850,000.00 note, of which Barnes, Inc., was maker, is a real estate trust indenture dated October 8, 2008, on Prospector on Tenth. The grantor in the trust indenture is Plaintiff. The trust indenture identifies that the debt it secures is a loan of Barnes, Inc., in the amount of $850,000.00 with interest at 7.25% and a maturity date of 10/08/2011. A copy of the trust indenture is at App. 6. Richard Barnes initialed each page of the Trust Indenture and executed it on October 8, 2008, as Plaintiff's President. (App. 3, p. 55, l. 15 to p. 56, l. 10) Richard Barnes is Plaintiff's President, having signed discovery responses acknowledging that position. (App. 26, p. 12)

Plaintiff also made, executed and delivered to the Bank an Assignment of

4

Leases and Rents signed by Richard Barnes, as Plaintiff's president, on October 8, 2008. (App. 3, p. 56, l. 11 to p. 57, l. 3) This document, a copy of which is at App. 7, identifies the debt secured as "Prairie Mountain Bank Loan #4025843". This is the loan number of the $850,000.00 loan made to Barnes, Inc., and secured by the Plaintiff's property, namely, the Prospector on Tenth. (App. 7)

12. In March 2009, the total debt owed by Barnes, Inc., to the Bank was approximately $3,150,000.00, comprised of the $500,000.00 operating line, $1,800,000.00 construction loan and the $850,000.00 subsequent loan, plus interest. (App. 24, ¶ 10) At or near the completion of the construction the total indebtedness was termed out. *Id.*

13. At the time the Barnes, Inc., loans were to be termed out, the assets of Barnes, Inc., were divided between Barnes, Inc., and two additional entities, namely, Prospector Land Co., LLC, and Prospector Catering Co., LLC. The promissory notes and the collateral securing the respective promissory notes are described below. The approximate $3,150,000.00 indebtedness was termed out as follows:

(a) Prospector Land Co., LLC, borrowed $1,200,000.00 and executed and delivered to the Bank a promissory note in that amount (App. 8). In order to secure that note, Prospector Land Co., LLC, made, executed and delivered to the Bank a trust indenture on the Prospector on Smelter which had been rebuilt (App. 9). Prospector Land Co., LLC, also delivered an Assignment of Leases and Rents (App. 10).

(b) Prospector Catering Co., LLC, borrowed $1,200,000.00 and executed and delivered to the Bank a promissory note in that amount (App. 11). In order to secure that note, Prospector Catering Co., LLC, made, executed and delivered to the Bank a trust indenture on the J-Bar T property (App. 12). Prospector Catering Co., LLC, also delivered an Assignment of Leases and Rents (App. 13).

(c) Barnes, Inc., borrowed $741,041.10, the balance remaining on the original $850,000.00 loan advanced to cover construction overages, and made, executed and delivered to the Bank its promissory note (App. 14). The loan was secured by a trust indenture on the Prospector on Tenth property, which trust indenture was made, executed and delivered by Plaintiff, signed by its President, Richard Barnes. The trust indenture in the place provided for "secured debt" states: "B-Bar Tavern, Inc.,

5

$741,041.10, 7.25%, 03-24- 2012." A copy of the trust indenture
appears at App. 15. The trust indenture provides:

> All duties under this security instrument are joint
> and individual. If Grantor signs this security
> instrument but does not sign an evidence of debt,
> Grantor does so only to mortgage Grantor's interest
> in the property to secure payment of the Secured
> Debt and Grantor does not agree to be personally
> liable on the Secured Debt.

Plaintiff also made, executed and delivered an Assignment of
Leases and Rents dated March 24, 2009. Each page is initialed by
Richard Barnes, who signed it on behalf of Plaintiff (App. 16). The
Assignment of Leases and Rents identifies "Prairie Mountain Bank
Loan #4025942" as the secured debt. (App. 16, p. 2) Richard
Barnes made, executed and delivered his personal guaranty (App.
17).

14. In May, 2010, all three loans, namely, the loans to Prospector Land
Co., LLC, Prospector Catering Co., LLC, and Barnes, Inc., went into default.
(App. 24, ¶ 12)

15. On June 21, 2010, Barnes, Inc., filed its Chapter 11 bankruptcy
petition. On July 1, 2010, Prospector Land Co., LLC, filed its bankruptcy petition
and on that same date, July 1, 2010. Prospector Catering Co., LLC, filed its
Chapter 11 bankruptcy petition.  During the pendency of the bankruptcy cases, the
Bank and the three bankrupt entities, together with Jack Barnes and Colette
Barnes, husband and wife, individually, Richard Barnes and Nancy Barnes,
husband and wife, individually, Plaintiff, and their respective attorneys, held a
settlement conference on December 23, 2010. The conference was conducted by
Neal Jensen, Assistant U.S. Trustee for the District of Montana. (App. 24, ¶ 13)
The conference was held at the law offices of Church, Harris, Johnson &
Williams, and lasted a full day. (App. 24, 13)
    The conference resulted in a global "Settlement Agreement" between all
of the above-named parties. The Settlement Agreement, dated December 23,
2010, signed by all parties and their counsel who represented them at the
conference, is at App. 18.
    The Settlement Agreement provided that Richard Barnes and Plaintiff
shall be granted a second priority lien of mortgage or deed of trust on the
Prospector on Smelter.  (App. 17, § 3)
    The Bank agreed, in the Settlement Agreement, that it would not take any
legal action against any obligor or guarantor of the Bank's loans to the three

6

bankrupt entities for nine months, and that the Bank would not take any legal action against Richard Barnes, Plaintiff, or Jack Barnes during that nine month period. (App. 17, ¶¶ 1, 2) The Bank also agreed, in the Settlement Agreement, that no payments would be owed to it by any obligor or guarantor or third-party pledgor on any loan to the three bankrupt entities during the nine month period. (App. 17, ¶ 5) The Bank honored the terms of the Settlement Agreement.  (App. 24, ¶16)

16. In addition to other terms and conditions set forth therein, the Settlement Agreement contains a mutual release of claims. Paragraph 9 of the Settlement Agreement reads:

> Except for the obligations undertaken by the parties to one another under the terms of this Settlement Agreement, the Obligor Parties, Colette Barnes and Nancy Barnes, on the one hand, and the Bank, on the other hand, mutually release one another, their representatives, insurers, attorneys, and agents of all claims, known or unknown, liquidated or contingent, through the date of this Settlement Agreement, including any claims sounding in tort, contract, in law or in equity.

> The "Obligor Parties" include Richard Barnes and Plaintiff (App.18)

17. The Settlement Agreement provides in paragraph 10, in part:

> The parties declare and agree that each of the loan documents, agreements and instruments creating, evidencing and securing the repayment of the above-referenced loans shall remain in effect and are valid, binding and enforceable according to their terms, except as modified by this Agreement.

(App. 18, ¶ 10) No provision of the Settlement Agreement modifies the Trust Indenture on the Prospector on Tenth property that it at issue in this case.

18. The negotiated mutual release of claims was an important element of the Settlement Agreement and without that provision, the Bank would not have agreed to the other terms of the Settlement Agreement. (Affidavit of Laura Vukasin, App. 24, ¶ 14)

19. Based on the Settlement Agreement, Barnes, Inc., filed its revised First Amended Chapter 11 Plan of Liquidation dated January 17, 2011. On August 3, 2011, Barnes, Inc., filed a Second Amended Chapter 11 Plan of Liquidation. The Second Amended Chapter 11 Plan of Liquidation, dated August 3, 2011, was

confirmed by the Court. That Plan specifically incorporates all the terms and conditions of the Settlement Agreement. (App. 19)

20. On December 31, 2010, Prospector Land Co., LLC, and Prospector Catering Co., LLC, filed their Amended Chapter 11 Plans of Liquidation, incorporating into those Plans the Settlement Agreement of December 23, 2010. The purpose of the Second Amended Chapter 11 Plans was, in part, to specifically incorporate the terms of the Settlement Agreement. (App. 20 and 21)

21. On December 28, 2010, the Settlement Agreement of December 23, 2010 was filed with the Court as an attachment to a stipulation seeking approval of the Settlement Agreement. (App. 22) On December 29, 2010, the Court entered its order approving the Settlement Agreement, after which approval, the respective Amended Plans of the three Debtors were approved by the Bankruptcy Court.

22. Prospector Land Co., LLC, Prospector Catering Co., LLC, and Barnes, Inc., defaulted under the terms of their respective confirmed Chapter 11 Plans. (App. 24, ¶ 15) Pursuant to the terms of the loan documents and the Settlement Agreement, the Bank scheduled for February 28, 2012, trust indenture foreclosure sales (App. 24, ¶ 15) of the following described trust indentures:

(a) Trust Indenture securing loans in the amounts of $1,200,000.00 and $200,000.00, on which Prospector Land Co., LLC, was the obligor to the Bank;
(b) Trust Indenture securing a loan in the original principal amount of $1,200,000.00 on which Prospector Catering Co., LLC, was the obligor to the Bank;
(c) Trust Indenture securing a loan in the original principal amount of $741,041.10 on which Barnes, Inc., was the obligor to the Bank, and which  Trust Indenture had been granted by Plaintiff

23. The trustee's sales of the trust indentures on land owned by Prospector Land Co., LLC, and Prospector Catering Co., LLC, were conducted and completed as scheduled.

The trustee's sale of the trust indenture on property owned by Plaintiff (Prospector on Tenth) was canceled by the trustee because Plaintiff filed a Chapter 11 bankruptcy case on February 27, 2012, the day prior to the schedule sale. (App. 23; App. 24, ¶ 15)

24. During the pendency of Plaintiff's Chapter 11 case, Plaintiff filed its adversary proceeding against the Bank on August 22, 2012, giving rise to the

8

issues now before the Court.

25. Plaintiff served responses to the Bank's discovery requests in the adversary proceeding. The responses are at App. 26. In those responses Plaintiff asserts that it is not bound by the Settlement Agreement (App. 18) because it was not properly a party to the settlement conference because the trust indenture is invalid and, therefore, Plaintiff was the victim of "duress, mistake, fraud, unconscionability, failure of consideration, statute of frauds, unclean hands, and misrepresentation" when it signed the Settlement Agreement. (App. 26, p. 6)

26. Richard Barnes was deposed in the adversary proceeding on February 26, 2013. The transcript of that deposition is App. 3. Barnes testified that the duress, mistake, fraud, unconscionability, failure of consideration, statute of frauds, unclean hands, and misrepresentation that formed the basis of Plaintiff's discovery responses were based upon the issues discussed during the deposition. (App. 3, p. 116, l. 16 through p. 120, l. 6)

During the deposition, Barnes discussed issues including: attorney Steve Potts did work for Plaintiff, for Jack Barnes and Jack Barnes' business entities, and for the Bank (App.3 p. 77, l. 24 through p. 78, l. 21); that Barnes, Inc., had been split into three entities (Barnes, Inc., Prospector Land, and Prospector Catering), that the loan to Barnes, Inc., had been split between the three entities, and that Potts have been involved in that process (App. 3, p. 79, l. 2 through p.81, l. 3); that the Bank had allegedly been the motivator behind dividing Barnes, Inc., into three entities, that Potts allegedly prepared the paperwork splitting Barnes, Inc., into three entities, that Potts may have prepared the trust indenture Richard Barnes signed on behalf of Plaintiff, and that Barnes allegedly signed the trust indenture at Potts' office (App. 3, p. 81, l. 4 through p. 90, l. 3); that Richard Barnes believed that the Bank had a security interest in Barnes, Inc.'s operating equipment and liquor license when, in fact, it did not (App. 3, p. 92, l. 9 through p. 95, l. 22, p. 99, l. 20 through p. 100, l. 6); that the Bank failed to disclose to Plaintiff and to Richard Barnes that Barnes, Inc., had been split into three entities (App. 3, p. 100, ll. 7-13); that the Bank had not cross-collateralized the loans to the three entities into which Barnes, Inc.'s assets had been split (App. 3, p. 100, l. 14, through p. 101, p. 101, l. 25); that the Bank had allegedly wanted Barnes, Inc., split into three entities to avoid problems with the FDIC (App. 3, p. 102, p. 1 through p. 103, l. 11); and that the Bank had allegedly engaged in bad faith based upon those allegations (App. 3, p. 103, ll. 6-11).

Richard Barnes admitted that he, and therefore Plaintiff, was aware of each of these issues within three or four months of his execution of documents in March of 2009. (App. 3, p. 79, ll. 18-21, p. 80, ll. 7-10, p. 81, ll. 17-22, p. 89, l. 25 through p. 90, l. 3, p. 95, ll. 18-22, p. 100, ll. 3-6, p. 101, ll. 18-25, p. 103, ll.

6-11).

27. The Bank retained attorney Christopher B. Swartley as an expert witness in this adversary proceeding. Mr. Swartley has authored an opinion in which he states that "[a] trust indenture, such as the one in this matter, that fails to identify the borrower for whom security is given, is nevertheless enforceable against the grantor as a lien or mortgage." (App. 27, Exh. A, p. 5) Mr. Swartley is experienced in real estate, commercial and banking matters as evidenced by his curriculum vitae. (App. 27, Exh. A, pp. 6-10).

In support of its opposition to summary judgment Plaintiff filed a Statement of Genuine

Issues (Dkt. 67) which sets forth the following alleged genuine issues of material fact:

1. The Real Estate Trust Indenture between B-Bar Tavern Inc. as grantor, and Prairie Mountain Bank, as beneficiary, was executed by Richard Barnes on March 25, 2009. (PMB App. 15, page 11 of 12; App. A; Richard Barnes affidavit, ¶ 18).

2. When he applied for the $850,000 loan to complete construction of the Prospector on Smelter, Jack Barnes was told by PMB President Laura Vukasin to ask Richard Barnes for the additional collateral PMB required. (App. B; Jack Barnes deposition transcript, page 27 line 8 through page 31 line 14).

3. At the end of 2008, Barnes Inc. was indebted to PMB in the principal amounts of $500,000, $1,800,000, and $850,000 for a total of $3,150,000 (PMB Statement of Undisputed Fact ¶ 13). At that time, the PMB lending limit was $1,200,000 (App. C; deposition transcript of Laura Vukasin as Rule 30(b)(6) witness for PMB, p. 33, lines 7 through 11).

4. Great Falls attorney Steven T. Potts provided legal services to Jack Barnes, Barnes Inc., Richard Barnes, B-Bar Tavern Inc., and Prairie Mountain Bank (App. D; deposition transcript of Steven T. Potts, page 13 line 17 through page 14 line10; page 30 line18 through page 33 line 14; . In fact, Potts was the registered agent for Barnes Inc. and B-Bar Tavern Inc. (App. D; Potts deposition transcript page 24 line 24 through page 35 line 21; page 46 line 21 thorough page 47 line 7). During the same time, Potts represented PMB (App. D; Potts deposition transcript page 50 lines 1 through 3). Potts is also a shareholder of the PMB (App. D; Potts deposition transcript page 49 lines 17 through 21). Potts was aware of the PMB loan limit issues in connection with the Barnes Inc. debt by PMB President Vukasin (App. D; Potts deposition transcript page 60 line 24 through page 61 line 12; page 71 lines 5 through 23). Sometime after discussing the Barnes Inc. loan limit issue with PMB, Potts proposed to Jack Barnes that if

Barnes Inc. transferred its real property to limited liability companies outside of Barnes Inc., PMB could make loans without running up against its lending limits. (App. D; Potts deposition transcript page 73 line 2 page 74 line 2). Thereafter, Potts organized Prospector Land Company LLC and Prospector Catering Company LLC (App. D; Potts deposition transcript page 74 line 15 through page 75 line 23). PMB paid Potts costs of organizing Prospector Land Company and Prospector Catering Company (App. D; Potts deposition transcript page 78 line 15 through page 79 line 1). At no time did Potts tell Richard Barnes of the organization of the two Prospector entities or the conveyance of the land from Barnes Inc. to those entities. (App. D; Potts deposition transcript page 83 lines 10 through 17). At no time did PMB tell Dick of the restructure of Barnes Inc. and the conveyance of its real estate to other entities (App. C; deposition of Laura Vukasin as Rule 30(b)(6) witness for PMB, page 148 lines 5 through 24).

5. PMB staff proposed to the PMB board of directors, that PMB enter into a series of loans with Barnes Inc., Prospector Land Company and Prospector Catering Company, in order to term out the Barnes Inc. construction loan and to meet the lending limit issues of Barnes Inc. (App. E; February 17, 2009 Board Loan Presentation produced in discovery).

6. PMB looked to the B-Bar property as the source of repayment of the original $850,000 loan; this fact was not disclosed to him (App. C; Laura Vukasin Rule 30(b)(6) deposition of PMB, page 46 lines 2 through 7; App. A; Richard Barnes Affidavit ¶¶ 15 and 16).

7. At the settlement conference held on December 23, 2010, Jack Barnes, on his behalf and on behalf of his entities, settled and left. Neal Jensen, the mediator, then left. Richard Barnes and B-Bar continued negotiating. At approximately 8:00 pm, Richard Barnes could hear the PMB counsel yelling at Richard's attorney that the proposed terms were a "deal breaker.". At that time PMB threatened to continue its foreclosure of the Trust Indenture. A loss of the B-Bar property would cause Richard to lose his livelihood. Richard was suffering from the lack of his pain medication and his blood pressure medicine. By 8 o'clock Richard felt quite ill. Richard felt he had to agree to the settlement as he would otherwise lose everything he worked for (App. A; Richard Barnes affidavit¶¶ 2 through 13). [,]

8. The March 24, 2009 PMB loan to Barnes Inc. was disbursed on March 24, 2009 (App. F; PMB loan statement provided by PMB in discovery).

9. Richard Barnes was unsophisticated in bank lending matters as he had been debt free since 1999 (App. A; affidavit of Richard Barnes ¶ 19).

11

On July 15, 2013, without requesting or obtaining leave from the Court, PMB filed a "Supplemental Statement of Uncontroverted Facts" (Dkt. 75) with its reply, along with a supplemental appendix, exhibits, and affidavits.  Such a supplement of facts in summary judgment proceedings is not authorized by Mont. LBR 7056-1(a).  PMB's supplement was not authorized by this Court, and therefore PMB's supplement of facts (Dkt. 75/76) was not considered by the Court and played no part in this decision.

## DISCUSSION

### I. Summary Judgment.

Summary judgment is governed by FED. R. BANKR. P. 7056.  Rule 7056, incorporating FED. R. CIV. P. 56(c), states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "The proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial."  *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)).

When seeking summary judgment, the moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).  If the moving party adequately carries its burden, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED.

12

R. CIV. P. 56(e). *See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in dispute"). That is, the opponent cannot assert the "mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, "[a] party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

To demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible into evidence. *Aquaslide*, 85 B.R. at 547. All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Liberty Lobby,* 477 U.S. at 247-48, 106 S.Ct. at 2509. If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied. *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986). Thus, the Court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence. *T.W. Elec. Serv.*, 809 F.2d at 631. In the absence of any disputed material facts, the inquiry shifts to whether the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

## II. PMB's Motion for Summary Judgment.

Count One (Objection to PMB's Proof of Claim) and Count Seven (Attorneys' Fees)

13

depend to a great degree on the outcome of the other five claims for relief.  Thus, the decision on whether PMB's motion should be granted or denied with respect to the other claims for relief will determine the outcome of PMB's motion with respect to Counts One and Seven.

Next, PMB addresses Count Six only briefly, contending that the validity of the assignment of leases is a non-issue and needs no resolution by the Court because the validity of the TI is the determinative issue in this case.  The Court concludes that PMB utterly failed its heavy burden under Rule 56 to show that there are no disputed facts warranting disposition of the case on the law without trial.  *Younie v. Gonya (In re Younie)*, 211 B.R. at 373.  Count Six stands or falls on its own.  The assignment of rents is a separate agreement, which PMB attached to its Proof of Claim as security.  While the validity of the TI is an important issue, PMB's short argument with respect to Count Six fails to satisfy its heavy burden for summary judgment.  PMB's motion for summary judgment on Count Six will be denied, and with it the Court denies PMB's motion with respect to Count One to the extent the Proof of Claim includes the assignment of rents.

Count Two seeks a declaratory judgment that the TI references an obligation of the Plaintiff that does not exist and is therefore invalid, because there is no promissory note or other evidence of debt owed by Plaintiff to PMB, and because Barnes, Inc., is not named in the TI.  Count Three seeks a declaratory judgment that the TI is invalid because there is no signed written obligation between Plaintiff and PMB to bring the alleged contract outside the statute of frauds, and there was no consideration for any contract.

PMB argues that its promise to make loans to a third party, Barnes, Inc., is sufficient consideration to support and enforce the TI against Plaintiff under legal authority, and under

14

Plaintiff's specific acknowledgment of receipt and sufficiency of "good and valuable consideration" in paragraph 2 of the TI.  Plaintiff argues that no valuable consideration existed and the TI was not acknowledged in accordance with MCA § 1-5-602 and § 70-21-203.

With respect to lack of consideration, Plaintiff argues that PMB incurred detriment prior to the date of the TI, and past consideration is not sufficient to support a promise under the pre-existing duty doctrine, citing *Access Organics, Inc. v. Hernandez*, 2008 MT 4, ¶ 21, 341 Mont. 73, 175 P.3d 899 (citing *Pub. Employee's Ass'n v. Office of Gov.*, 271 Mont. 450, 455, 898 P.2d 675, 678 (1995)(internal citation omitted)); *Carroccia v. Todd*, 189 Mont. 172, 177, 165 P. 2d 225 227 (1980).  Plaintiff contends that the TI is invalid because it does not reference a valid debt owed by Plaintiff, and Plaintiff has no debtor-creditor relationship with PMB even though the TI claims on its face that there is an obligation of $741,000 owed by B-Bar Tavern, citing *In re Maestro. Rigby v. Italian Cmty. Hall, Inc.*, 2011 Bankr. LEXIS 2059, 10-13 (B.A.P. 9th Cir. May 10, 2011).  Plaintiff argues that the only reasonable interpretation of the TI is a debt owed by B-Bar Tavern to PMB, which debt does not exist, and Barnes, Inc., is nowhere in the TI as the maker of the obligation.  PMB replies that the Plaintiff waived the lack of consideration argument in its answer when it denied that the TI are contracts.

With respect to the absence of Barnes, Inc.'s name from the TI, PMB argues that even if the TI was not executed in conformity with the Small Tract Financing Act for that absence, under § 71-1-321 the TI is still considered a mortgage rather than be invalid, citing *Brandon v. GMAC Mortg. LLC, Mountain West Bank, N.A., et al., (In re Muriel J. Simmons)*, 2012 WL 1899375 (Bkrtcy. D. Mont.), *aff'd*, *Brandon v. GMAC Mortg. LLC*, 2012 WL 5304701 (D. Mont.).  Plaintiff responds that MCA§ 71-1-321 does not permit any instrument to succeed as a

15

mortgage, but rather requires that they are considered to be a mortgage "and are subject to all laws relating to mortgages on real property."  Plaintiff argues that the TI does not contain a description of an existing debt of the Plaintiff, Plaintiff owes no debt to PMB and the TI secures a debt that does not exist so cannot be valid as a mortgage under MCA § 71-1-204 ("Form of Mortgage").  PMB replies that § 71-1-204 does not require a mortgage be made in the form suggested by the statute.

PMB cites MCA §§ 28-3-203, 28-3-301, and 28-3-402 allow for the Court to refer to the assignment of leases and rents, the personal guarantys of Plaintiff's president Richard Barnes for the loans made by PMB to Barnes, Inc., and to consider these several contracts taken together with other circumstances and give effect to mutual intention and conclude that the TI securing the debt owed by Barnes, Inc., to PMB is valid, binding and enforceable.

Plaintiff argues that paragraph of the TI provides that it is complete and fully integrated, and therefore no parol evidence should be considered, citing *Richards v. JTL Group, Inc.*, 2009 MT 173, ¶ 16 , 350 Mont. 516, 212 P. 3d 264.  PMB replies that Montana's parol evidence rule makes an exception when a mistake is put in issue by the pleadings, as in the instant case, so the Court can look at parol evidence to determine what the parties intended.

Plaintiff contends that the TI is not valid as a mortgage because it was not acknowledged within the requirements of § 1-5-602(1), and Montana's mortgage statutes are strictly construed. PMB replies that the TI is to be liberally construed under current Montana statutes since 1924. Plaintiff contends that no one is identified on the TI as signing on behalf of B-Bar Tavern, Inc., because the acknowledgment is signed in blank, nothing shows that the person appeared before the notary to acknowledge the signature and capacity to act in a representative capacity, and the

16

notarization took place the day before Richard Barnes signed the TI.  PMB replies that Plaintiff is factually wrong and Richard Barnes executed the TI on the same date of the notarization, and that Barnes' uncertain testimony is insufficient to raise a genuine issue of fact.  PMB replies that courts liberally interpret acknowledgment requirements, but PMB acknowledges a "potential non-compliance" with § 1-5-602(1) by Richard Barnes.  Reply, Dkt. 74, p. 4.

The above-quoted facts and detailed arguments of the parties persuade the Court that summary judgment is not an appropriate disposition for Counts Two and Three.  As stated above, if a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied.  *T.W. Elec. Serv.*, 809 F.2d at 630-31; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587.  The parties argue in great detail about the validity of the TI as a mortgage and under Montana's Small Tract Financing Act because of numerous alleged defects.  At this stage the moving party has a heavy burden, and this Court is not convinced that PMB satisfied its burden that there are no genuine issues of material facts with respect to Counts Two and Three.  Summary judgment therefore will be denied as to Counts Two and Three, and because of that summary judgment must be denied to the extent they affect Counts One, Five, and Seven.

Count Four is based on the statute of frauds.  Plaintiff argues that its alleged promise to answer for the debt of Barnes, Inc., is invalid under the statute of frauds unless in writing, and no writing exists.  PMB argues there are numerous writings.

The statue of frauds, MCA § 28-2-903, describes what contracts must be in writing:

(1) The following agreements are invalid unless the agreement or some
note or memorandum of the agreement is in writing and subscribed
by the party to be charged or the parties' agent:

17

. . .
     (b) A special promise to answer for the debt, default or miscarriage of another, except in the cases provided for in 28-11-105.

PMB argues that the TI is a writing in which Plaintiff granted PMB a lien on the property as security for the obligations owed by Barnes, Inc., and satisfies the statute of frauds.  In addition, PMB argues that the TI granted by Plaintiff to the Bank serves as security for the debt and "is hypothecated for the performance of an act" which is Barnes, Inc.'s repayment of the debt, and does not bind Plaintiff personally, which is reflected in the TI.

With respect to the Settlement Agreement, PMB argues that the Settlement Agreement is in writing and so satisfies the statute of frauds.  The Court finds that a genuine issue of material fact exists under Count Four whether the TI and Settlement Agreement satisfy the statute of frauds.  The Court allows that a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, so summary judgment must be denied.  *T.W. Elec. Serv.*, 809 F.2d at 630-31; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587.

Count Five seeks avoidance of PMB's lien under the trustee's "strong arm powers" under 11 U.S.C. § 544(a)(1) and (a)(3) which provide that a

trustee shall have . . . the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by –

     (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such judicial lien, whether or not such creditor exists;

        …

     (3) a bona fide purchaser of real property, other than fixtures, from the

18

> debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such purchaser exists.

11 U.S.C. § 544(a).

Section 544(a)(1) allows a trustee in bankruptcy to avoid unperfected interests in personal and real property. *In re Goettel*, 16 Mont. B.R. 27, 33 (Bankr. D. Mont. 1997). Ninth Circuit authority and a leading commentator recognize that a debtor in possession has the status of a trustee under § 544(a)(3) to avoid any transfer of property of the debtor that is voidable by a bona fide purchaser of real property. *In re AEG Acquisition Corp.*, 127 B.R. 34, 43 (Bankr. C.D. Cal. 1991), *aff'd sub nom.*, *In re AEG Acquisition Corp.*, 161 B.R. 50 (9th Cir. BAP 1993); *see also* Alan R. Resnick, Henry J. Sommer, 7 COLLIER ON BANKRUPTCY, ¶ 1107.03[4] (16th ed. 2010).

PMB describes Plaintiff's § 544(a) argument as "at best, circuitous." PMB argues that § 544(a) allows a trustee to avoid unperfected security interests, but that the evidence shows that its TI was recorded on March 31, 2009, and so is not subject to avoidance under § 544(a)(1). As to § 544(a)(3), PMB argues that Plaintiff cannot be a bona fide purchaser ("BFP") under Montana law because the recorded TI was constructive notice of its contents under MCA § 71-1-321, citing *Brandon* and *Brandt v. Esplanade of Central Mont., Inc., et al., (In re Esplanade of Central Mont., Inc.)*, 19 Mont. B.R. 162, 175 (Bankr. D. Mont. 2001).

Plaintiff contends that as trustee it can avoid PMB's lien because the TI is invalid under Montana law both as a trust indenture and as a mortgage, because of the defects discussed above. As authority Plaintiff cites *Simon v. Zaptocky (In re Zaptocky)*, 231 B.R. 260 (Bankr. M.D. Ohio 1998), *aff'd*. *Zaptocky v. Chase Manhattan Bank (In re Zaptocky)*, 250 F.3d 1020, 1024 (6th Cir. 2001), and *Richardson v. Wells Fargo Home Mortg. Inc. (In re Brandt)*, 421 B.R. 426 (Bankr.

19

W.D. Mich. 2009).  PMB replies that, even if the TI is defective, a recorded defective instrument provides constructive notice. *Washington v. Slack*, 249 Mont. 56, 813 P.2d 447 (1991); *Ash-Will Farms, L.C. v. Leachman Cattle Co., LLC,* 2006 WL 3827453 (USDC Mont. 2006), *aff'd. Ash-Will Farms, L.C. v. Leachman Cattle Co., LLC*, 322 Fed.Appx. 505, 2009 WL 965905 (9th Cir.).

PMB also contends that Plaintiff waived all objections to the enforceability of the TI in the Settlement Agreement reached at the December 23, 2010 settlement conference in which the parties agreed that the TI and loan documents are valid, binding and enforceable except as modified by the Settlement Agreement.  PMB argues that Plaintiff is bound by the Settlement Agreement under Montana law explained in *Hetherington v. Ford Motor Co.*, 257 Mont. 395, 399, 849 P.2d 1039, 1042 (1993), so long as the party does not manifest a simultaneous intent not to be so bound.  PMB argues that Plaintiff attended a full day settlement conference with counsel and signed a written Settlement Agreement, that no evidence exists that Plaintiff did not intent to be bound by the Settlement Agreement, and Plaintiff received the benefit that it bargained for in the form of PMB's performance under the settlement.

Plaintiff argues that the Settlement Agreement fails for failure of consideration because the TI did not require regular monthly payments, and the debt referenced in the TI was not due until March 24, 2012, long before the date of the Settlement Agreement and thus PMB's forbearance from foreclosure cannot be valid consideration for Plaintiff's waiver of all future claims.  PMB replies that the promissory note by Barnes, Inc., secured by the TI required monthly payments and was in default by May 2010, so consideration existed.

PMB argues that Plaintiff cannot be granted relief on the grounds it was the victim of

20

fraud because it did not plead fraud with particularity in its complaint or answer to PMB's counterclaim as required in Fed. R. Civ. P. 9.  Rule 8(c)(1), Fed. R. Civ. P. ("Affirmative Defenses"), applicable in adversary proceedings under F.R.B.P. 7008, requires that in responding to a pleading, a party must affirmative state any affirmative defense, including "fraud."  Rule 9(b) (F.R.B.P. 7009) requires that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Plaintiff does not assert or argue fraud in its opposition to summary judgment.

Plaintiff argues that the Settlement Agreement is not binding due to failure of consideration and economic duress of the Plaintiff and Plaintiff's principal.  Plaintiff claims economic duress because the contract was made under circumstances evincing a lack of free will, including PMB's removal of collateral from Barnes, Inc., which could have protected Plaintiff in the event of default, PMB's failure to inform Richard Barnes that the fundamental transaction made in 2008 had changed, and the extreme threat by PMB to close B-Bar Tavern, even before beginning foreclosure proceedings against Barnes, Inc.  PMB replies that Barnes, Inc., had filed foreclosure by that time and Plaintiff was the only entity from which PMB could seek payment.

Plaintiff cites a Pennsylvania case, *Litten v. Jonathan Logan, Inc.*, as support against a grant of summary judgment on the basis of inextricable financial crisis.  *Stanley v. Holms*, 1999 MT 41, ¶40, 293 Mont. 343, 975 P. 2d 1242 (discussing *Litten*).  Plaintiff argues that Richard Barnes' will was overcome by the inextricable financial crisis PMB placed him in, and his only option to avoid bankruptcy was to sign the Settlement Agreement.

With respect to Plaintiff's claim of duress, PMB argues that it fails because Plaintiff knew of the complained of conduct by June or July of 2009, had the opportunity for investigation

and consultation with counsel, but nevertheless entered into the Settlement Agreement 18 months later.  PMB's ability to enforce its legal rights by lawful means to attempt collection cannot, PMB argues, be the basis for a claim of duress, citing *Fronk v. Collins*, 2011 MT 315, ¶ 15, 363 Mont. 110, 266 P.3d 1271.

In its reply PMB argues that Plaintiff never disclosed in discovery that Richard Barnes was under duress due to lack of food and medication, and he had sufficient time after the settlement conference to eat and take medication.  PMB argues that Plaintiff waived the economic duress affirmative defense by not pleading it in its answer, that economic duress is a different defense than general duress, and that Plaintiff's financial difficulties are its own creation, not caused by PMB which fully performed all terms of every agreement it made with Plaintiff.

PMB contends that Plaintiff's mistake defense fails in two aspects.  First, because Richard Barnes' deposition testimony shows that Plaintiff was not ignorant of the facts on which it bases its mistake defense at the time Plaintiff executed the Settlement Agreement; and second, because Plaintiff acknowledged in the Settlement Agreement, while represented by counsel, that the TI is valid, binding and enforceable, and Plaintiff released all claims "known or unknown" through the date of the Settlement Agreement, thereby waiving any claim that the TI is invalid.

PMB contends that it would be inequitable to allow Plaintiff to enjoy the full benefit of PMB's performance under the Settlement Agreement but avoid the Agreement under a theory of "unclean hands" when Plaintiff's performance was due, especially when Richard Barnes testified that he was aware of all the facts supporting all of Plaintiff's defenses to the Settlement Agreement when Plaintiff executed the Settlement Agreement.  PMB contends that no evidence

22

exists to support a claim of unconscionability because PMB did not draft the Settlement

Agreement, and the Plaintiff was free to choose to walk out of the settlement conference at any

time, so Plaintiff had a meaningful choice whether to accept the settlement.  *Summers v.*

*Crestview Apartments*, 2010 MT 164, ¶ 22, 357 Mont. 123, 236 P.3d 586.

    With respect to Plaintiff's "failure of consideration" defense to the Settlement

Agreement, PMB cites *Nimmick v. Hart*, 248 Mont. 1, 8, 808 P.2d 481, 486 (1991) for the

proposition that failure of consideration does not exist if a party receives actual consideration.

PMB argues that it performed under the Settlement Agreement by allowing a 9 month period

during which no payments would be owed to it and PMB would not take any legal action, and

Plaintiff received the full bargained for consideration.

    Having considered the arguments, as above the Court concludes that PMB failed to

satisfy its heavy burden under Count Five that no genuine issues of material fact exist.  The Court

allows that a rational trier of fact might resolve the disputes raised by the parties in Count Five in

favor of the nonmoving party, so summary judgment must be denied.  *T.W. Elec. Serv.*, 809 F.2d

at 630-31; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587.

    PMB seeks attorney fees and costs under the terms of the TI and Montana's Uniform

Declaratory Judgment Act.  So does Plaintiff.  At this time in this adversary proceeding, no clear

prevailing party can be determined, and therefore awarding of costs and attorneys' fees is

premature.

    In summary, the Court finds and concludes that genuine issues of material fact remain.

PMB's motion for summary judgment will be denied.

    **IT IS ORDERED** a separate Order shall be entered denying PMB's motion for summary

judgment.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana