## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| In re | |
| **B-BAR TAVERN INC**, | Case No.  **12-60228-11** |
| Debtor. | |
| **B-BAR TAVERN INC**, | |
| Plaintiff. | |
| -vs- | |
| **PRAIRIE MOUNTAIN BANK**, | Adv No.  **12-00043** |
| Defendant. | |

## MEMORANDUM OF DECISION

At Butte in said District this 18th day of December, 2013.

In this adversary proceeding Plaintiff/Debtor B-Bar Tavern Inc. ("B-Bar Tavern") objects to Proof of Claim No. 1 filed by creditor Prairie Mountain Bank ("PMB") and seeks to invalidate the Trust Indenture ("TI") securing PMB's debt and avoid PMB's lien on Plaintiff's property, and also seeks attorney fees.  PMB answers that it honored all agreements with B-Bar Tavern, and PMB requests reformation of the TI based on mutual mistake, plus enforcement of the TI against its security which Plaintiff pledged under the TI and a Settlement Agreement.  After trial of this cause and review of the record, the parties' briefs, and applicable law, for the reasons set forth below judgment shall be entered:  (1) disallowing PMB's Proof of Claim No. 1 but otherwise dismissing Plaintiff's claims for relief, and (2) reforming the TI to correct mutual material mistakes on the TI, Exhibit 35.  Each party shall be responsible for its own attorneys'

fees and costs.

Plaintiff was represented at the trial by attorney James A. Patten ("Patten") of Billings and Benjamin C. Tiller of Great Falls.  PMB was represented by attorneys James Anthony Donahue ("Donahue"), Gregory J. Hatley ("Hatley") and John P. Paul ("Paul") of Great Falls. The following persons testified:  Steven Potts ("Potts"), Laura Vukasin ("Vukasin"), Kimberly Hannah ("Hannah"), Jack Barnes ("Jack"), Richard Barnes ("Dick"), Michael Richards,[1] Heather Robbins ("Robbins"), and accountant Jim Koontz ("Koontz").  Plaintiff's Exhibits ("Ex.") 1 – through – 49 were admitted into evidence without objection, as were Ex. 51, 52, and PMB's Ex. A – through – Z, AA, BB, CC, DD, and EE.  Ex. 50 and 53 were admitted over PMB's objection. The Court took judicial notice of certain adjudicative facts enumerated in the Court's Order entered on July 30, 2013 (Document No. 93).[2]

At the conclusion of the parties' cases-in-chief the Court granted the parties time to file post-trial briefs, which have been submitted and reviewed by the Court along with the record and applicable law.  This matter is ready for decision.

This Court has jurisdiction of the above-captioned Chapter 11 case and Debtor's Objection to PMB's Proof of Claim under 28 U.S.C. § 1334(a).  Debtor's Objection to PMB's claim and request to avoid PMB's lien are core proceedings under 28 U.S.C. § 157(b)(2)(B) and

---

[1]The Court sustained PMB's objection and refused to allow Richards to give opinion testimony about whether PMB complied with accepted banking standards and practice for disclosing risks to guarantors.  Transcript ("Tr."), page 403.  The Court allowed Plaintiff's attorney to make an offer of proof that PMB did not comply with the standard and practice for disclosing risks to Dick Barnes.  Tr., pp. 402-03, 405.

[2]Those matters included stipulations, plans, and orders approving stipulations and confirming plans entered in Case Nos. 10-61620, 10-61622, and 10-61483.

(K).  This Memorandum of Decision includes the Court's findings of fact and conclusions of law

pursuant to F.R.B.P. 7052 (applying Fed. R. Civ. P. 52) in adversary proceedings.

## PROCEDURAL HISTORY

Plaintiff B-Bar Tavern commenced this Chapter 11 case by filing a petition on February

27, 2012, signed by Richard Barnes, president.  The petition states that Debtor is a small business

debtor as defined at 11 U.S.C. § 101(51D).  Debtor listed real property located at 616 10th

Avenue South in Great Fall, Montana, described as its principal place of business on Schedule A

with a current market value of $1,885,750.00, securing a claim in the amount of $823,681.41.

Schedule D lists PMB as a creditor holding a contingent, unliquidated, disputed claim in the

amount of $823,681.41 secured by Debtor's place of business.  No priority claims are scheduled,

and Schedule F lists a total of $0 in unsecured nonpriority claims.

PMB filed the only Proof of Claim in this case, Claim No. 1, on June 12, 2012, asserting

a secured claim in the amount of $820,923.27, plus interest, fees, costs and expenses based on

the TI.  Claim 1 values the real estate security at $1,410,150.00.  The amount of arrearage is

stated in the amount of $156,791.00.  On September 7, 2012, Debtor filed its Disclosure

Statement and Plan of Reorganization.  The Court approved the Disclosure Statement after a

hearing held on October 22, 2012.

Debtor filed its complaint initiating this adversary proceeding on August 22, 2012,

objecting to PMB's Proof of Claim, seeking a declaratory judgment that PMB's lien is invalid

and seeking to avoid PMB's lien under § 544(a), and requesting costs and attorneys' fees.

PMB filed its answer on September 20, 2012, including a counterclaim asking the Court to revise

or reform the TI under MONT. CODE ANN. ("MCA") § 28-2-1611 and other Montana statutes to

3

correct a mutual mistake of the parties and include the name of Barnes, Inc., on the TI.  Plaintiff

filed a motion to amend its complaint and join attorney Steven T. Potts as a party, but that motion

was denied.  Trial was originally scheduled to commence in April 2013, but was continued until

trial commenced on August 5, 2013.

## FACTS

A brief summary of the facts is helpful in dealing with this complicated record.  Plaintiff

is owned by Dick Barnes who is Jack's brother.  At Jack's request Dick agreed to sign a personal

guaranty of a loan from PMB to Jack's company Barnes, Inc., and Dick agreed to pledge his

company/Plaintiff's place of business as security for the loan.  During the pendency of the loan

Jack restructured his companies by transferring Barnes, Inc.'s properties to two new limited

liability companies ("LLC's").  Barnes, Inc., defaulted on the loan, and PMB sought to enforce

its rights against the security pledged by Plaintiff under the TI, Ex. 35.

The approved Pretrial Order sets forth the following agreed facts:

The following material facts are not in dispute:

> 1 . Plaintiff owns real property situated at 616 - 10th Ave, South, Great
> Falls, MT.

> 2. Richard ["Dick"] Barnes is the President and sole owner of the B-Bar
> Tavern Inc. stock.

> 3.  Richard Barnes' brother is Jack Barnes.

> 4. Jack Barnes was the President and sole shareholder of Barnes, Inc.  In
> 2009, he became the President and sole member of two new entities, Prospector
> Land Company LLC and Prospector Catering Company LLC.

> 5. In 2007 a bar and restaurant owned by Barnes, Inc. named Prospector I
> was destroyed by fire.

4

6. In January, 2008, Barnes, Inc. borrowed, through a line of credit, $500,000 from Prairie Mountain Bank secured by the Barnes, Inc., real property on Smelter Ave.

7. In June, 2008, Barnes, Inc. entered into a construction loan agreement with Prairie Mountain Bank for the reconstruction of the bar, restaurant, and casino on its property on Smelter Avenue and secured the loan with a trust indenture on the Barnes, Inc., property on Smelter Avenue in Great Falls, Montana, and the Barnes Inc. real property on Third Ave. N.W., Great Falls, Montana [the "J-Bar T"].

8. In October, 2008, Barnes, Inc., borrowed $850,000 from Prairie Mountain Bank to complete the construction of the bar, restaurant, and casino on Smelter Ave. Jack Barnes and Richard Barnes guaranteed the $850,000 loan. B-Bar Tavern Inc, executed, as grantor, a Deed of Trust with Prairie Mountain Bank as beneficiary, for $850,000. At that time, Barnes Inc. still owned the real property on Smelter Ave.

9. As of December 31, 2008, Barnes Inc. had three loans outstanding with Prairie Mountain Bank in the principal amounts of $500,000, $1,800,000, and $850,000.

10. Great Falls attorney Steven Potts had represented Jack Barnes and Barnes, Inc., prior to April 1,2009. Attorney Potts represented Richard Barnes and B-Bar Tavern prior to April 1, 2009. Attorney Potts was a shareholder of Prairie Mountain Bank and represented Prairie Mountain Bank prior to April 1, 2009.

Additional facts are established by the testimony and exhibits.

Potts has been an attorney for 27 years, and practiced in Great Falls and briefly in New York. He testified that most of his legal work relates to economic matters such as contracts, business transactions, and estates. Potts was the registered agent for B-Bar Tavern until he resigned in 2012, and also was the registered agent for other Barnes family entities. Tr., p. 76. Dick testified that Potts represented B-Bar Tavern in a regulatory investigation by the State of Montana involving an alleged loan from Dick to another family corporation. Tr., pp. 308, 309. Potts also represented Dick in B-Bar Tavern's bar business for the last 15 years. Tr., pp. 308,

5

309.

Jack testified that Potts had been Jack's attorney, Barnes, Inc.'s attorney and attorney for every member of his family and their businesses for quite a few years.  Tr., pp. 272-73.  Potts testified that he did not obtain written conflict of interest waivers from Dick, Jack, B-Bar Tavern, Barnes, Inc., or PMB, even though they all were his clients.  Tr., pp. 93, 94.  Dick testified that he did not know that Potts was a lawyer for PMB and a shareholder of PMB when Dick signed the loan documents for his brother Jack in 2008 and 2009.  Tr., p. 311.

PMB's president Vukasin testified that Potts provided PMB with legal services in 2008 and earlier, and she knew Potts had a relationship with the Barnes family but did not know that Potts was counsel for the Barnes family.  Tr., pp. 124, 125.

Potts also represented Silver City Corporation, the principals of which were the spouses of Dick and Jack, Nancy Barnes and Colette Barnes, respectively.  Potts testified that Silver City Corporation owned the liquor license which was operated in the Prospector I on Smelter Avenue owned and operated by Barnes, Inc.  Jack disagreed, and testified that Barnes, Inc., owned the liquor license at the Prospector I.  Tr., p. 298.  Jack testified that he, Dick, and other family members worked with their parents in a family-held bar business, the Red Barn, until Jack acquired his parents' interests.  The Red Barn became the Prospector I.  Tr., pp. 257-259, 303.

B-Bar Tavern operates on 10th Avenue South in Great Falls under the name "Prospector II."  Dick worked for his father at the 8 Ball Inn until Dick took over his father's corporations which owned the 8 Ball Inn and Prospector II.  Tr., pp. 303, 304.  Dick obtained B-Bar Tavern in a stock trade with his father in 1992 or 1993.  Tr., p. 305.  Dick took over B-Bar Tavern with an SBA loan owing on it, but paid that loan off in 2004.  Tr., pp. 306, 307.  He had one other bank

loan which he paid off in 2001.  Tr., p. 307.  Otherwise B-Bar Tavern had no outstanding bank debt or other debt.  Tr., p. 308.  When PMB opened, PMB's president was a friend of Dick's, so he opened bank accounts at PMB, which is located 200 feet from the business location of B-Bar Tavern.  Tr., p. 308.  Dick has had cancer and has high blood pressure and takes medications. Tr., p. 306.

On July 4, 2007, before the fire at Prospector I, Potts had conversations with Dick and Jack about purchasing the J-Bar T together in some kind of entity,[3] and Dick wanted to take a second mortgage against the J-Bar T after the bank.  Tr., p. 95.  That transaction, Ex. 41, with financing to be through PMB, never happened.[4]  Tr., p. 169.  Instead, Jack bought the J-Bar T through Barnes, Inc.  Tr., p. 290.

The Prospector I was insured, and Barnes, Inc., received $1.5 million in insurance proceeds for the fire loss.  Tr., p. 260.  Jack testified that he used the insurance proceeds to pay off the balance from Barnes, Inc.'s purchase of the J-Bar T a few months after the fire, and to pay off a loan secured by his liquor license. Tr., pp. 261, 290.

### Barnes, Inc.'s 2008 Loan

Vukasin has been employed by PMB since 2002, and has been PMB's president and CEO since 2004.  PMB has up to 25 employees and five departments, including a lending department. A senior credit officer/executive vice president is in charge of the lending department, but Vukasin was in charge of the lending department in the fall of 2008.  Tr., p. 107.  A "lender" at

---

[3]Dick testified that Barnes Enterprises, the entity named as Buyer on Ex. 41, was never created.  Tr., p. 312.

[4]Jack originally wanted a different entity to own the J-Bar T so that he could use the Silver City casino license.  Tr., pp. 290-91.

PMB is the person whose function is to look at loan documents after they are generated for accuracy, although the senior credit officer also may review loan documents.  Tr., pp. 106, 107. Kimberly Hannah ("Hannah") was one of PMB's commercial lenders/loan officers in the fall of 2008, and Heather Robbins ("Robbins") was a loan processor and notary for PMB in the fall of 2008.  Tr., p. 106.  Vukasin testified that Jack came in to PMB after the fire happened and asked for a line of credit ("LOC"), because he had no income.  Tr., p. 170.

Ex. 1 and 2 are loan documents evidencing a $500,000 revolving LOC for Barnes, Inc., dated January of 2008, both signed by Hannah as the lender for PMB.  Tr., pp. 107-09.  Ex. 1 matured in January 2009.  Tr., p. 145.  Ex. 3 is a security agreement signed by Jack for Barnes, Inc., pledging the Prospector I on Smelter Avenue as security for the line of credit.  Tr., pp. 109, 170.  Ex. 6 is a trust indenture pledging the Prospector I as security for the line of credit, signed by Jack.  Tr., p. 111.  Jack testified that the security for the LOC at that time was just land because there was no building left standing at the Prospector I location on Smelter Ave.  Tr., p. 263.  The purpose of the $500,000 LOC was for site work at the Prospector on Smelter to finish demolition, prepare for rebuilding, plus some income for Jack's living expenses.  Tr., p. 263.

During this time period, Vukasin testified that she did not think Jack's purchase of the J-Bar T was finalized yet, and PMB took the Prospector I as security because there was no lien against it and Jack had plans to rebuild the Prospector I.  Tr., pp. 170, 171.  Ex. 4 is Jack's personal guarantee for the LOC.  Tr., p. 109-10.  Jack testified that Dick did not provide a personal guarantee or offer the B-Bar Tavern property as collateral for the original $500,000 loan in 2008.  Tr., p. 272.

Ex. 7 is a promissory note in the amount of $1.8 million described as the "construction

8

loan" to Barnes, Inc., for reconstruction of the Prospector I after the fire, dated June 24, 2008
Tr., pp. 111, 264.  Vukasin testified that the $1.8 million was based upon Jack's consultations
with his architect and contractor on what it would take to construct a new Prospector I on Smelter
Avenue, and PMB relied on Jack's bid.  Tr., pp. 171, 172.  The construction loan matured in
February 2009.  Tr., p. 145.  Ex. 7 is stamped paid on March 25, 2009.  Tr., p. 111.

Ex. 9 is a LOC agreement for the $1.8 million construction loan to Barnes, Inc., and Ex.
10 is the security agreement.  Tr., pp. 113-14.  Ex. 13 is a trust indenture for the Prospector I on
Smelter Avenue as security for the construction loan, and Ex. 14 is a trust indenture pledging the
J-Bar T as collateral for the construction loan.  Ex. 15 is an assignment of leases and rents signed
by Jack for Barnes, Inc., as is Ex. 16.  Tr., p. 114.  Jack testified that the collateral for the
construction loan was the Prospector I land and future building, plus the J-Bar T.  Tr., p. 265.

Vukasin testified that the total owed by Barnes, Inc., for the January 2008 LOC and $1.8
million construction loan was $2.3 million.  Tr., p. 114.  Hannah remained the PMB loan officer
for the construction loan.  Tr., p. 116.  Vukasin testified that Hannah told her that Hannah had
asked Jack for a lien on the all beverage liquor license as collateral for the construction loan, but
did not get such a lien as Jack refused, and the loan closed secured by real property.  Tr., pp. 120,
121, 122.

Ex. A is a commercial loan application, dated 10-02-2008 and signed by Jack for Barnes,
Inc., on 10-8-08, requesting a $850,000 loan.  Tr., p. 238.  At the bottom of page 1 of Ex. A
under "Sources of Repayment" is included "Liquor License."[5]  Hannah distinguished repayment

---

[5]Hannah clarified that the liquor license referred to in Ex. A was B-Bar Tavern's liquor
license.  Tr., p. 238.

9

sources from what PMB had as collateral, explaining that the repayment sources just state how a borrower has the ability to repay the loan. Tr., p. 242. Vukasin testified that Hannah prepared Ex. A assuming that the liquor license would be part of the security, but Jack informed her that the liquor license could not be collateral[6]. Tr., pp. 135, 172, 173, 233, 238, 240. Ex. B is a loan application summary for the same loan.

Construction of the new Prospector I building was delayed by a wet spring, and as construction was nearing completion Jack testified that the architect "handed me a bunch of bills in one whack" which went way over the loan amount. Tr., p. 265. Jack testified that he told Vukasin and Hannah that a problem existed. Tr., p. 266. On cross examination Jack answered "No" when asked if he claims that PMB was at fault for any of the cost overruns. Tr., pp. 282-83.

Vukasin testified that Jack phoned her in September or October of 2008 and told her that not enough money remained in the $1.8 million construction loan to complete the Prospector I building. Tr., pp. 116-17, 175. Jack testified that he told Vukasin and Hannah when they were inspecting the building site. Tr., pp. 266, 267. Vukasin testified that Jack asked for an additional loan to Barnes, Inc., to compete the building. Tr., pp. 117, 118, 175. Jack did not submit a formal loan application, but informed PMB how much he needed. Tr., pp. 118, 175.

At first Jack told PMB that he needed around $500,000 more, but the bills from the architect added up to approximately $800,000. Tr., p. 267. Vukasin testified that PMB was shocked and frustrated when Jack told them he needed another $850,000 to complete

---

[6]Jack testified that he assumed that liquor licenses were always included in collateral every time he borrowed from a bank, but he learned later that the licenses could not be included. Tr., p. 284.

10

construction.  Tr., pp. 176, 177.   PMB ultimately agreed to lend Barnes, Inc., another $850,000 to complete construction.  Tr., pp. 119, 283.

Ex. 17 is the note signed by Jack for Barnes, Inc., for the $850,000, dated 10-8-2008 with a maturity date of 10-08-2011, and is stamped "PAID" as of 3/25/09.  Tr., p. 119, 271.  Hannah testified that the closing of the $850,000 loan took place at PMB, and Jack, Dick and the notary were at the closing.  Tr., p. 206.  Jack testified that he did not talk with Potts about the original LOC, construction loan, or the additional $850,000 loan from PMB to finish construction, before he entered into those transactions.  Tr., pp. 273, 274.

Vukasin testified that she did not suggest to Jack that Dick provide collateral for the $850,000 in additional funds, but she did inform Jack that he would need to provide PMB with significant additional collateral in order for PMB to lend additional funds to complete construction.  Tr., pp. 119, 120, 177, 267, 268, 283, 413.  She explained that PMB was not comfortable with the amount of its security at that time to cover an additional $850,000.  Tr., p. 413.  Jack disagreed about Dick, and Jack testified that Vukasin asked him if Dick would be willing to put up his Prospector II property as additional collateral.  Tr., pp. 268, 284.  Vukasin testified that the Barnes family suggested offering Dick's property as collateral.  Tr., p. 180.

PMB's collateral at that time was the land on Smelter Avenue and the J-Bar T.  Tr., pp. 172, 284.  Vukasin testified that Jack could not use any supposed equity as additional collateral because the Prospector I building was not completed so was not worth close to the appraised value.  Tr., p. 177.  The fixtures, inventory, and Jack's equity in his home were not nearly enough to secure another $850,000.  Tr., p. 180.

Jack testified that he asked Dick for additional collateral at PMB's request.  Tr., pp. 284,

11

285.  Dick testified that nobody from PMB ever came and asked Dick for security.  Tr., p. 335.

Dick testified that Jack approached him and told him that Jack was going to fall short, and PMB

was not going to allow Jack to open the Prospector I if Jack could not get additional collateral.

Tr., p. 314.  Dick testified that he was quite surprised that Jack was short because Jack had the

insurance proceeds from the fire.  Tr., p. 315.  Dick testified that he had a disagreement with Jack

about the expansiveness of Jack's building plans for rebuilding Prospector I, and Dick doubted

that Jack could make it.  Tr., pp. 314, 315, 343.  Jack asked Dick to guarantee an additional loan

from PMB, and to use Dick's B-Bar Tavern building as additional security for the October 2008

loan.  Tr., pp. 313, 315, 334-35.

　　　　Vukasin testified that Jack told her that he had spoken with his brother, and Dick was

willing to put up his building as additional collateral for the $850,000 needed to complete

construction.  Tr., pp. 119, 120, 178.  Vukasin testified that it was not unusual for PMB to use

another person's collateral as security for a loan to a different entity, and PMB handled this

transaction no differently than in past transactions.  Tr., p. 178.  Vukasin testified that Dick's

personal guarantee was PMB's additional collateral, in addition to Plaintiff's building.  Tr., p.

413.

　　　　Jack testified that he spoke with Dick twice about providing additional collateral to

complete construction.  Tr., p. 269.  He testified that Dick was a little upset that Jack was not

able to provide additional collateral on his own.  Tr., p. 285.  Jack testified that Dick did not ask

him about whether the other family liquor licenses had already been pledged as collateral.  Tr., p.

286.

　　　　Dick did not immediately agree to help Jack.  Tr., p. 315.  Dick testified that he was not

12

happy about it and told Jack that he was going to have to talk to his wife Nancy and get back to him. Tr., pp. 269, 315. Dick testified that he talked with Potts about whether it was a good idea to help Jack. Tr., p. 315. Potts testified that Dick telephoned him in October 2008, and told him that Dick was going to guarantee PMB's loan to Barnes, Inc. Potts testified that Dick asked him whether he had to file non-institutional loan paperwork with the State of Montana, and Potts advised him no. Tr., pp. 25-26.[7].

PMB asked Dick for financial information about B-Bar Tavern and Dick personally to make sure Dick had the capacity to make the payments, and Dick provided it. Tr., pp. 181, 349, 350. Dick testified that he asked Vukasin how Jack had fallen short, and whether she was sure Jack had no more collateral, and she told Dick that Jack did not. Tr., pp. 317, 335. Jack testified that Dick told him at their second conversation that Dick would put up additional collateral to complete construction. Tr., p. 269. Jack agreed that Dick's agreement to provide additional collateral for the loan benefitted Jack. Tr., p. 285.

Dick testified that he guaranteed repayment of Barnes, Inc.'s loans from PMB in October 2008, and March 2009, and that he signed TI's in both instances. Tr., pp. 310-311. Dick testified that Potts was his attorney and B-Bar Tavern's attorney when Dick signed those loan documents. Tr., p. 311.

---

[7]Potts testified that Dick was asking because of earlier proceedings involving non-institutional loans allegedly from Silver City Corporation, which was settled in July 2008. Potts testified that a guarantee of a bank loan is not considered by the State a non-institutional loan. If the guarantor later makes payment, then the department considers it a non-institutional loan and requires the debtor first get permission. Tr., pp. 26-27. Dick testified that he was concerned about whether signing a guarantee of a loan to Barnes, Inc., would create another problem with the State. Tr., pp. 315, 316. Potts advised Dick that it was not illegal as long as he did not have to repay the loan, and in that event he would have to seek the State's permission. Tr., pp. 316, 317, 348, 349.

Ex. 20 is Dick's personal guaranty of the Barnes, Inc., $850,000 loan dated October 8, 2008. Tr., pp. 77, 123, 136. Ex. 20 provides that Dick guarantees payment of the loan "and any extensions, renewals or replacements thereof." Dick remembered executing Ex. 20 at PMB in the presence of Vukasin and Hannah. Tr., p. 319.

Vukasin answered "No" and "Absolutely not" when asked if she ever told Dick that he would never have to pay on his personal guarantee. Tr., pp. 183, 407. Dick testified otherwise. He testified that Vukasin told him a few days before he signed his guaranty: "Dick, you'll never have to pay[;]" but he testified that she never explained why. Tr., pp. 318, 319, 320. Vukasin testified that nothing in writing exists from PMB informing Dick that he would not have to pay on his guaranty, or that PMB would not foreclose on the B-Bar Tavern property. Tr., p. 410.

### "Dutch Uncle" Talk – October 2008

Vukasin testified that PMB has a policy and practice of advising a guarantor about the obligations and burdens of signing a guaranty, known as a "Dutch Uncle talk," and that both Vukasin and Hannah followed that policy when Dick signed the guaranty and trust indenture on October 8, 2008. Tr., pp. 137, 138. Vukasin testified:

> I told Dick, "You put your collateral, whatever it is, up as collateral for someone else's loan, you just have to understand what your responsibilities are. If anything starts to go south -- if right after, if they don't make their payments, you, as a personal guarantor, you're the first phone call that I make if they don't make payments. If worse comes to worse and everything falls apart, if we have to start a foreclosure action, you could lose your business that you've worked your whole life for."

Tr., p. 179.

In PMB's case-in-chief Vukasin elaborated that she told Dick before he executed the loan

14

documents in October 2008, and in March 2009:[8]

> We explained in detail the risks that were associated with putting up collateral or personally guaranteeing any debt for anyone other than yourself, especially when you have no day-to-day management, no decision-making ability.  Went into great detail to explain what the risks were that were associated with putting up collateral and/or personally guaranteeing the loan.

Tr., p. 408.

Vukasin testified that Dick told her he was not happy about it, but that "I'll always help my brother."  Tr., pp. 179, 180.

Hannah testified that she spoke with Dick in October 2008 about the risks:

> I told him that if for any reason the primary borrower defaults on the loan, it's going to affect his credit rating, we will have to come after him for the repayment. And if he's not able to do that with him pledging his collateral also, along with guaranteeing it, we could foreclose on his property.

Tr., pp. 215-16.

Dick admitted that Vukasin and Hannah explained to him the consequences of signing the guaranty.  He testified that they said, "[t]hat if Jack failed in, in making the, the payoff of the, of these loans, that I would be called upon."  Tr., pp. 319, 320.  Dick continued:  "A few days earlier, she had said I would never have to pay.  The day of the signing, Kimberly Hannah took me through what could happen, and – (inaudible, static in microphone) – Laura expanded on it."  Tr., p. 320.  Dick testified that Hannah's testimony about what she told Dick when he executed Ex. 20 "was probably comparable" with his recollection of what she said to him, "although, I don't know if it all soaked in."  Tr., p. 320, lines 15-16.  On cross examination by PMB's counsel

---

[8]Plaintiff's counsel impeached Vukasin when she was confronted with her testimony the day before when she testified that she did not go into detail in March 2009 and only learned about it later from Hannah.  Tr., p. 408.

Dick answered "Yes" when asked whether Vukasin or Hannah explained to him that he was providing a personal guarantee and that if Barnes, Inc., failed to pay the loan PMB would come looking to Dick for payment.  Tr., p. 334.

Ex. 21 is the trust indenture signed by Dick as B-Bar Tavern's "Pres" dated 10/8/08, to secure the Barnes, Inc., $850,000 loan.  Tr., pp. 77, 123**.**  Dick testified that he signed and initialed Ex. 21 as president of B-Bar Tavern.  Tr., pp. 331, 332.  Dick testified that Ex. 21 says that the B-Bar Tavern property would be used to guarantee his brother's $850,000 loan.  Tr., p. 320.  However, Dick testified, "I didn't understand that I would be the one that they would come after first."  Tr., p. 332, 342.  Dick still thought that Jack had a lot of equity over and above his loans from PMB.  Tr., p. 343.  But under cross examination Dick admitted that he understood that he would have to repay the loan if Barnes, Inc., did not pay it.  Tr., p. 347.

Vukasin testified that Hannah was present when Dick signed Ex. 21 in Hannah's office, as was Jack, and Vukasin was in and out of the office.  Tr., pp. 123, 124, 136-137, 183.  Hannah also testified that she was present when Dick executed all the loan documents, and that Dick in fact did sign all the documents.  Tr., pp. 221, 222.  Dick testified that when he signed Ex. 21 the construction at the Prospector I was not complete.  Tr., p. 321.

Vukasin testified that Ex. D is a corporate authorization resolution which PMB required in conjunction with the TI signed by Dick in October 2008.  Tr., p. 194.  Ex. D is dated 10-8-2008 and signed by Dick as B-Bar Tavern's president, and by secretary/treasurer Ryan Stoll.  Vukasin testified that Dick came in to PMB and signed Ex. D.  Tr., p. 194.  Vukasin testified that PMB's purpose in requiring a corporate resolution is to show that all officers of a corporation agree which officers are authorized to sign on behalf of the corporation and what powers they

16

have.  Tr., p. 195.  The powers listed in Ex. D include "(4) Borrow money on behalf and in the

name of the Corporation, sign, execute and deliver promissory notes or other evidences of

indebtedness" and "(5) Endorse, assign, transfer, mortgage or pledge . . . real estate or other

property now owned or acquired by the Corporation as security for sums borrowed . . . ."  Ex. D.

Ex. 22 is an assignment of leases and rents signed by Dick as president of B-Bar Tavern

for the $850,000 completion loan, dated 10-08-2008.  Tr., p. 333.  Vukasin testified that B-Bar

Tavern was not renting or leasing its property when Dick signed Ex. 22, but that Ex. 22 is a

standard document PMB requires in case the borrower rented or leased its property out.  Tr., p.

185.  Ex. 22 is notarized by Lori Ann Heinen, another PMB loan processor.  Tr., p. 126.  Vukasin

testified that if a lender is busy, loan documents can be prepared by a commercial lender or the

president/CEO.  Tr., pp. 126-127.

Vukasin testified that Potts was not present when Dick signed Ex. 21.  Tr., p. 124.  Potts

testified that Dick called him after he signed Ex. 20 and 21.  Tr., p. 78.  Potts testified that he did

not review any of the loan documents from PMB to any of the Barnes entities.  Tr., pp. 81-82.

With the additional funds Jack was able to complete construction of the Prospector I.  Tr., p. 286.

**PMB's Loan Limit Issue.**

PMB had another participant in the Barnes, Inc., construction loan which was Teton Bank

f/k/a First National Bank of Fairfield.  Tr., pp. 33, 101.  Vukasin testified that the $1.8 million

construction loan to Barnes, Inc., exceeded PMB's lending limits, so she had talked to First

National Bank about participating.  Tr., p. 173.  She testified that the Fairfield bank had up to a

million dollars of the $1.8 million construction loan to Barnes, Inc.  Tr., p. 101.

Ex. 8 is the participation agreement on the construction loan signed by PMB and First

17

National Bank of Fairfield, dated 8/24/2008 and stamped paid on 3/25/09.  Tr., p. 111.  Ex. 8 provides that the participating lender will advance additional principal when the outstanding balance exceeds $1 million, but the participant's advances will not exceed an additional $800,000.  Tr., p. 112.

Potts testified that the participating lender did not want to participate in a "term-out" or "takeout" loan to replace the Barnes, Inc., construction loan.  Tr., pp. 34, 80.  Vukasin agreed. Tr., p. 113.  This created what Potts called a "loan limit issue" for PMB.  Tr., p. 34.  Potts explained that a state statute exists that says that a bank can only make loans of a certain percentage of its capital to a single borrower.  Tr., p. 29.  Potts testified that the Barnes, Inc., debt to PMB in 2008 exceeded PMB's loan limit.  Tr., p. 30.

Potts testified that Vukasin told him about the loan limit issue sometime before February 25, 2009, and that the Barnes, Inc., construction loan had to be termed out after construction on the Prospector I building was completed in late 2008.  Tr., pp. 32, 33, 38, 46-47.  Potts answered "No" when asked if Vukasin presented the loan limit issue to him and asked him for a solution. Tr., p. 80.  Vukasin agreed that PMB did not retain Potts for advice on loan limits on any of the Barnes, Inc., loans.  Tr., p. 414.  Potts testified that he thinks Koontz came up with the debt numbers and got authorization from Jack for the loan amounts because Jack signed the loan documents.  Tr., pp. 72, 83.

On page 16 of Ex. 43 are Potts' billing entries from December 13, 2008 through January 28, 2009, detailing loan limit statutes and rules, telephone calls with Vukasin and other PMB personnel and bank examiners.  Tr., p. 40.  Potts testified that the loan limit issue referred to in Ex. 43 was similar, in that a group of companies owned by Jack would be added together and

18

violate the state law loan limitation, but the bank client referred to in Ex. 43 was not Barnes, Inc.
Tr., pp. 40, 41, 76.  Potts believed that PMB's loan limit in late 2008 was $1.2 million.  Tr., p.
49.

Vukasin testified that PMB's lending limit in February 2009 was $1.2 million.  She
denied that the FDIC criticized PMB about violating its lending limits in 2009, but she admitted
that PMB "had a discussion about it."  Tr., p. 165.  Plaintiff impeached Vukasin with her
deposition testimony from February 27, 2013, in which Vukasin answered "Yes" when asked if
PMB had ever been written up for violating the lending limit in 2009.  Tr., p. 165.  Vukasin
denied that had anything to do with the Barnes loans, and she testified that PMB called Potts
because the matter was subject to interpretation.  Tr., p. 166.

**Transfer of Barnes, Inc.'s Properties to New LLC's**.

Potts testified that he was concerned about the loan limit issue acting in his capacity as
attorney for Barnes, Inc.  Tr., p. 36.  He answered "Yes" when asked on direct examination
whether he suggested to Jack that Barnes, Inc., divest itself of its real property holdings and
restructure.  Tr., pp. 31, 35, 36, 37.  Jack agreed that Potts came to him in February 2009, and
proposed that Jack transfer the Barnes, Inc., properties to new entities .  Tr., p. 275.  As of
January 2009, Barnes, Inc., owned both the Prospector I and the J-Bar T.  Tr., p. 33.  Dick
understood that Barnes, Inc., owned the J-Bar T.  Tr., pp. 321, 322.

Potts explained that such transfers were a way to cure the loan limit issue, and that
another reason was a way for Jack to begin turning over ownership of his business property[9] to

---

[9]Potts testified that Jack could transfer only real property to his wife and kids, not
interests in his liquor license, because they already had ownership interests in other licensed
liquor and gaming establishments.  Tr., pp. 31-32.

his wife and kids.  Tr., p. 31.  On cross examination Potts explained that Jack expressed to him an interest in transferring Barnes, Inc.'s real estate assets to other entities as a means of transferring his properties to family members in late 2008.  Tr., pp. 60, 85.  Jack testified on redirect examination that he never had any such conversations with Potts about estate planning or devising a mechanism to transfer property to his children.  Tr., p. 298.

Another purpose Potts described for transferring real estate out of Barnes Inc. was that Barnes, Inc.'s purchase of the J-Bar T on Third Avenue N.W., for $1.2 million, was intended to be temporary because Barnes, Inc., had the insurance proceeds after the fire which Jack could use to buy J-Bar T, instead of borrowing from a bank.  Tr., pp. 61, 90, 169, 170.  But, Potts testified that Barnes, Inc., is a "C" corporation and in his opinion it is never a good idea to hold real estate in a C corporation.  Tr., p. 62.  Jack planned to move the Silver City liquor license to the J-Bar T before the State Department of Revenue revoked that license for inactivity, and Barnes, Inc., needed to transfer the J-Bar T to another entity to accomplish that.  Tr., pp. 61-62.  Potts told Jack that the loan limit issue could be a problem with refinancing the construction loan, which could be solved if three smaller loans were made to three entities.  Tr., p. 46.

As part of the restructure described by Potts, the Prospector I property was to be transferred into a LLC called Prospector Land Co., LLC ("Prospector Land") and the J-Bar T was to be put into a second LLC named Prospector Catering Co., LLC ("Prospector Catering").  Tr., p. 35.  Ex. 36 and 37 include the articles of incorporation for the two LLC's filed with the State of Montana on February 23, 2009.  Jack testified that he did not ask Potts to organize those LLC's, but he admitted that he spoke with Potts about organizing them and Jack approved.  Tr., p. 274.

20

Potts testified that he believed it would be a good idea for Barnes, Inc., to transfer its Smelter Avenue Prospector I property out of Barnes, Inc.'s name, and he verified that by talking with Jack's accountant Jim Koontz, before he spoke with Vukasin about loan limit issues.  Tr., pp. 63, 64-65.  Potts needed information from Koontz before deciding how to move the assets out of Barnes, Inc., and how the Barnes, Inc., debt should be split.  Tr., p. 68.  Jack testified that he spoke with Koontz before the transfers.  Tr., p. 281.  Jack needed Koontz to address the tax consequences of the transfers of property out of Barnes, Inc., and the legal way of making the payments because of the two liquor licenses involved.  Tr., p. 293.

Koontz testified on rebuttal that Potts phoned him before the transfers by Barnes, Inc., to the new LLC's, and Potts asked him if there would be tax consequences if the J-Bar T property and Prospector I were separated from Barnes, Inc.  Tr., pp. 455, 458.  Koontz testified that he told Potts that there would be no tax consequences from the transfer of Prospector I, and there would be no tax consequence to Barnes, Inc., from the transfer of J-Bar T so long as it was sold at cost or acquisition price, which he thought was $1,350,000.  Tr., pp. 455,[10] 456-57, 459-60.  Koontz testified that he did not have any conversations with Potts, Jack or PMB about the new LLC's borrowing from PMB, or about loan amounts.  Tr., p. 457.

Potts summarized his reasons for suggesting that Jack transfer Barnes, Inc.'s real estate properties to new entities as the tax issues,[11] the loan limit issue, and Jack's desire to begin transferring ownership in his business to his wife and children, which could not be done unless

---

[10]Koontz and Patten in their interchange mistakenly described both transfers as to Prospector Land.  Tr., p. 455.

[11]One example of the tax issue was a potential gain in real estate value if B-Bar Tavern kept ownership of the J-Bar T property for several years.  Tr., p. 65.

the properties were transferred out of Barnes, Inc.  Tr., p. 66.  The transfers were Potts' solution.
Tr., p. 66.  Jack testified that he was not thinking about gifting some of his business interests to
his family members.  Tr., p. 288.

Potts testified that the restructure by Barnes, Inc., transferring its real estate properties to
the new LLC's was his idea, and not PMB's.  Tr., p. 67.  Potts testified that he called Vukasin in
January of 2009, before creating the new LLC's, and asked her if it would help if Jack created the
two new entities and the three entities borrowed the entire amount required to finish construction,
instead of just Barnes, Inc.  Tr., pp. 79, 80, 97.  Potts testified that PMB stated that it would pay
him the cost of organizing the two LLC's in the restructure.  Tr., pp. 35-36, 38, 85, 98.

Jack testified that Potts told him that he had a conversation with PMB, that PMB wanted
Jack to form new LLC's and it would not cost Jack anything because the Bank would pay Potts'
legal fees.  Tr., pp. 276-77.  Jack had no objection with Potts proceeding as proposed, because
Jack wanted to do what PMB wanted to remain in good standing.  Tr., p. 277.  However, Jack
testified that he could not remember any conversations with Vukasin, Hannah or PMB about the
transfers to the new LLC's before they took place, and that all was done through Potts.  Tr., pp.
280-81.

Vukasin testified that she does not remember having a conversation with Potts about the
loan limit issues, or offering to pay Potts for the cost of organizing Prospector Land and
Prospector Catering.  Tr., p. 143.  Later, Vukasin testified that Potts was wrong and no one at
PMB offered to pay the cost of organizing Prospector Land and Prospector Catering.  Tr., p. 156.
Potts testified that he could not find any indication in his records that PMB paid his fees and
costs for creating the two new LLC's.  Tr., p. 38.  Vukasin testified that PMB never received a

22

bill from Potts for his services setting up the new LLC's, and PMB did not pay Potts for those services. Tr., p. 411.

Vukasin testified that PMB had no discussions with Jack or Potts about the transfers until they called her and told PMB that the transfers were going to happen, but that was not something PMB would get involved in.  Tr., p. 167.  Jack testified that no one from PMB ever approached him about organizing new LLC's, and all the information Jack has about PMB's involvement in setting up the new LLC's came from Potts.  Tr., pp. 287, 288.  Jack testified that Potts told him that PMB wanted Jack to transfer Barnes, Inc.'s properties into new entities.  Tr., pp. 292, 293. Dick testified at his deposition that Jack told him that PMB suggested the creation of the new LLC's, but at trial Dick denied that Jack was the source of his information, but Dick believed Jack until he talked to Koontz.  Tr., p. 358.

Vukasin testified that PMB did not play any part of determining how Barnes, Inc.'s properties would be structured or valued in organizing Prospector Land and Prospector Catering. Tr., pp. 150, 159.  Vukasin testified that Jack made the transfers of Barnes, Inc.'s properties to the new LLC's in 2009, and PMB had no involvement in those transfers.  Tr., pp. 166-167, 168, 169.

Hannah testified that Jack contacted her and told her that he wanted to combine the LOC and construction loan, and he wanted to take the loan that was guaranteed by Dick and pay that down as much as he could.  Tr., pp. 222.  Hannah began an analysis along those lines, but did not complete it.  She testified that Jack changed his mind and told her a few days later that he created some LLC's and wanted to break up the way he was doing his loans.  Tr., p. 223.  Hannah testified that Jack gave her the amounts of loans he wanted, i.e., $1.2 million for the J-Bar T and

$1.2 million for the Prospector I.  Tr., pp. 223-24.  Hannah testified that Dick[12] told her that tax issues determined the amount of the loan secured by the J-Bar T.  Tr., p. 224.  Jack disagreed. Jack testified that he did not have conversations with Hannah, Vukasin, or Potts, about the dollar amounts of the Prospector Land and Prospector Catering loans.  Tr., pp. 281, 282.

Ex. 38 and 39 are warranty deeds executed by Jack on behalf of Barnes, Inc., and articles of incorporation, transferring Barnes, Inc.'s properties to the two new LLC's, Prospector Catering and Prospector Land on March 24, 2009.  Tr., pp. 39, 70, 154, 278.  Hannah testified that Jack signed Ex. 38 and 39 at PMB, where they were notarized by Robbins together with all of the other documents signed by Dick and Jack on March 24, 2009.  Tr., p. 213.  Jack remembered signing the new loans, but he testified that could not remember where it happened.  Tr., p. 278. Potts' office filed Ex. 38 and 39 after Jack signed them.  Tr., p. 70.

Potts testified that Jack wanted the J-Bar T property in Prospector Catering and the Prospector I building and land on Smelter Avenue to be in Prospector Land.  Tr., pp. 70[13].  Jack testified that Ex. 38 transfers the J-Bar T to Prospector Catering, and Ex. 39 transfers the Prospector I to Prospector Land.  Tr., pp. 277, 291.  Jack testified that he did not tell Dick that the Barnes, Inc., properties had been transferred to Prospector Catering and Prospector Land. Tr., p. 280.  However, Jack testified that Dick determined three or four months after the transfers that they had taken place.  Tr., p. 295.  Potts testified that he did not ever tell Dick about the restructure of the Barnes, Inc., properties into the two new LLC's.  Tr., pp. 41, 93.

---

[12]The question's reference to Dick on line 2 of Tr., p. 224, is a mistake, as Hannah was testifying about Jack's supplying the purchase prices.

[13]At first Jack testified that it went the other way around – the Prospector I went to Prospector Catering and the J-Bar T went to Prospector Land.  Tr., p. 274.

Ex. 43 is Potts' attorney billing invoices addressed to the attention of Vukasin at PMB. Ex. 43 does not show any charges by Potts to PMB for legal services in March 2009, related to the creation of Prospector Land and Prospector Catering, and Potts testified he did not bill PMB for those services.  Tr., p. 75; Ex. 43, pp. 7, 16.

### 2009 Refinancing

Vukasin testified that PMB always anticipated that there would be some term-out of the three loans to Barnes, Inc., and that it would have to do a takeout loan when the construction loan came due.  Tr., pp. 185, 186.  Jack agreed.  Tr., pp. 286, 294.  Vukasin testified that Jack came in and asked to combine all three loans, and later returned and said that he wanted to create the new entities.  Tr., p. 187.  Jack disagreed, and answered "No" when asked if he approached Vukasin and/or Hannah about combining all the loans into one.  Tr., p. 287.  Later Jack changed his answer, and testified that he would not dispute that he approached PMB and wanted to combine his loans into one loan.  Tr., p. 292.  But he continued to deny that he told Vukasin or Hannah that he wanted to split Barnes, Inc's properties into different entities.  Tr., p. 292.

Ex. 46 is a loan presentation, dated 2-17-09, which Hannah put together and presented to PMB's loan committee for the refinancing of three loans in accordance with Jack's wishes.  Tr., pp. 141, 142, 187, 224-225.  PMB's board approved Ex. 46.  Tr., pp. 151, 225.

Vukasin testified that Jack requested to combine and refinance his debts to PMB because they were coming close to maturity.  Tr., pp. 143-44, 146.  Vukasin admitted that the $850,000 loan was to mature in October 2011, so it did not have to be refinanced right away.  Tr., p. 145. She also testified that the Barnes, Inc., loan secured by Dick's guaranty and the B-Bar Tavern building was not in violation of PMB's loan limit and did not have to be rewritten, but that Jack

25

asked that all three loans be combined.  Tr., p. 146.

Asked by Plaintiff's counsel if she agreed that there were lending limit issues in connection with the Barnes, Inc., loans as of 2-17-09, Vukasin did not agree.  Tr., p. 142.  Later, however, upon examination by PMB's counsel, Vukasin answered "Yes" when asked if the $1.8 million construction LOC would be a lending limit issue.  Tr., p. 186.  Ex. 46 includes a third bullet point near the top of page 1 that states:  "These loans are being refinanced due to maturity on the construction LOC and to satisfy the lending limit issues." Asked why the $3 million in total loans to Barnes, Inc., was not a lending limit issue Vukasin answered:  "I guess it is an issue when you put it that way.  It's something that may have various solutions to, though."  Tr., p. 142.  Vukasin testified that with the two new LLC's created there no longer was a loan limit issue.[14]  Tr., pp. 142, 188.  On redirect examination by Plaintiff's attorney, Vukasin agreed that there would have been a loan limit issue but for the conveying of properties to Prospector Land and Prospector Catering, but it was one "that I would have had a solution to."  Tr., p. 197.

The second page of Ex. 46 has three (3) "Requests:" #1 Refinance the $1.2 million construction LOC; #2 was described by Vukasin as taking the remaining balance on the construction loan for a $100,000 LOC into permanent financing in the amount of $1.2 million; and #3 to take excess funds from the second loan and put it to the Barnes, Inc., loan which was secured by Dick's guaranty and the B-Bar Tavern property, and refinance that loan over a 20-year term.  Tr., p. 148.

Asked about the $1.2 million amount of Request #1 on Ex. 46, Vukasin testified that Jack

---

[14]Vukasin testified that she had already started looking for other participants for refinancing, but discontinued those efforts when she learned about Jack creating the new LLC's to cure the lending limit issue.  Tr., pp. 174, 186.

requested the $1.2 million amount based on the collateral that was being given as security on the loans, after Jack met with Potts and Koontz, and the amount had nothing to do with the loan limit issue.  Tr., p. 149.  Hannah testified that the dollar figures for the loan amounts on Ex. 46 were given to her by Jack.  Tr., pp. 209, 210.

Vukasin testified that the appraisal value for the completed Prospector I building was $3 million,[15] less the approximate $400,000 value of the liquor license which was included in the appraisal but was not part of PMB's security, or about $2.6 million in value securing the $1.2 million loan.  Tr., pp. 149, 150.  Vukasin explained that the amount of the loan Request #2 on Ex. 46 was $1.25 million, which also was the buy-sell amount for Barnes, Inc.'s purchase of the J-Bar T property.  Tr., p. 148.

Ex. E is Barnes, Inc.'s application for the final loan, signed by Jack, reviewed on 2-24-2009 and approved by Hannah, in the amount of $741,041.10.  Vukasin testified the loan on Ex. E was approved after the board reviewed Ex. 46, that the final amount was arrived at after $100,000 was applied to the principal balance, and the loan was secured by Dick's signature and the B-Bar Tavern property.  Tr., pp. 147, 188-89.  Vukasin testified that the $100,000 was used to reduce the debt which Dick had personally guaranteed and pledged his B-Bar Tavern property for,[16] and dropped the payment to Barnes, Inc., on a monthly basis by $2,000.  Tr., pp. 188-89. The loan in the amount of $741,041.10 was advanced on March 24, 2009.  Ex. 51; Tr., p. 157.

Hannah testified that, after the loan presentation (Ex. 46) was approved, she called Dick

---

[15]Jack testified that both the County and PMB had separate appraisals of the Prospector I property and they were the same $3 million value.  Tr., p. 299.  Richards clarified that the $3 million appraised value was once the new building was done.  Tr., p. 392.

[16]Jack testified regarding the $100,000 that "I don't remember it at all."  Tr., p. 295.

and told him that he needed to come to PMB and sign, that Jack was changing the way PMB was restructuring the loans, and that they were going to pay down the loan guaranteed by Dick by about $100,000.  Tr., p. 225.  Hannah testified:  "I told him that each loan was going to be – one was going to be under Prospector Land and one was going to be under Prospector Catering.  They were both going to be $1.2 million, which left him on the Barnes, Inc. loan, reduced to $741,000 – or it was under $100,000."  Tr., p. 225.  Dick understood that the loan documents he executed in March 2009 were essentially the same kind of documents he had executed in October 2008 to guarantee and provide security for the same basic loan with a slightly reduced amount.  Tr., pp. 354, 355, 356.  Dick was still willing to execute the loan documents in March 2009 to help his brother.  Tr., p. 356.

Hannah asked Dick for updated tax returns and both personal and business financial information in order to show that Dick had the ability to repay the debt if Jack could not make the loan payments.  Tr., pp. 226, 227.  Dick understood that PMB requested his financial information to know that he could pay back the loan.  Tr., p. 371.  Dick thought he had an understanding of Barnes, Inc.'s assets consisting of the Prospector I and the J-Bar T when he signed the loan documents in March 2009, but he testified that he did not know that there had been a change in what Barnes, Inc., owned.  Tr., p. 372.

Loans were made to the two new LLC's, Prospector Land and Prospector Catering, in the amount of $1.2 million apiece, which Potts testified were within PMB's loan limits.  Tr., pp. 46, 82, 83.  Vukasin testified that the creation of the new Prospector entities benefitted Dick and reduced Dick's risk by the amount of $100,000 applied against the obligation Dick had guaranteed.  Tr., p. 199.

Ex. 52 is the comment sheet for the Prospector Land loan dated 2/24/09, and states the estimated market value of the security for the $1.2 million loan is $3 million.  Tr., p. 87.  Potts testified that he could not tell from Ex. 52 how much total debt at the time was encumbering that property.  Tr., p. 87.  Vukasin testified that the $3 million value on Ex. 52 includes a liquor license, leaving about $2.6 million value for the Prospector I building.

Prospector Land entered into a $1.2 million loan from PMB secured by the completed Prospector I building formerly owned by Barnes, Inc.  Tr., pp. 151, 299.  This was Request #1 from Ex. 46.  Tr., p. 152.  Vukasin admitted that at the time of the loan, Prospector Land had assets worth $1.4 million more than the $1.2 million loan.  Tr., p. 155.  Vukasin also testified that, after the transfer of Prospector I to Prospector Land, Barnes, Inc., was left with less debt, and she did not know what assets Barnes, Inc., still had.  Tr., p. 155.  Request #2 from Ex. 46 became the loan evidenced by Ex. 27, a $1.2 million loan by PMB to Prospector Catering.  Tr., p. 152.

Potts testified that as a result of the transfer of Barnes, Inc.'s properties into the two new LLC's, the debt which B-Bar Tavern had guaranteed was reduced by $100,000.  Tr., p. 73.  Potts does not believe that the restructure and transfer of Barnes, Inc.'s properties to Prospector Land and Prospector Catering harmed Dick or B-Bar Tavern.  Tr., p. 74.  Potts testified that he spoke with Dick in October 2008 about executing a new deed of trust for B-Bar Tavern with PMB, but did not talk with Dick about renewing his personal guaranty before March 25, 2009.  Tr., pp. 41, 79.

Potts also spoke with Vukasin and Jack in October 2008 and advised PMB that he also represented Dick.  Tr., p. 44.  Dick called Potts in October 2008 and asked about cosigning the

Barnes, Inc., loan, and Potts wanted to make sure that it was a guarantee by Dick instead of cosigning.  Tr., pp. 44-45.  Potts testified that he did not advise Dick about whether Dick should or should not sign the personal guarantee and TI in March 2009.  Tr., p. 79.  Potts testified that he was not aware that Dick signed another trust indenture in March 2009.  Tr., p. 42.  Potts testified that he does not think PMB gave him documents relating to the B-Bar Tavern trust indenture in March of 2009, or that if they sent some documents to him he returned them.  Tr., p. 42.

Ex. 23 is the loan to Prospector Land executed by Jack in the amount of $1.2 million dated March 24, 2009.  Tr., pp. 127, 278.  Ex. 24 is an accompanying security agreement pledging the Prospector I building on Smelter Avenue as collateral for the $1.2 million loan. Tr., p. 127.  Ex. EE is the trust indenture pledging the Prospector I on Smelter Avenue to secure the $1.2 million loan in March 2009.  Tr., p. 128.  Jack signed Ex. EE as member of Prospector Land, and his signature was notarized as such.  Tr., p. 235.  Robbins signed the notary line on Ex. EE.  Tr., p. 445.  She testified that she does not have a recollection of Jack signing Ex. EE in 2009.  Tr., p. 445.

Ex. 27 is the note for a $1.2 million loan to Prospector Catering, dated March 24, 2009, secured by a security agreement, Ex. 28, on the J-Bar T and a liquor license.  Tr., p. 129.  Jack testified that he signed Ex. 27.  Tr, p. 279.[17]  Vukasin testified that Jack agreed to give a lien on the Silver City liquor license to secure this loan.  Tr., p. 129.  Jack denied that PMB approached him about offering that liquor license as collateral for the Prospector Catering loan, and denied that he agreed to obtain his wife's consent to offer that liquor license as security. Tr., p. 297.

Ex. 29 is the trust indenture signed by Jack for Prospector Catering pledging the J-Bar T

---

[17]Jack stated the amount of Ex. 27 as $1,296,000.  Tr., p. 279.  Ex. 27 is barely legible.

building for that loan.  Tr., p. 129.  Jack's signature on page 11 of Ex. 29 is not accompanied by his handwritten notation as "Member."  Tr., p. 236.  But on page 12 of Ex. 29 the notary indicates that it was acknowledged by Jack as Member.  Tr., p. 236.  Ex. 30 is a guarantee executed by Jack for Prospector Catering dated March 24, 2009.

Ex. 31 is a loan to Barnes, Inc., in the amount of $741,041.10 signed by Jack on 3/24/2009.  Tr., p. 130.  Hannah testified that this is the same loan described in Request # 3 on Ex. 46.  Tr., p. 209.  Ex. 32 is a security agreement signed by Jack on 3/24/09[18] for Barnes, Inc., for the $741,041.10 loan.  Tr., p. 130.  Vukasin testified that the collateral identified in Ex. 32 is the B-Bar Tavern building owned by B-Bar Tavern, even though Ex. 32 is signed by Barnes, Inc., not B-Bar Tavern.[19]  Tr., p. 130.  Ex. 33 is another guaranty signed by Jack for Barnes, Inc.  Ex. 26 is Jack's personal guarantee of the Prospector Land note, dated March 24, 2009.  Tr., p. 128.

Vukasin testified that she had Dick come in to PMB and sign a personal guaranty in March 2009, after the transfers of properties from Barnes, Inc., to Prospector Land and Prospector Catering.  Tr., pp. 155-56.  Ex. 34 is a guaranty for the PMB loan to Barnes, Inc., in the amount of $841,041.10, signed by Dick as "Pres"[20] on March 24, 2009.  Vukasin testified that Ex. 34 is a guaranty for the $741,000 loan.  Tr., p. 130.  Hannah testified that Dick is the guarantor of the loan on Ex. 34, and that Dick would be obligated to pay if Barnes, Inc., defaulted.  Tr., p. 241.  B-Bar Tavern's expert Richards testified that Dick guaranteed the note.

---

[18]The typed in date at the top of Ex. 32 states "03-24-2008" instead of 2009.

[19]Why Jack, rather than Dick, would sign a security agreement pledging the B-Bar Tavern building is not explained.

[20]Ex. 34 does not name the entity on behalf of which Dick signed it as "Pres."

Tr., p. 393. Dick admitted guaranteeing Barnes, Inc.'s loans in October 2008 and March 2009, and that he signed trust indentures. Tr., pp. 310, 311. Dick admitted that he signed Ex. 34 as president, and he testified that he believed he was signing a personal guarantee and was confused when they had him add "president." Tr., p. 322.

Vukasin testified that both she and Hannah gave Dick the "Dutch Uncle talk" again in March 2009 about the risks and obligations he would be undertaking through his guaranty. Tr., pp. 138, 156, 199. Vukasin testified that she did not tell Dick, at the time he signed Ex. 34 and 35, that the real estate owned by Barnes, Inc., had been conveyed to the two new Prospector entities[21], but that Hannah told Vukasin that Hannah told Dick. Tr., pp. 138, 139.[22] Plaintiff impeached Vukasin with her earlier deposition testimony that no one at the bank told Dick about the restructuring of Barnes, Inc.'s properties. Tr., p. 140. Vukasin later testified that Hannah told her after Vukasin's deposition was taken that Hannah told Dick about the restructure of Barnes, Inc.'s properties to the new entities. Tr., p. 141.

Potts testified that the total of the three new loans to Barnes, Inc., and the two new LLC's was $3,141,000, including $741,000 to Barnes, Inc., in March 2009. Tr., pp. 80-90. Potts testified that the equity in Barnes, Inc., and the two new entities in March 2009 was $1.1 million, calculated by adding the $1.2 million value of the J-Bar T and the $3 million value of the Prospector I from Ex. 52, and subtracting the total $3,141,000 total loan. Tr., p. 90. Potts

---

[21]Vukasin misspoke the names of one of the entities. She testified that the Barnes, Inc., properties had been conveyed to Prospector Land and "Prospector cattle company." Tr., p. 138. The latter entity is Prospector Catering as shown by the other exhibits.

[22]Asked how she knew that Hannah told Dick Vukasin answered: "Because she told me that she told him that. Kimberly's very thorough. I'm thorough; she's more thorough." Tr., p. 139.

admitted that Barnes, Inc., was left with no real property and no equity.  Tr., p. 90.

### Ex. 35 – The Trust Indenture (TI)

Ex. 35 is the TI which is the main subject of contention in this adversary proceeding.  Ex.
35 is dated March 24, 2009, on page 1, names B-Bar Tavern as Grantor and conveys B-Bar
Tavern's property as collateral.  Dick testified that he signed Ex. 35 and initialed each page.  Tr.,
p. 350-51.  Paragraph 18 at page 7 of Ex. 35 provides for payment of Lender's costs, attorneys'
fees and other expenses in the event of breach, enforcing or collection.  Paragraph 25 on page 10
of Ex. 35 provides the applicable law, severability and interpretation.  Paragraph 25 provides in
pertinent part:  "This Security Instrument is complete and fully integrated.  This Security
Instrument may not be amended or modified by oral agreement."

Ex. 35 is signed by "Richard J. Barnes" on page 11 of 12 with his handwritten date
"3/25/9" next to Dick's signature.  Unlike Dick's signatures on other documents he did not
follow his signature with "Pres" on Ex. 35.  Tr., p. 234.  Dick testified that he signed Ex. 35, but
he insisted that he executed the loan documents at Potts' office, not at PMB, in the presence of
Potts and Dick's wife.  Tr., p. 323.  Dick testified that a notary public was not present when he
signed the documents.  Tr., p. 323.

Hannah testified that she was PMB's lender who was present at the closing when Dick
signed Ex. 35 and the other loan documents, TI's, and assignments, at PMB on March 24, 2009,
along with Jack, Dick, and Robbins.  Tr., pp. 211, 221, 222, 227.  Hannah testified that Jack and
Dick signed all of the closing documents together, and that she explained to them both which
document each was signing, one at a time.  Tr., pp. 214, 222.  Hannah testified that the notary
was present when Dick signed the loan documents on March 24, 2009.  Tr., p. 227.  Jack testified

33

that he could not remember signing documents at the same time with Dick at PMB.  Tr., p. 282.

Robbins was the notary public who notarized Ex. 35.  She testified that she worked at PMB's loan department until she left in July of 2012, and that she had been a notary for at least 3 years as of March 2009.  Tr., p. 435.  Robbins testified that she knows Dick Barnes, but that her standard procedure as a notary, even if she knows a person, is to inspect the person's driver's license, write down their information, verify the person is who they say they are, and notarize the document.  Tr., p. 437.  On cross examination Robbins testified that she does not specifically recall Dick being in front of her in PMB signing Ex. 35.  Tr., pp. 444, 445.[23]

Under questioning by the Court about the discrepancy between Dick's handwritten date "3/25/9" on page 11 of Ex. 35 and the March 24, 2009, date of acknowledgment on page 12, Hannah testified first that it was a typo, and when the Court rejected that explanation she testified:  "I think is was just, it was just wrong.  I think he just wrote it wrong.  He didn't even put the '0' in '9.'  I don't – I just believe he didn't know exactly what the date was and I didn't catch it either."  Tr., p. 244.  Robbins testified that she does not agree with the "3/25/9" date handwritten by Dick next to his signature on Ex. 35.  Tr., p. 441.

On redirect by Plaintiff's counsel Hannah admitted that she is speculating that Dick made a mistake on the date, and she admitted that the other loan documents signed by Dick were generated with the dates already on them.  Tr., p. 244.  On re-cross examination by PMB's counsel Hannah testified that if Dick had come into PMB on March 25, 2009, to sign these loan

---

[23]The Court took judicial notice that Montana law changed to require notaries to maintain a log book, effective in October 2009.  Robbins testified that she kept a log book, but that she destroyed it when she left her employment.  She was not aware of the dispute between the parties when she destroyed her book.  Tr., p. 450.

documents, PMB would have reprinted them with the date of March 25, 2009, but that Dick in fact came into PMB on March 24, 2009.  Robbins corroborated Hannah's testimony describing that procedure of PMB to ensure the correct date on loan documents.  Tr., p. 438.  Robbins testified that her normal procedure was to check to make sure that a document was dated the same day that she notarized it.  Tr., p. 439.

Vukasin testified that she was present at PMB when Dick executed Ex. 35 and other documents on March 24, 2009.  Tr., pp. 196-97.  However, Vukasin testified that she did not actually view Dick sign Ex. 35.  Tr., p. 197.  Hannah testified that she saw Dick sign and date Ex. 35 on page 11, p. 217.  Hannah testified that the $741,041.10 loan was closed at PMB, and that Jack and Dick and the notary were present with her at the closing.  Tr., pp. 206, 208.  Hannah testified that Plaintiff's counsel was incorrect in suggesting that PMB made a mistake and disbursed the loan too soon, because she testified that she had to have all her loan documents signed before she disbursed the loan on March 24, 2009.  Tr., p. 245.

Vukasin admitted that PMB and not Dick prepared Ex. 35.  Tr., p. 199.  Hannah testified that it is the lender's responsibility to review documents such as Ex. 35 for their sufficiency.  Tr., p. 210.  Hannah testified that it was her responsibility to review Ex. 35 for its sufficiency before it was signed.  Tr., p. 210.  She testified that Ex. 35 was created from information provided to PMB by Jack.  Tr., p. 211.  Hannah did not deny that Ex. 35 contains errors, but she testified that they were "[v]ery minimal errors compared to disbursement of a loan."  Tr., p. 246.

Immediately above Dick's signature on page 11 of Ex. 35 are the words "Entity Name" followed by the typed-in words "B-Bar Tavern, Inc."  Hannah testified that she knew Dick's capacity as president of B-Bar Tavern from the corporate resolution which Dick signed at the

35

same time the loan closed. Tr., p. 237.

Hannah testified that when Dick signed the March 2009 loan documents she gave him the "Dutch Uncle" speech again, explaining the risks that Dick would have to pay and his property may be subject to foreclosure if Jack defaulted. Tr., pp. 216, 221. Hannah testified that Dick had a lot of concern about his personal guaranty and pledging his collateral for the Barnes, Inc., loan, and that Dick did not seem happy about it, but was willing to do it for his brother Jack. Tr., pp. 221-22.

In addition, Hannah testified that she told Dick at the closing that the loans had been rearranged into the new LLC's. Tr., pp. 216, 231. Hannah testified that she told Dick that the collateral on the Prospector Land loan for $1.2 million was the Smelter Avenue property, and the collateral on the Prospector Catering loan for $1.2 million was the J-Bar T property and the liquor license[24], then she told Dick about the loan that he guaranteed. Tr., p. 231.

Dick disputed Hannah's testimony. He answered "No" when asked if he had any knowledge, at the time he executed the documents, about the transfers of property from Barnes, Inc., to Prospector Land and Prospector Catering, and that neither Potts, Vukasin or Hannah told him anything about the transfers when he signed Ex. 35. Tr., pp. 323, 324, 326.

Dick testified that he did not learn about the creation of Prospector Land and Prospector Catering until May of 2009 when his wife read about new businesses in the newspaper. Tr., pp. 325, 326. Dick testified that he spoke with Koontz shortly after May 2009 and learned about

[24]Hannah testified that the UCC which PMB filed on the liquor license was denied by the state because of the lack of correct signatures. Tr., p. 232. PMB asked Jack to get the security interest in the liquor license and he said he would take care of it, but did not, and PMB never obtained a security interest in the liquor license. Tr., p. 232.

Jack's new LLC's.  Tr., p. 358, 359.  Dick contacted Jack, and Dick testified that Jack told him

that PMB had suggested forming the new LLC's.  Tr., p. 359.  However, no one from PMB told

Dick that PMB had insisted on the new LLC's.  Tr., p. 359.   It still took awhile before it dawned

on Dick that he was the only party providing security for the loan by Ex. 35.  Tr., pp. 326, 374.

Dick testified:  "I don't understand how I ended up being the sole secured party of the $741,000

loan."  Tr., p. 362.  He admitted that he was the sole collateral source for the $741,000 loan in

October 2008 and again in March 2009.  Tr., p. 362.

       Page 12 of Ex. 35 is for acknowledgments.  The "(Individual)" acknowledgment on the

top of page 12 of Ex. 35 is blank.  Below that is "(Business or Entity Acknowledgment)" with

the name of "B-Bar Tavern, Inc." as the name of the Business or Entity.  Robbins notarized Ex.

35 on page 12 on March 24, 2009.  Tr., p. 440.  Robbins testified that she would not have

notarized Ex. 35 with an incorrect date, and that PMB would have reprinted the loan documents

with the correct date, which she verified by looking at the date on her computer screen.  Tr., p.

440.

       Hannah testified that she reviewed Ex. 35 before it was signed, and that Ex. 35 does not

say anywhere that it was signed by Dick in his representative capacity as president of B-Bar

Tavern.  Tr., pp. 234, 246.  Hannah admitted that Dick's representative capacity should have

been indicated on Dick's signature on Ex. 35.  Tr., p. 246.  Robbins did not recall why Dick's

name and position are not filled in.  Tr., p. 444.

       The acknowledgment on Ex. 35 is signed by Robbins on page 12 as notary public with a

typewritten date of acknowledgment as the "24th day of March, 2009."  Ex. 35.  Dick's name and

representative are not on the acknowledgment page 12 of Ex. 35.  Hannah testified that Dick's

name and representative capacity "just got left blank" on the acknowledgment, and should have been included.  Tr., pp. 244, 246.

Potts testified that he did not prepare Ex. 35, and he never saw it in 2009.  Tr., p. 51.  Hannah agreed that Potts did not prepare any of the 2009 loan documents.  Tr., p. 227.  Hannah testified that she did not talk to Potts about Ex. 35 or the associated promissory note, and she did not send Ex. 35 or any of the loan documents signed on March 24, 2009, to Potts for his review.  Tr., pp. 210, 227.  Vukasin agreed that Potts did not, on behalf of PMB, prepare or review any of the loan documents for PMB's loan to Barnes, Inc., and the new LLC's in March 2009.  Tr., pp. 413, 414.

Dick testified that Jack directed him to go to Potts' office to sign Ex. 34 and 35, and that Jack was not present when Dick signed them.  Tr., p. 325.  When asked by PMB's counsel whether he could be wrong in stating that he executed Ex. 34 and 35 at Potts' office, Dick answered:  "After listening to Laura and Kimberly yesterday, excuse me, I tried to place myself, imagined myself being at the bank, and I cannot place myself there.  I place myself at Steve Potts's office."  Tr., p. 356.  Asked again whether he could be wrong about signing at Potts' office Dick answered:  "When I - (inaudible, static in microphone) - through my mind, I was at Steve Potts's office."  Tr., p. 357.  PMB's counsel impeached Dick with his deposition testimony from February 2013 when he admitted that he could have been wrong about signing the loan documents in Potts' office.  Tr., pp. 357-58.

When asked on direct examination:  "Did Dick come to your office and sign the trust indenture in March of 2009?" Potts answered "No."  Tr., p. 42.  On cross examination Potts testified that Dick was not in Potts' office on March 24, 2009, or on March 25, 2009.  Tr., pp. 51-

38

52[25].  Potts testified that Robbins was never an employee of Potts' office, and that Robbins never

came to his office to notarize documents.  Tr., p. 54.

Robbins disagreed with Dick's testimony that he signed Ex. 35 at Potts' office.  She

testified that Ex. 35 had to have been signed and notarized by her at PMB because she has never

notarized documents anywhere else.  Tr., p. 442, line 11.[26]  Dick came to Potts' office in April

2009 to sign unrelated documents which Potts notarized, but Potts did not have a notary book at

the time.[27]  Tr., p. 84.

Hannah testified that PMB does not ever allow a borrower to sign loan documents

without a notary being present, and PMB does not ever allow a borrower to sign outside of the

bank and bring a document in later to get it notarized.  Tr., pp. 220-21.  Borrowers must sign loan

documents in the presence of a notary who verifies their signature.  Tr., p. 221.  Robbins agreed,

and testified that PMB never put her in a situation where people brought in documents that were

already signed and asked her to notarize their signatures.  Tr., p. 442.  Robbins testified that in

situations in which PMB had documents for a customer to sign but the customer failed to come

in on the prepared date, PMB would re-evaluate and reprint the documents with the date on

which the document is signed.  Tr., p. 438.

Vukasin testified on direct examination by Plaintiff's attorney that Ex. 35 was to secure

---

[25]Dick signed a document unrelated to this litigation while at Potts' office on April 9, 2009, and Potts notarized that document.  Tr., pp. 52, 53.

[26]That statement is probably not accurate.  Robbins testified that she first became a notary at a previous employer, American General Financial Services.  Tr., p. 436.  Thus, Robbins probably notarized documents at that previous employer.  The Court believes that Robbins meant that she never notarized documents anywhere other than PMB while she was employed there.

[27]No notary log was required before October 2009 under Montana law.

the $741,041.10 loan to Barnes, Inc., and that Ex. 31 through 35 were prepared by PMB.  Tr., p.

131.  Page 2 of Ex. 35, item 4, identifies the "secured debt" as a $741,041.10 debt dated 03-24-

2012 owed by "B-Bar Tavern, Inc."  Vukasin admitted that B-Bar Tavern was not indebted to

PMB on any loans as of March 24, 2009, including the amount listed at item 4 of Ex. 35.  Tr., pp.

131, 132.  Hannah agreed.  Tr., p. 217.  The reference to "B-Bar Tavern" as owing the secured

debt at item 4 of Ex. 35 is unquestionably a mistake.  Vukasin testified that the borrower's name

on Ex. 35 was supposed to be Barnes, Inc., not "B-Bar Tavern" and that was an error on PMB's

processor's part in utilizing the loan form software program.  Tr., p. 191.  Hannah agreed that

PMB should have listed Barnes, Inc., instead of B-Bar Tavern as the secured debtor on Ex. 35.

Tr., p. 230.

Hannah testified that the $741,041.10 loan amount on Ex. 35 is the same amount on the

corresponding assignment of leases and rents, Ex. G, executed by Dick on behalf of B-Bar

Tavern, loan #4025942.  Tr., pp. 229, 230.  Hannah testified that B-Bar Tavern is not obligated to

repay the loan under the loan documents.  Tr., pp. 249-50.  On the other hand B-Bar Tavern's

property described at Ex. 35 is PMB's security available to make sure PMB got paid back,

according to Hannah.  Tr., pp. 241-42.

### Other Loan Documents

Ex. G is the assignment of rents and leases by B-Bar Tavern, signed by Dick but not as

"Pres" and dated March 24, 2009.  Tr., p. 351.  Vukasin testified that Ex. G refers to the

$741,041.10 debt that was secured by the B-Bar Tavern property, and Dick's guaranty, loan #

4025942.  Tr., pp. 192, 193.  PMB asked for the assignment for the same reason as before, to be

able to have access to any leases or rent moneys in the event of default.  Tr., p. 193.  PMB

40

recorded Ex. G in the county records.  Tr., pp. 411-12.

Ex. H is same kind of corporate resolution as Ex. D requested by PMB, only dated 3/24/2009, and signed by Dick and Ryan Stoll.[28]  Tr., pp. 195, 351, 352.  Vukasin testified that PMB required B-Bar Tavern provide it with another corporate authorization resolution for the new loan and TI, to make sure that nothing had changed.  Tr., pp. 195, 196.  Dick testified that he makes the final decision whether B-Bar Tavern enters into any transaction.  Tr., pp. 330, 331.  Hannah testified that she was present when Dick signed Ex. H, and it authorized Dick to sign on behalf of B-Bar Tavern.  Tr., p. 228.  Hannah testified that Dick presented himself as the president of B-Bar Tavern when he executed the TI (Ex. 35) and assignment of leases and rents associated with the March 24, 2009, documents.  Tr., p. 229.  Dick agreed that as president[29] he was authorized to sign any of the loan documents.  Tr., p. 352.

Hannah testified that PMB had all of the loan documents, including Ex. 35, signed before PMB distributed the loan proceeds, and the transaction history of Loan 4025942, Ex. 51, shows the proceeds were distributed on March 24, 2009.  Tr., p. 218.  Hannah testified that PMB has its loan processor review all loan documents to make sure they have all required signatures and initials, and are notarized, prior to funding, and further testified that PMB would not have allowed the loan to be distributed without having all the signatures on the loan documents.  Tr., p. 219.  Hannah testified that she is one of the persons for PMB who reviews loan documents to

---

[28]Hannah testified that Ryan Stoll did not sign the corporate resolution at the same time the loan was closed, but that he came in later that same day.  Tr., p. 237.  Dick testified that Stoll is not involved in the day-to-day business of B-Bar Tavern and needs Dick's permission to sign documents.  Tr., p. 331.

[29]Hatley made a mistake in his question by referring to Dick as president of Barnes, Inc., instead of Dick's company B-Bar Tavern.  Tr., p. 352, line 13.

make sure they are all executed properly, and only then she disburses the loan.  Tr., p. 220.

Hannah testified that she would not have released the loan for distribution if all of the signatures

were not on the documents.  Tr., p. 220.

Jack testified that, as a result of Dick's guarantee and involvement, Jack benefitted by

being able to access the loan proceeds.  Tr., p. 296.  Dick testified that PMB did everything it

said it would and fulfilled its obligation to his brother.  Tr., p. 347.  Vukasin agreed that PMB

fulfilled all its obligations to Dick and Jack.  Tr., p. 416.

### Later Developments & Default

Dick testified that 3 or 4 months after he executed the loan documents of March 2009, he

learned that PMB had not taken Jack's liquor license or equipment, furniture, or fixtures as

collateral.  Tr., pp. 336, 360, 361.  PMB's counsel impeached Dick with his deposition testimony

taken on February 26, 2013, where Dick testified that Vukasin indicated that PMB had absolutely

nothing left to get as security from Jack.  Tr., pp. 337-338, 369.  Later Dick testified at his

deposition that Jack told him that Jack had collateralized the J-Bar T property and also all the

Smelter property.  Tr., p. 339.  At trial Dick testified that he was mistaken at the time of his

deposition answer.  Tr., pp. 339-340.  Dick testified that he learned that the Barnes, Inc., liquor

license and equipment, and the Silver City liquor license[30] had not been given as security for the

loans he guaranteed, as he thought they had been.  Tr., pp. 360, 361, 370.

Jack defaulted on the loan payments.  Dick testified that neither he nor B-Bar Tavern has

paid anything to PMB on account of the guarantee, Ex. 34, or the TI, Ex. 35.  Tr., p. 370.

---

[30]Dick never expected the Silver City Corporation liquor license to be given as security
because his wife was half owner, and she had not been approached.  Tr., p. 361.

Vukasin testified that Dick has never offered to pay any of the loan that was provided to Barnes, Inc. Tr., p. 416.[31]  Dick testified that he offered to buy the J-Bar T, but he wanted a release of the TI against B-Bar Tavern in return.  Tr., p. 374.

PMB commenced foreclosure proceedings against the B-Bar Tavern based on Ex. 35, and a sale was scheduled to take place on March 3, 2010.  Tr., p. 327.  PMB foreclosed on Barnes, Inc.'s J-Bar T and the Smelter Avenue Prospector I properties.  Those were sold at foreclosure, and Dick testified that there was no equity realized from either sale.  Tr., pp. 344, 345.  Dick had a second lien position against the Prospector I and attended the foreclosure sale, but he did not make a bid.  Tr., p. 346.  Under cross examination Dick testified that there was never any excess equity in the Barnes, Inc., property when Dick guaranteed the Barnes, Inc., loans in 2008.  Tr., pp. 346-47.

### Settlement Conference

A settlement conference was held on December 22, 2010, in the office of Jack's attorney. Tr., pp. 326, 363.  Dick attended the conference with his wife, represented by counsel and his accountant Koontz.  Tr., p. 327.

Dick testified that if there was a foreclosure of the B-Bar Tavern building it would be next to impossible for him to continue in operation of the B-Bar Tavern liquor license.  Tr., p. 328.  Dick's only other income is from a small rental unit and an ATM business.  Tr., p. 328. Dick testified that the rental and ATM income is not sufficient to meet he and his wife's living

---

[31]Plaintiff's counsel again impeached Vukasin by forcing her to admit that PMB had a conversation with Dick about him paying $741,000 less the value of the liquor license, furniture, fixtures and equipment.  Tr., p. 417.  Vukasin's excuse is that she did not think the offer "was ever formally made."  Tr., p. 417.

needs or retirement needs, and the B-Bar Tavern business is necessary for their living and retirement.  Tr., p. 329.  Dick testified that, at the settlement conference, he was concerned that if he did not sign the settlement agreement he would lose the B-Bar Tavern building to foreclosure and be left with no income or retirement.  Tr., p. 329.

Ex. Q is the Settlement Agreement dated December 23, 2010.  Dick admitted that he signed Ex. Q individually and on behalf of B-Bar Tavern, both of which were represented by counsel at the time Dick signed.  Tr., p. 363.  PMB signed Ex. Q.  Dick testified that he signed Ex. Q because he did not have any choice, because if he did not sign foreclosure would take place.  Tr., p. 373.

As part of Ex. Q PMB promised not to take any legal action against B-Bar Tavern for nine months, and would vacate the nonjudicial foreclosure proceeding it had commenced.  Dick and Vukasin both testified that PMB performed as promised under the Settlement Agreement. Tr., pp. 365, 415.  Dick and B-Bar Tavern were granted a second priority lien against the Prospector I property, and PMB supplied a trust indenture to Dick.  Tr., pp. 366, 367-68.  Dick testified that he knew about all the things which he alleges in this litigation that PMB did inappropriately when he signed Ex. Q.  Tr., p. 364.

Paragraph 9 on page 4 of Ex. Q includes a mutual release "of all claims, known or unknown, liquidated or contingent, through the date of this Settlement Agreement, including any claims sounding in tort, contract, in law or in equity."  Vukasin testified that PMB would not have signed the Settlement Agreement without the release.  Tr., p. 416.

Ex. 25 is a trust indenture dated 1/4/2011, in which Prospector Land gave PMB an additional $200,000 lien on the Prospector I on Smelter Avenue through the Settlement

44

Agreement.  Tr., p. 128.  Ultimately PMB foreclosed on the Prospector I.  Vukasin testified that

when PMB took back the Prospector I from Prospector Land there was no equity in the property.

Tr., p. 167.  PMB also foreclosed on the J-Bar T property owned by Prospector Catering, and

Vukasin testified there was no equity realized from that sale either.  Tr., p. 168.

       Ex. 48 is a breakdown of proceeds from the sale of Prospector I prepared by PMB's CFO

Jason Hammer.  Tr., p. 160.  Vukasin testified that Ex. 48 is a report showing the actual sale of

the Prospector I on Smelter Avenue to Mountain View Co-op, after PMB bought the Prospector I

at a foreclosure sale.  Tr., pp. 160-61.  Vukasin testified that PMB was the only bidder at the

foreclosure sale.  Tr., p. 161.  She testified that B-Bar Tavern had a second-position trust

indenture on the Prospector I property, but that B-Bar Tavern did not bid.  Tr., p. 168.

       Potts testified that his actions related to the restructure of Barnes, Inc., did not harm Dick

or B-Bar Tavern.  Tr., p. 79.  When asked on redirect examination about the harm after Barnes,

Inc., was left with no property and no equity after the restructure, Potts testified that if Dick or B-

Bar Tavern were asked to perform on Dick's guaranty or the TI, then Dick and/or B-Bar Tavern

would have a claim against Jack, who ultimately owned the equity in the new LLC's.  Tr., pp. 90-

91, 92.

### Ex. 53 & 50 – More Impeachment of Vukasin.

       Plaintiff impeached Vukasin about statements she made in an insurance application

which she signed,[32] Ex. 53, compared with Ex. 50, a "Consent Order" entered by the Federal

Deposit Insurance Company ("FDIC") in FDIC-11-504b ("In the Matter of Prairie Mountain

---

[32]Vukasin testified that her executive assistant completed Ex. 53 and Vukasin signed it
after covering points the assistant was unsure of.  Tr., p. 419.

Bank, Great Falls, Montana (Insured State Nonmember Bank") dated November 9, 2011.  Ex. 50

does not involve any of the loans at issue in this adversary proceeding.  Tr., p. 429.  Ex. 53

includes at approximately the 8th page a "Community Bank Questionnaire signed by Vukasin on

9/28/11.

PMB marked the answer "No" at question 4 which asks whether there are any threatened

or pending lawsuits against the PMB.  Tr., p. 421.  Vukasin testified that she signed that

questionnaire nine months after the date of the Settlement Agreement with B-Bar Tavern and

Dick, and there were no threatened or pending lawsuits.  Tr., p. 421.  However, the FDIC consent

order, Ex. 50, is dated November 9, 2011, and Potts' billing invoice submitted to PMB, Ex. 43,

shows on page 2 entries related to the FDIC beginning on September 19, 2011,[33] nine days before

Vukasin signed the questionnaire on Ex. 53.

Vukasin insisted that PMB was not under a regulatory proceeding with FDIC at the time

she signed the questionnaire in Ex. 53, notwithstanding Potts' billing records and the FDIC

consent order, Ex. 50, entered a few months later.  Tr., p. 424.  However, question 6 on the

questionnaire asks:  "Is the insured under any current regulatory orders *or proceedings*?  Ex. 53.

Vukasin checked "No" and she continued to answer "no" at trial, insisting that there was no

regulatory proceeding when she answered the questionnaire.  Ex. 53; Tr., pp. 424, 425.

Vukasin's testimony is contradicted by Ex. 43, 50 and 53.

Approximately 24 pages later in Ex. 53 is another series of questions to be completed.

On a page marked "Page 2 of 4" on Ex. 53 is a paragraph 16 which asks if there have been during

---

[33]Potts' Sep-19-11 entry lists 5.0 hours and $875 in fees described as:  "Meet w/ Laura
and Jim re:  FDIC report; research, work on response to proposal."

the past 5 years any oral or written demands for monetary or nonmonetary relief.  Vukasin

marked "No" in response to paragraph 16.  Tr., p. 425.  Plaintiff impeached her again when she

testified that she remembered Koontz writing a letter to the Montana banking commissioner

complaining about PMB.  Tr., p. 425.

Next, paragraph 21 asks if the applicant is operating under a cease and desist order,

memorandum of understanding "or similar agreement with any regulatory agency."  PMB

marked the answer "No."  Paragraph 25 asks if whether applicant has been alerted to any

concentration of credit that warranted a reduction or correction, to which PMB answered "No."

Vukasin signed that application 2 pages later on 10-4-11.

Vukasin admitted that PMB had discussions with regulators about a concentration of

credit, but she insisted that she was not alerted about a concentration of credit until the consent

order came out.  Tr., p. 428.  As she did when confronted with the loan limit problem, Vukasin

tried to explain her denials by testifying:  "I didn't say I didn't have any idea.  I just didn't agree .

. . ."  Tr., p. 428.  Vukasin signed the questionnaire under oath.  Tr., p. 429.

### DISCUSSION

The facts related above confront this Court with conflicting testimony, and with choices

about which witnesses to believe and give weight to with respect to certain critical facts relating

to the date and location of the execution of Ex. 35.  The Court will make those determinations at

the appropriate place below.  What is not before the Court in this adversary proceeding are any

claims for relief against Potts, who, the evidence shows, at times represented both of the parties

in this adversary proceeding.  Potts also represented Dick, Jack and his business entities, and

other Barnes family businesses, without obtaining written conflict waivers from any of them.

47

Plaintiff attempted to amend the complaint to add Potts to this adversary proceeding, but the Court denied that motion and thus no claims against Potts will be considered, discussed, or decided herein.  As for Potts' representation of the parties, they each voluntarily selected Potts as their  attorney of record, and they cannot now avoid the consequences of the acts or omissions of their freely-selected attorney.  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396-97, 113 S.Ct. 1489, 1499, 123 L.Ed.2d 74 (1993).

### Objection to Claim

Counts One through Four of the complaint all object to PMB's Claim 1, and under various theories seek avoidance of PMB's lien based on the TI, Ex. 35.  The Court's Order approving the Pretrial Order ("PTO") states that it supersedes the pleadings, and the PTO describes one legal issue as whether Ex. 35 is valid and enforceable as a lien.  However, in reviewing the evidence and applying bankruptcy law to the evidence, this Court concludes that PMB does not have an allowed "claim" against B-Bar Tavern in the amount asserted, and PMB's Claim 1 must be disallowed in its entirety.

A proof of claim that is executed and filed in accordance with the Rules "shall constitute prima facie evidence of the validity and amount of the claim."  Rule 3001(f); *see also Garner v. Shier (In re Garner)*, 246 B.R. 617, 620 (9th Cir. BAP 2000) ("There is an evidentiary presumption that a correctly prepared proof of claim is valid as to liability and amount.").  A claim "is deemed allowed, unless a party in interest . . . objects."  § 502(a); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Electric Co.,* 549 U.S. 443, 449, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007).

Upon objection, a bankruptcy court "shall determine the amount of such claim . . . as of

48

the date of the filing of the petition, and shall allow such claim in such amount, except to the

extent that— (1) such claim is unenforceable against the debtor and property of the debtor, under

any agreement or applicable law for a reason other than because such claim is contingent or

unmatured."  § 502(b)(1).  The United States Supreme Court explained:

> Section 502(b)(1) disallows any claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." This provision is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy.  *See* 4 Collier ¶ 502.03[2] [b], at 502–22 (explaining that § 502(b)(1) is generally understood to "make available to the trustee any defense" available to the debtor "under applicable nonbankruptcy law"— i.e., any defense that the debtor "could have interposed, absent bankruptcy, in a suit on the [same substantive] claim by the creditor").

> This reading of § 502(b)(1) is consistent not only with the plain statutory text, but also with the settled principle that "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000). That principle requires bankruptcy courts to consult state law in determining the validity of most claims. See *ibid.*

> Indeed, we have long recognized that the " 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.' " *Ibid.* (quoting *Butner v. United States*, 440 U.S. 48, 57, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); citation omitted). Accordingly, when the Bankruptcy Code uses the word "claim"—which the Code itself defines as a "right to payment," 11 U.S.C. § 101(5)(A)—it is usually referring to a right to payment recognized under state law. As we stated in *Butner*, "[p]roperty interests are created and defined by state law," and "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 440 U.S. at 55, 99 S.Ct. 914; accord, *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161, 67 S.Ct. 237, 91 L.Ed. 162 (1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law").

49

*Travelers,* 549 U.S. at 450-51, 127 S.Ct. at 1204-05; *In re Fitness Holdings Int'l., Inc.*, 714 F.3d 1141, 1146 (9th Cir. 2013).

Plaintiff objects to PMB's claim on the basis that its lien is invalid under Montana law either as a trust indenture or as a mortgage.  The language quoted above from *Travelers*, 549 U.S. at 450-51, makes the state law governing mortgages and trust indentures applicable to Plaintiff's objection to PMB's lien.  On the other hand, provisions of the Bankruptcy Code also apply.

This Court discussed its longstanding rule governing allowance of claims *In re Eiesland*, 19 Mont. B.R. 194, 208-09 (Bankr. D. Mont. 2001):

> A validly filed proof of claim constitutes *prima facie* evidence of the claim's validity and amount.  F.R.B.P. 3001(f).  The Ninth Circuit recently explained the general procedure for allocating burdens of proof and persuasion in determining whether a filed claim is allowable in *Lundell v. Anchor Const. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000):

>> A proof of claim is deemed allowed unless a party in interest objects under 11 U.S.C. § 502(a) and constitutes "*prima facie* evidence of the validity and amount of the claim" pursuant to Bankruptcy Rule 3001(f). See also Fed. R. Bankr.P. 3007. The filing of an objection to a proof of claim "creates a dispute which is a contested matter" within the meaning of Bankruptcy Rule 9014 and must be resolved after notice and opportunity for hearing upon a motion for relief. See Adv. Comm. Notes to Fed. R. Bankr.P. 9014.

>> Upon objection, the proof of claim provides "some evidence as to its validity and amount" and is "strong enough to carry over a mere formal objection without more." *Wright v. Holm (In re Holm )*, 931 F.2d 620, 623 (9th Cir.1991) (quoting 3 L. King, Collier on Bankruptcy § 502.02, at 502-22 (15th ed.1991)); *see also Ashford v. Consolidated Pioneer Mort. (In re Consol. Pioneer Mort.)*, 178 B.R. 222, 226 (9th Cir. BAP 1995), *aff'd*, 91 F.3d 151, 1996 WL 393533 (9th Cir.1996). To defeat the claim, the objector must come forward with sufficient evidence and "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *In re Holm*, 931 F.2d at 623.

50

* * * *

> "If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *In re Consol. Pioneer*, 178 B.R. at 226 (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir.1992)). The ultimate burden of persuasion remains at all times upon the claimant. *See In re Holm*, 931 F.2d at 623.

> *See also Knize*, 210 B.R. at 778; *Matter of Missionary Baptist Found. of Am.*, 818 F.2d 1135, 1143 (5th Cir.1987); *In re Stoecker*, 143 B.R. 879, 883 (N.D.Ill.1992), *aff'd in part, vacated in part*, 5 F.3d 1022 (7th Cir.), *reh'g denied* (1993).

> Thus, the Bank's Proof of Claim No. 2 is *prima facie* evidence of the validity and amount of its claim under Rule 3001(f), and the Debtor has the burden of showing sufficient evidence and to "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *Lundell*, 223 F.3d at 1039 (quoting *Holm*).  This Court finds that Eric, as the objecting party, has not produced sufficient evidence to cause the burden to revert to the Bank to prove the validity and amount of its claim.  *Lundell*, 223 F.3d at 1039 (quoting *In re Consol. Pioneer*, 178 B.R. at 226).

The analysis under *Lundell v. Anchor Const. Specialists* was reiterated by the Ninth

Circuit *In re Los Gatos Lodge, Inc.*, 278 F.3d 890, 894 (9th Cir. 2002).  Then in 2006 the BAP, in

*Litton Loan Servicing, LP v. Garvida (In re Garvida)*, 347 B.R. 697, 706-07 (9th Cir. BAP 2006),

discussed clarification provided by the United States Supreme Court decision, *Raleigh v. Ill.*

*Dep't of Revenue*, 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000), regarding the "prima

facie evidence" language in Rule 3001(f):

> The Supreme Court has clarified that the Rule 3001(f) "prima facie evidence" language does not address the burden of proof in an objection to claim proceeding. *Raleigh*, 530 U.S. at 22 n. 2, 120 S.Ct. 1951.

> It follows that, after *Raleigh*, Rule 3001(f) cannot be construed as allocating the burden of proof and, instead, operates merely as an evidentiary presumption that is rebuttable.

> The evidentiary presumption of a prima facie case operates to shift the burden of

51

going forward but not the burden of proof. [*Garner v. Shier (In re Garner),* 246 B.R. 617, 622 (9th Cir. BAP 2000)]; *Diamant v. Kasparian (In re So. Cal. Plastics, Inc.),* 165 F.3d 1243, 1248 (9th Cir. 1999) (although the creditor bears the ultimate burden of persuasion, the debtor must come forward with evidence to rebut the presumption of validity); 9 [COLLIER ON BANKRUPTCY ¶ 3007.01[1] (Alan N. Resnick & Henry J. Sommer eds. 15th ed. rev. 2006)] ("once this burden of going forward to overcome the presumption is met, the ultimate burden is on the claimant"). Hence, at best, Litton's $33,435.46 proof of claim was entitled to the Rule 3001(f) evidentiary presumption, which is capable of being rebutted.

Assuming, without deciding, that the evidentiary presumption did apply, the mechanics of what it takes to rebut the Rule 3001(f) presumption are driven by the nature of the presumption as "prima facie" evidence of the claims validity and amount. *Garner*, 245 B.R. at 621-22. The proof of claim is more than "some" evidence; it is, unless rebutted, "prima facie" evidence. *Id.* One rebuts evidence with counter-evidence. *Id.*

347 B.R. at 706-07.

In *Garvida* the objecting debtors satisfied their burden of going forward by proferring evidence at a hearing proving they made payments, and as a result the burden shifted to the creditor to prove the validity and amount of its claim, which it failed to prove when it failed to provide an accounting. 347 B.R. at 702, 707. In the instant case, PMB filed Proof of Claim No. 1 accompanied by attachments which include Ex. 31, the Barnes, Inc., promissory note dated 3-24-2009, the TI executed by Dick (Ex. 35), and the assignment of leases and rents (Ex. G). Ex. 31 is a promissory note signed by Jack on behalf of Barnes, Inc., and it does not constitute evidence that B-Bar Tavern is liable to PMB for repayment of the loan.

Montana Local Bankruptcy Rule 3001-2 ("Attachments to Proof of Claim") provides in pertinent part that documents must be attached to any secured proof of claim including "all notes . . . and all other information which might be necessary for a trustee or debtor in possession to verify the nature and amount of the debt, and the validity and perfection of the underlying lien." The note attached to PMB's Claim 1 is evidence of a debt owed by Barnes, Inc. It is not

evidence of a debt owed by B-Bar Tavern. Whether or not PMB is entitled to an evidentiary presumption of the validity and amount of its claim under Rule 3001(f), the Court finds that Plaintiff satisfied its burden to come forward with evidence to rebut the presumption of validity and amount of PMB's Claim No. 1, and the ultimate burden of persuasion is PMB's. *Garvida*, 347 B.R. at 706-07.

The testimony at trial established without question that Ex. 35 is mistaken in listing B-Bar Tavern at paragraph 4 on page 2 as owing the secured debt. Hannah and Vukasin admitted that it was a mistake for B-Bar Tavern to be listed at paragraph 4 instead of Barnes, Inc., and Hannah testified that B-Bar Tavern is not liable to repay the $741,041.10 loan. No witness testified that B-Bar Tavern is "personally" liable to repay the secured debt on Ex. 35, although Ex. 35 does purport to grant B-Bar Tavern's property as security for the debt owed by Barnes, Inc.

Given the admitted mistake in Ex. 35 naming B-Bar Tavern as the debtor at paragraph 4, no other writing exists in the evidence, which shows that B-Bar Tavern is personally liable to repay the $741,041.10 loan to Barnes, Inc. "A mortgage does not bind the mortgagor personally to perform the act for the performance of which it is a security unless there is an express covenant to that effect." MCA § 71-1-104. The evidence admitted at trial is voluminous, but does not include any express covenant by B-Bar Tavern to repay the $741,041.10 loan to Barnes, Inc.

If one expressly agrees to be personally liable for a mortgage debt then one may be subject to a judgment, including a deficiency judgment, under MCA § 71-1-222(2). *Fed. Land Bank of Spokane v. Davis*, 88 Mont. 463, 295 P. 253, 254 (1930); *Kinyon Inv. Co. v. Belmont*

*State Bank*, 69 Mont. 282, 221 P. 286, 288 (1923).  In the instant case no evidence exists in the record that B-Bar Tavern expressly agreed to be personally liable for the debt in Ex. 35, and its inclusion as the debtor at paragraph 4 on page 2 of Ex. 35 is unanimously agreed to be a mistake.  Thus, Ex. 35 does not bind B-Bar Tavern personally to repay the $741,041.10 debt.  MCA § 71-1-104.

Ex. 34 is Dick's personal guaranty, as testified by Dick, Potts, Hannah, and Vukasin.  Ex. 34 does not bind B-Bar Tavern to repay the loan.  Dick testified that he could not understand why PMB had him sign Ex. 34 as president, but B-Bar Tavern is not named anywhere on Ex. 34, and the Court finds that Ex. 34 is Dick's personal guaranty, not a writing binding B-Bar Tavern to repay PMB.

Montana's statute of frauds requires that an agreement, which by its terms is not to be performed within a year from the making of the agreement, must be in writing or is invalid.  MCA § 28-2-903(1)(a).  *Bloome v. First Nat'l Bank of Miles City*, 238 Mont. 181, 186, 776 P.2d 525, 528 (1989).  The Barnes, Inc., note, Ex. 31, had a 3-year maturity, so any promise by B-Bar Tavern to be liable to repay that note is invalid unless in writing as required under the statute of frauds.  No such writing exists in the record.

MCA § 28-2-903(1)(b) provides that "a special promise to answer for the debt of another" must be in writing or be invalid[34].  *Phil-Co Feeds, Inc. v. First Nat'l Bank in Havre*, 238 Mont. 414, 777 P.2d. 1306, 1310 (1989); *McGowan Commercial Co. v. Midland Coal & Lumber*

---

[34]The exception referred to in MCA §§ 28-2-903(1)(b) and 28-11-105 ("When guaranty considered original obligation and need not be in writing") was neither invoked nor argued by the parties, nor has it any supporting evidence in the record that B-Bar Tavern promised to answer for Barnes, Inc.'s obligation to repay the loan.

*Co.*, 41 Mont. 211, 108 P. 655, 657 (1910).  The Montana Supreme Court noted that the statute

of frauds applies to liabilities based on contract.  *Phil-Co Feeds*, 777 P.2d at 1311.  The instant

case involves bank debt based on contract, so any promise by B-Bar Tavern to be personally

liable for Barnes, Inc.'s debt must be in writing or invalid under MCA § 28-2-903(1)(b).  Ex. 35

is B-Bar Tavern's grant of its property as security for the loan, it is not a promise to be personally

liable to repay Barnes, Inc.'s debt.

Turning from state law to "certain bankruptcy fundamentals" described *In re Smith*, 435

B.R. 637, 643 (9th Cir. BAP 2010):

> "The term 'debt' means liability on a claim. [11 U.S.C. § 101(12)].  "The term
> 'claim' means . . . right to payment, whether . . . such right is . . . [liquidated,
> unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed . . .]
> secured, or unsecured . . . ." § 101(5)(A).  "The term 'creditor' means . . . entity
> that has a claim against the debtor that arose at the time of or before the order for
> relief concerning the debtor . . . ." § 101(10)(A).

It is settled law that § 101(5)(A) adopts the "broadest possible definition" of claim.  *In re*

*Johnston*, 149 B.R. 158, 161 (9th Cir. BAP 1992).

Notwithstanding these broad definitions, the Court finds that PMB is not a creditor with a

right to payment from B-Bar Tavern of the debt stated in PMB's Claim 1 in the amount stated of

$820,923.27 on the petition date.  *Smith*, 435 B.R. at 643.  As stated above, no written evidence

exists in the record of a note or other promise by B-Bar Tavern to repay PMB's $741,041.10 loan

to Barnes, Inc.  Without a writing such a promise to repay would be invalid under Montana's

statute of frauds.

In the context of a bankruptcy discharge, this Court has noted that a discharge only

extinguishes a debtor's personal liability, and not debtor's actual debts.  *In re Britton*, 18 Mont.

55

B.R. 302, 303 (Bankr. D. Mont. 2000).  Here, the evidence shows that B-Bar Tavern has no personal liability to PMB for repayment of the $741,041.10 loan to Barnes, Inc., and that loan is not an actual debt owed by B-Bar Tavern, but rather a debt of Barnes, Inc.

Ex. 35 grants PMB a lien on B-Bar Tavern's property.  "Lien" means "a charge against or interest in property to secure payment of a debt or performance of an obligation."  11 U.S.C. § 101(37); *Smith*, 435 B.R. at 643.  PMB's lien against B-Bar Tavern's property is to secure payment of a debt owed by Barnes, Inc., not a debt owed by B-Bar Tavern.

The United States Supreme Court wrote:  "A bankruptcy discharge extinguishes only one mode of enforcing a claim--namely, an action against the debtor *in personam*--while leaving intact another--namely, an action against the debtor *in rem"* against assets.  *Johnson v. Home State Bank*, 501 U.S. 78, 84, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66, 84 (1991); *In re Krenzelok*, 15 Mont. B.R. 391, 393 (Bankr. D. Mont. 1996).[35]  Indeed, a secured creditor may stay aloof of the entire bankruptcy process, since valid liens pass through bankruptcy unaffected by the discharge.  *Dewsnup v. Timm*, 502 U.S. 410, 418, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992); *Farrey v. Sanderfoot*, 500 U.S. 291, 297, 111 S.Ct. 1825, 1829, 114 L.Ed.2d 337 (1991); *Krenzelok*, 15 Mont. B.R. at 393.

PMB did not stay aloof from this Chapter 11 case, but filed Proof of Claim 1 asserting a secured claim against B-Bar Tavern in the amount of $820,923.27 plus interest, charges and attorney's fees based upon the promissory note signed by Jack for Barnes, Inc., and Ex. 35.  The

---

[35]A secured creditor has a right to repossess its collateral if a debtor fails to make payments after discharge, without violating § 524(a)(2), so long as the creditor is not collecting the debt as a personal liability of the debtor.  *In re Garske*, 287 B.R. 537, 542, 545 (9th Cir. BAP 2002), citing *Johnson v. Home State Bank*, 501 U.S. at 80, 83, 111 S.Ct. 2150, 2154.

evidence shows and this Court finds and concludes that PMB has failed its ultimate burden of persuasion.  No evidence exists that B-Bar Tavern is personally liable for the $741,041.10 note, and therefore this Court disallows Proof of Claim No. 1 because it is based on the $741,041.10 debt owed by Barnes, Inc., to which PMB added interest, late charges, costs and attorney's fees.

One small component of Claim 1, $2,770.00 on the attachment, includes costs and attorney's fees due under the provisions of Ex. 35 which entitle the prevailing party to attorney's fees and costs.  If the TI survived the Plaintiff's other challenges to its validity, PMB might be entitled to file an amended Proof of Claim for those costs and attorney's fees under *Travelers*. However, below the Court concludes that the TI shown on Ex. 35 is invalid under Montana mortgage and acknowledgment statutes, so the attorney's fee and costs provisions of the TI do not survive.

### Contentions of the Parties.

Plaintiff B-Bar Tavern contentions include that the B-Bar Tavern TI does not identify the party whose debt is being answered for and thus is insufficient to satisfy the statute of frauds; that the TI was executed without reference to Dick Barnes' representative capacity so is not binding on the corporation B-Bar Tavern; that the notary's execution of the certificate of notarial act that did not identify the acknowledger nor his representative capacity does not satisfy Montana's mortgage statute; and that the statutory requirement that hand-written words prevail over typed words, together which require the conclusion that the TI, Ex. 35, was signed by Dick on March 25, 2009, subsequent to disbursement of the Barnes Inc. loan on March 24, 2009.  Plaintiff further argues that the parol evidence rule prevents the TI from being interpreted to refer to a Barnes Inc. debt, and that PMB is not entitled to equitable relief of reformation because PMB

57

failed to disclose fundamental changes in the assets of Barnes Inc, "clandestinely involving its mutual attorney" Potts, and acting in a manner that benefitted all parties but Plaintiff.

This Court first will address Plaintiff's contentions regarding Montana's mortgage and acknowledgment statutes, and although some overlap occurs the Court will discuss PMB's counterclaim for reformation separately afterward .

### The Trust Indenture – Ex. 35

Plaintiff contends that the March 2009 TI contains numerous defects, any one of which renders the TI ineffective due to its failure to comply with the requirements of Montana's Small Tract Financing Act and mortgage statutes. Plaintiff argues that B-Bar Tavern was not indebted to PMB, and no "Secured Debt" of B-Bar Tavern to PMB existed. Because of the defects, Plaintiff contends that it has the power under § 544(a) as a judgment lien creditor to avoid the TI.

PMB contends that Plaintiff is bound by the TI because it waived all claims against the validity and enforcement of the TI in the Settlement Agreement, and that the TI can be reformed to reflect the intention of the parties. PMB argues that the Plaintiff bears the burden of proof and has failed to satisfy its burden, while PMB fully performed under the TI and all related documents in October 2008 and March 2009 loans, that Plaintiff has not taken the steps required for rescission[36] of the TI, and therefore Plaintiff is bound by the TI.

Both sides argue this Court's decision in *Brandon v. GMC Mortgage, LLC (In re*

---

[36]PMB devotes a section on rescission, which it states Plaintiff seems to raise "by implication" even though it is not in the Pretrial Order. PMB argues that Plaintiff has not repaid the loaned funds as required to rescind promptly under MCA § 27-2-1713. Plaintiff's reply brief states that it does not seek the remedy of rescission. Based on Plaintiff's reply, and because rescission is not raised in the pleadings or Pretrial Order, this Court does not address rescission herein.

*Simmons)*, 2012 WL 1899375 (Bankr. D. Mont. 2012), *aff'd*., 2012 WL 5304701 (D. Mont.).

*See, e.g., In re B-Bar Tavern Inc.*, 497 B.R. 84, 95 (Bankr. D. Mont. 2013).  The district court in

affirming *Brandon* noted that a trust indenture which does not conform with the Small Tract

Financing Act (the "Act") is considered to be a mortgage and is subject to all laws relating to

mortgages on real property under MCA § 71-1-321.  *Brandon*, 2012 WL 5304701 at *2.  Section

71-1-305 also provides that a trust indenture is deemed to be a mortgage and is subject to all laws

relating to mortgages on real property except to the extent that such laws are inconsistent with

the provisions of the Act.  The parties do not argue about inconsistencies between the Act and

ordinary mortgage statutes

      PMB cites MCA § 71-1-304 for the proposition that a grantor can grant a lien on real

property to secure a loan to a party other than a grantor.  Under the Act, MCA § 71-1-304(1)

provides that a trust indenture "may be made to secure the performance of an obligation of a

grantor *or any other person named in the indenture* to a beneficiary . . . ."  (Emphasis added).

*See Citizens State Bank v. Ryan*, 243 Mont. 23, 26, 792 P.2d 1116, 1118 (1990).  In interpreting

Montana's statutes, the Court looks first to the plain meaning of the words used in the statute.

*Pilgeram v. Greenpoint Mortg. Funding, Inc.*, 2013 MT 354, ¶ 15, __ Mont. __, __ P.3d __ ; *In*

*re Maynard*, 2006 MT 162, ¶ 5, 332 Mont. 485, 139 P.3d 803.  The Montana Supreme Court

explained that "we first look to the plain meaning of the statute's words. [*Williamson v. Mont.*

*Pub. Serv. Comm'n*., 2012 MT 32, ¶ 36, 364 Mont. 128, 272 P.3d 71].  If the language is clear

and unambiguous, we will not resort to other means of interpretation.  *Williamson*, ¶ 36 (citing

*Rocky Mt. Bank v. Stuart*, 280 Mont. 74, 80, 928 P.2d 243, 246-47 (1996)."  *Pilgeram*, 2013 MT

354, ¶ 15.  Applying the plain meaning of MCA § 71-1-304(1), that statute clearly provides that a

trust indenture such as Ex. 35 may be made to secure the performance of "any other person named in the indenture," even if the grantor is not the obligor for the underlying debt such as in the instant case. Ex. 35, however, nowhere names Barnes, Inc., as the obligor. Instead it mistakenly names B-Bar Tavern as the obligor of the secured debt at paragraph 4 on page 2. As such, Ex. 35 does not comply with MCA § 71-1-304(1).

The regular mortgage statutes include MCA § 71-1-201 ("What real property may be mortgaged – debts secured"), which provides in pertinent part that property may be mortgaged "to secure existing debts, *to secure debts created simultaneously with the execution of the mortgage*, . . . ." Montana's rule of statutory interpretation is to apply the plain meaning of a statute, which means simply to ascertain and declare what is in terms or in substance contained in the statute, and not to insert what has been omitted or omit what has been inserted. *Clouse v. Lewis and Clark Cnty.*, 2008 MT 271, ¶ 50, 345 Mont. 208, 220, ¶ 50, 190 P.3d 1052, ¶ 50; *State v. Martel*, 273 Mont. 143, 150, 902 P.2d 14, 19 (1995). Nothing in MCA § 71-1-201 requires that the debt created be owed by the mortgagor in order for property to be mortgaged to secure a debt. Instead, the plain language of MCA § 71-1-201 allows the mortgage of any interest in real property to secure debts created simultaneously with the execution of the mortgage. Under MCA § 71-1-201, Ex. 35 would be valid as a mortgage if it is executed simultaneously with the debt evidenced by Ex. 31 on March 24, 2009.

However, a dispute exists between the parties about the date Dick executed Ex. 35. His handwritten signature on page 11 of Ex. 35 states "3/25/9" while the printed dates on page 1 and the acknowledgment on page 12 state March 24, 2009. MCA §§ 1-4-105 and 28-3-205 provide that when an instrument contains partly written words and partly language in preprinted form, the

written words control the pre-printed form.  *Matter of Estate of Lahren*, 268 Mont. 284, 288, 886

P.2d 412, 414 (1994).  Therefore, subject to PMB's counterclaim for reformation, Dick's

handwritten date of "3/25/9" controls and Ex. 35 does not comply with the requirement of MCA

§ 71-1-201 that the mortgage secure a debt created simultaneously with the execution of the

mortgage, because the debt on Ex. 31 was created the day before Dick's handwritten date of

March 25, 2009, on Ex. 35.

A third mortgage statute provides a suggested "Form of mortgage."  MCA § 71-1-204

provides in pertinent part:  "That the mortgagor mortgages to the mortgagee (here describe the

property), as security for the payment to the mortgagor of ... dollars, on (or before) the ... day of

..., in the year ..., with interest on that amount (or as security for the payment of an obligation,

*describing it*, etc.)."  (Emphasis added).  This Court believes, it goes without saying, that the

obligation must be described accurately.  Ex. 35 does not describe the Barnes, Inc., obligation on

the debt accurately because it states that the secured debt is owed by B-Bar Tavern on paragraph

4, not by Barnes, Inc.

Plaintiff argues that a trust indenture under MCA § 71-1-204 must contain a description

of the obligation for which the mortgage is security.  PMB responds that MCA § 71-1-204 states

that a mortgage "may" be made in a suggested form, and that Montana law requires only that a

mortgage be in writing and to state the amount of future advances or total indebtedness.  MCA §

71-1-206(1).

MCA § 71-1-206(1) does provide that future advances or total indebtedness "must be

stated in the mortgage[,]" but it does not relieve PMB of the obligations of the other mortgage

statutes to describe the debt.  Basic principles of statutory interpretation found at *Heuther v. Dist.*

61

*Ct.*, 2000 MT 158, ¶ 28, 300 Mont. 212, 220, ¶ 28, 4 P.3d 1193, 1198, ¶ 28

(concurring/dissenting opinion) include:

> When a statutory scheme has several provisions, a construction is to be adopted which will, if possible, give effect to all. Section 1-2-101, MCA. A statute dealing with a particular subject will control over a general statute which is inconsistent with it. Section 1-2-102, MCA. And finally, an interpretation which gives effect to a statute is preferred to one which would make it void. Section 1-3-232, MCA, and *Mead v. MSB, Inc.* (1994), 264 Mont. 465, 474, 872 P.2d 782, 788.

PMB's interpretation MCA § 71-1-206(1) would make void the requirements of the other mortgage statutes that a debt be accurately described in a mortgage.  The requirement of MCA § 71-1-206(1) that future advances and total indebtedness be stated in a mortgage does not negate what this Court considers a requirement that the debt be accurately described.

PMB cites *Swords v. Occident Elevator Co.*, 72 Mont. 189, 192, 232 P. 189 (1924) for the proposition that mortgage statutes are to be liberally construed with respect to real estate mortgages, and that leads to the conclusion that the TI is valid.  The reference in *Swords* is to the predecessor of MCA § 1-2-103, which continues to state simply that the common law rule, that statutes in derogation thereof are to be strictly construed, has no application to Montana's statutes, and "their provisions and all proceedings under them are to be liberally construed with a view to effect their objects and to promote justice."  MCA § 1-2-103.  PMB misinterprets the meaning of this general provision for statutory construction.  MCA § 1-2-103 is not particular to mortgage statutes, and it cannot cure PMB's failures to correctly describe the debt in Ex. 35 and otherwise comply with the mortgage statutes.  Rather, by its terms MCA § 1-2-103 specifically states that the statutes "establish the law of this state respecting the subjects to which they relate, and their provisions and all proceedings under them are to be liberally construed with a view to

effect their objects and to promote justice."  Plaintiff is not attempting to impose any common

law rule, but rather Plaintiff argues that PMB failed to comply with the statutory requirements

under the mortgage statutes and Act.  Liberal construction cannot cure PMB's admitted mistakes

and failures to accurately complete execution of Ex. 35 in accordance with Montana's mortgage

statutes.

Plaintiff argues that the debt of B-Bar Tavern identified in Ex. 35 does not exist, and cites

*Hone v. Carlson,* 2001 WL 27382 (Wash.App.Div. 3) for the rule that "[A] mortgage cannot

exist without a debt, and that debt must be identified and the amount fixed with certainty."

(quoting *Koster v. Wingard*, 314 P.2d 928 (1957)).  PMB argues that *Hone v. Carlson* is an

unpublished decision which should not be cited as authority.  The Court agrees.  Montana's

statutes and case law are sufficient for this decision without the need for the Court to refer to

unpublished decision from another state decided on that state's statutes.

Plaintiff cites *Jones v. Hall*, 90 Mont. 69, 67, 300 P. 232, 234 (1932) that a mortgage

cannot exist beyond the life of the debt or obligation it is given to secure.  Since the "Secured

Debt" identified in Ex. 35 as owed by B-Bar Tavern does not exist, Plaintiff argues that Ex. 35

fails to provide the debt information required by statute and no default can occur of the

nonexistent Secured Debt.  Hence, Plaintiff argues, the identification of a non-existent Secured

Debt in paragraph 4 of Ex. 35 invalidates the TI.  For purposes of Montana's mortgage statutes,

the Court agrees.

Plaintiff argues that the uncertainty in the TI should be construed most strongly against

the party who caused the uncertainty to exist, MCA § 28-3-206, and that party is PMB.  The

Montana Supreme Court has noted that MCA § 28-3-206 is not a peremptory rule requiring that a

63

non-drafting party prevail in all cases, but rather is a rule of interpretation that requires a court to interpret the contract "most strongly" against the drafting party. *Travelers Ins. Co. v. Holiday Vill. Shopping Ctr. Ltd.,* 280 Mont. 217, 224, 931 P.2d 1292, 1296-97 (1996).

PMB argues that the amount of the loan stated on the TI, the interest rate, maturity date; the assignment of leases and rents also executed by Plaintiff on March 24, 2009, identifying the PMB loan number; Dick's personal guaranty and his testimony that the March 2009 documents evidenced a continuation of the same transaction, taken together compel the conclusion that the TI is valid. PMB cites MCA § 28-3-203 as support for taking several contracts between Plaintiff and PMB together as one transaction, *viz.*, the loan to Barnes, Inc., and the security granted for that loan by Plaintiff. PMB argues that the mutual intention of the parties should be ascertained from the documents and trial testimony under MCA § 28-3-301, and that the mutual intention is readily ascertainable that Dick knew the two TI's he signed in PMB's favor were to be security for a loan to Barnes, Inc. PMB further argues that the circumstances surrounding execution of the TI should be referenced under Montana's rule of construction MCA § 28-3-402, and those circumstances compel the conclusion that the TI was to secure PMB's loan to Barnes, Inc.

Plaintiff cites the parole evidence rule as reason to preclude PMB from offering any evidence of the parties' intent or meaning of "Secured Debt" on the TI, Ex. 35. Plaintiff cites the integration clause at paragraph 25 on page 15 of Ex. 35 which provides: "This security agreement is complete and fully integrated." Plaintiff cites Montana's parol evidence rule, MCA § 28-2-904, and the Montana Supreme Court's decision in *Richards v. JTL Grp. Inc.*, 2009 MT 173, ¶ 16, 350 Mont. 516, 522, 212 P. 3d 264, that an integration clause expresses the intention that the writing represents a complete and final agreement barring consideration of evidence

other than the terms of the writing.

PMB argues that *JTL* is inapplicable because it held that oral terms excluded from the written agreement were not part of the parties agreement based on the parole evidence rule, while the instant case involves a mutual mistake in the TI, not a claim that additional oral terms should be added to the trust indenture. PMB admits that the TI reflects a mistake in referencing the secured debt as that of B-Bar Tavern rather than Barnes, Inc., but PMB argues that allowing Plaintiff to take advantage of that mistake to invalidate the TI instead of rectifying the mistake is not legally or equitably appropriate.

In *JTL* the Montana Supreme Court noted that as a general rule the parol evidence rule "precludes the admission of extrinsic evidence of an unambiguous integrated writing in any situation involving parties to the instrument when the rights and duties created by the document are the dispositive issue." *JTL,* at ¶ 16, quoting *In re Marriage of Olson*, 2005 MT 57, ¶ 17, 326 Mont. 224, 108 P.3d 493. The court noted that the intention that a writing represents a final and complete agreement is often expressed as an integration clause. *JTL,* at ¶ 16, quoting *In Brimstone Min., Inc. v. Glaus*, 2003 MT 236, ¶ 46, 317 Mont. 236, 77 P.3d 175. An exception is found at MCA § 28-2-905(1)(a) when a mistake or imperfection of the writing is put into issue by the parties, such as in the instant case, which will be discussed below. For purposes of the Act and mortgage statutes, this Court will construe Ex. 35 against the party that drafted it pursuant to MCA § 28-3-206, and will enforce the integration clause which PMB included in Ex. 35 and bars extrinsic evidence. The Court finds that Ex. 35 violates the Act and mortgage statutes by incorrectly identifying B-Bar Tavern as owing the "Secured Debt" at paragraph 4.

**Representative Capacity**

65

Plaintiff contends that the TI is executed by Dick Barnes personally, not in a representative capacity for B-Bar Tavern, and that the corporate resolution, Ex. H, did not authorize Dick to execute the TI except as security for B-Bar Tavern debt. Page 16 of Ex. 35 plainly shows that Dick did not sign "Pres" after his signature like he did on other loan documents in the record.

Plaintiff argues that Dick was not authorized to execute a TI or give security for the debt of another entity. The evidence, however, shows that Dick is president and sole shareholder of B-Bar Tavern. He intended to sign Ex. 35 to help his brother, and no evidence exists in the record of any other entity or person with authority to prohibit Dick from pledging B-Bar Tavern's property as security for Barnes, Inc.'s debt.

Plaintiff cites *Baker v. Power*, 7 Mont. 326, 328, 16 P.589, 590 (1888) and *Alpine Bank v. Moreno (In re Moreno)*, 293 B.R. 777, 780, 785 (Bankr. D. Colo. 2003), as support for its contention that since Dick Barnes signed the TI individually, and not in his capacity as president of B-Bar Tavern, that B-Bar Tavern did not execute the TI. PMB argues that Dick's testimony establishes that he executed the TI in October 2008 in his capacity as B-Bar Tavern's president, and that he was authorized by the corporate resolutions to sign documents which PMB presented to him in October 2008 and March 2009 as a continuation of the same transaction. Tr., pp. 330-32, 352. As above, the parole evidence rule and integration clause prevent the Court from looking beyond the language of the mortgage. *Baker v. Power*, 16 P. at 590. Ex. 35 does not include Dick's signature as president of B-Bar Tavern, and therefore for purposes of the mortgage statutes, and subject to PMB's counterclaim, the Court finds that Dick did not sign Ex. 35 in a representative capacity for B-Bar Tavern.

66

PMB argues that the language of Ex. H shows that Dick was given authority to sign the TI pledging B-Bar Tavern's property as security for sums borrowed, that the corporate resolution does not specify by whom the sums must have been borrowed and this Court should not insert language that the sums must be borrowed by Plaintiff.  Plaintiff replies that PMB prepared the corporate resolution so any ambiguities are resolved against PMB.  *Eldredge v. Asarco, Inc.*, 2011 MT 80, ¶ 43, 360 Mont. 112, 252 P3d 182 ("this Court generally construes any ambiguity or omission in a contract against the drafter." (citing *Performance Mach. v. Yellowstone Mt. Club*, LLC, 2007 MT 250 ¶. 39, 339 Mont 259, 169 P.3d 394)).  The flaw in Plaintiff's reliance on *Eldredge* is that the corporate resolution is not a contract between the Plaintiff and PMB. While PMB may have prepared Ex. H, PMB did not sign it and is not a party to a contract with Plaintiff represented by Ex. H.  Plaintiff's officers are the only signatories.

Ex. H also includes language authorizing Plaintiff to "borrow money on behalf of and in the name of Corporation, sign, execute and deliver promissory notes or other evidence of indebtedness."  Arguing that ambiguity as to the phrase "sums borrowed" is resolved against PMB, Plaintiff's reply argues that the terms "sums borrowed" relate to the sums borrowed as authorized by the preceding section which applies only to sums borrowed by the corporation, and that B-Bar Tavern lacked corporate authority to mortgage its property to secure Barnes, Inc.'s debt.  Plaintiff argues that B-Bar Tavern's lack of corporate authority to mortgage its property is consistent with Dick's execution of the TI personally rather than in a representative capacity for B-Bar Tavern, and that PMB failed its responsibility to assure that its loan documents were prepared and executed in conformity with the law.  The Court agrees that Dick did not sign Ex. 35 in a representative capacity for B-Bar Tavern as required, but from Dick's testimony it is clear

67

that he intended to, and the Court will address that below.

### Acknowledgment

MCA § 71-1-207(1) provides that mortgages may be acknowledged and recorded in the same manner as grants of real property. MCA § 70-21-203 provides the requirements for acknowledgment of an instrument before it can be recorded, including acknowledgment of execution of an instrument by a corporation's president or other officer authorized by resolution to act on behalf a the corporation, and notarization of proof of execution. MCA § 70-21-203; *McWilliams v. Clem*, 228 Mont. 297, 305, 743 P.2d 577, 582 (1987).

Plaintiff contends that Dick Barnes' signature on the TI was not an acknowledgment on behalf of B-Bar Tavern as required under MCA § 1-5-602, MCA, and therefore the TI was not acknowledged in the manner as a grant of real property as required under MCA § 70-21-203. Plaintiff argues that the TI was not acknowledged in accordance with MCA § 1-5-602(1) because it lacks a certification that the signature of Dick Barnes was in a representative capacity, or that his signature was given with authority granted by the B-Bar Tavern corporate entity. Plaintiff argues that Dick's signature on the TI is not in a representative capacity for B-Bar Tavern, and the certificate is left blank so the acknowledgment is invalid.

Plaintiff further argues that the notary, Robbins, testified she has no knowledge that Dick Barnes is an officer of or affiliated with B-Bar Tavern. Another defect cited by Plaintiff is the incongruent dates. Dick Barnes' signature includes his handwritten date of March 25, 2009, but the notary signed the acknowledgment on March 24, 2009. Plaintiff argues that this evidence on the face of the document renders the trust indenture defective.

PMB argues that the acknowledgment meets the requirement of MCA § 1-5-609(1) and

68

(2) because it indicated the notary's certificate and indicated the notary's jurisdiction, the date the act is performed , the title of the notary's office, officer's residence, date of expiration of officer's office and includes the officer's seal.  PMB refers to testimony of both Robbins and Hannah that they knew Dick at the time he executed the TI, and that Dick presented himself as B-Bar Tavern's president when he executed the TI.  Therefore, PMB argues, the requirements for the taking of an acknowledgment under MCA § 1-5-603(1) were met, and that Dick's acknowledgment and presentation of himself as Plaintiff's president meant that he signed the TI with proper authority under MCA § 1-5-602(1).  Like the mortgage statutes, PMB contends that Montana's acknowledgment requirements should be liberally interpreted to correct an omission from the face of the instrument or other parts of the certificate.

"In taking an acknowledgment, the notarial officer shall determine, either from personal knowledge or from satisfactory evidence, that the person appearing before the officer and making the acknowledgment is the person whose true signature is on the instrument."  MCA § 1-5-603(1).  The evidence shows that Robbins satisfied the requirements of MCA § 1-5-603(1).  She testified that she knows Dick and knew that he is the person who signed Ex. 35.

"Acknowledgment" is defined at MCA § 1-5-602(1) as "a declaration by a person that the person has executed an instrument for the purposes stated in the instrument and, if the instrument is executed in a representative capacity, that the person signed the instrument with proper authority and executed it as the act of the person or entity represented and identified in the instrument."

MCA § 1-5-609 describes what is required for a certificate of notarial acts.  MCA § 1-5-609(1) describes what must be included in a certificate of notarial act, which is not in dispute,

69

and MCA § 1-5-609(2) requires in addition that the certificate be in the short form set forth in MCA § 1-5-610 or a form otherwise prescribed by law.  MCA § 1-5-610 sets forth two (2) short-form certificates of notarial acts required for acknowledgment in an individual capacity, and for an acknowledgment in a representative capacity. *See Point Serv. Corp. v. Myers*, 2005 MT 322, ¶ 23, 329 Mont. 502, 508, 125 P.3d 1107 (2005).  MCA § 1-5-610 provides that the short-form certificates "are sufficient for the purposes indicated *if they are completed* with the information required by . . . ."  (Emphasis added).

Page 12 of Ex. 35 includes both short-form certificates of notarial acts described in MCA § 1-5-610, one for an individual capacity, which is left blank, and the second for "Business or Entity Acknowledgment" which Robbins signed as notary, naming B-Bar Tavern as the entity. However, the acknowledgment does not name Dick or his title, which is required.  Robbins admitted that Dick's name and representative capacity were required on the acknowledgment, and that it was a mistake for her to leave them out.

It is not this Court's role to fill in the blanks of the acknowledgment for PMB.  "In the construction of an instrument, the office of the judge is simply to ascertain and declare what is in terms or substance contained therein, not to insert what has been omitted or to omit what has been inserted.  Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all."  MCA § 1-4-101.

Based on the lack of Dick's name and representative capacity on the acknowledgment on page 12 of Ex. 35, the Court finds that Ex. 35 was not properly acknowledged as required under MCA §§ 1-5-602(1), 1-5-609(2) and 1-5-610.  Not having been properly acknowledged, Ex. 35 could not be recorded pursuant to MCA § 70-21-203.

70

### Lack of Consideration

Next Plaintiff argues that the TI fails for lack of consideration, because B-Bar Tavern received no consideration for the TI and has no financial obligation to PMB.  Plaintiff argues that past consideration is not sufficient to support a promise, citing *Access Organics, Inc. v. Hernandez*, 2008 MT 4, ¶ 21, 341 Mont. 73,175 P.3d 899, and that any detriment claimed by PMB occurred the day before Dick signed the TI, when the Barnes, Inc., note was signed and funds disbursed on March 24, 2009.  Since PMB had already completed its performance of the loan on March 24, 2009, Plaintiff argues, the "pre-existing duty doctrine" applies and no consideration existed for the TI when Dick Barnes signed the TI the following day on March 25, 2009, and so the TI fails for lack of consideration.  *Carroccia v. Todd*, 189 Mont. 172, 177, 165 P.2d 225, 227 (1980).

With respect to the dispute about when Dick executed Ex. 35 in March 2009, Plaintiff argues that Dick's handwritten date is on the face of the TI, that the notary certificate is incomplete and suspect and the notary testified she has no recollection of Dick's signature while Dick testified that he signed the TI is Potts' office and hand wrote the date.  Tr., p. 325. Handwritten words on an instrument control words in printed form when they are inconsistent. MCA § 1-4-105.  Plaintiff argues that Dick's handwritten date of March 25, 2009, controls and thus he signed the TI when PMB had already disbursed the loan to Barnes, Inc., and as a result the TI fails for lack of consideration.

PMB argues that the evidence shows that Dick signed Ex. 35 on March 24, 2009.  PMB cites *Flathead Cnty. Welfare Dep't. v. Endres*, 166 Mont. 379, 533 P.2d 959 (1975), and *Hoerner Waldorf Corp. of Mont. v. Bumstead-Woolford Co.*, 158 Mont. 472, 479-80, 494 P.2d 293, 297

71

(1972) as support for broadly interpreting MCA § 1-4-105.  PMB contends that the date of March

24, 2009, is typed on the TI and is not one of the pre-printed terms of the TI, so the typed date of

March 24, 2009, is given the same weight as the handwritten date of March 25, 2009, so

Plaintiff's lack of consideration argument fails.  The Montana Supreme Court stated as a

"fundamental principle of contract law that written *or typewritten* provisions in a contract take

precedence over printed provisions."  *North Fork Pres. Ass'n v. Dep't of State Lands*, 238 Mont.

451, 462, 778 P.2d 862, 869 (1989), citing *Hoerner Waldorf*.  The date March 24, 2009, on page

1 and page 12 were entered by Hannah when she generated Ex. 35 on the date of the closing,

March 24, 2009.  For purposes of MCA § 1-4-105, the date March 24, 2009, entered by PMB is

just as original as Dick's handwriting, as opposed to the pre-printed forms from PMB's software

program.  *Hoerner Waldorf,* 158 Mont. at 479-80, 494 P.2d at 297.

PMB argues that Potts testified that Dick was not in Potts' office on March 24, 2009, or

March 25, 2009, and that Robbins is an employee of PMB who testified that she notarized Dick's

signature on the TI on March 24, 2009.  PMB argues that Dick admitted at his deposition that he

could be wrong in contending that he signed the TI at Potts' office, and that Plaintiff cannot

prove that Dick signed the TI at Potts' office on March 25, 2009, while Robbins, Hannah and

Vukasin each testified that Dick signed the TI at PMB on March 24, 2009, when he also signed

twenty related documents.  PMB argues that it would not disburse loan funds without signed loan

documents and does not allow a borrower to sign loan documents without a notary present.  If

Dick had come to PMB to sign the TI on March 25, 2009, PMB argues, it would have reprinted

the TI with the correct date.

Faced with conflicting testimony, the Court must make a determination of witness

72

credibility.  Evaluating the weight to be assigned to witness testimony is the province of the bankruptcy court.  *See Groves v. Pickett*, 420 F.2d 1119, 1126 (9th Cir. 1970).  Having observed the demeanor of the witnesses while they testified under oath, and consideration of the impeachment of Dick and Vukasin, the Court finds that Vukasin was not a credible witness, and that Dick was not credible when he testified that he signed Ex. 35 at Potts' office on March 25, 2009.  *See Allen v. Iranon*, 283 F.3d 1070, 1078 n.8 (9th Cir. 2002); *In re Taylor*, 514 F.2d 1370, 1373-74 (9th Cir. 1975);  *Anderson v. City of Bessemer City*, N.C., 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *See also*, *Casey v. Kasal*, 223 B.R. 879, 886 (E.D. Pa. 1998).

Plaintiff's counsel impeached Vukasin repeatedly.  First with respect to whether PMB had a loan limit problem, then regarding whether she gave the "Dutch Uncle" talk to Dick in March 2009, then with respect to several statements she made in Ex. 53 while applying for insurance, and finally about credit concentration and a FDIC consent order, Ex. 50.  Several times, when impeached about whether loan limits or credit concentration were problems for PMB, Vukasin was forced to admit they were after first denying it.  Her explanation is that a problem is not a problem if she has a solution.  Such reasoning is specious and incompatible with her obligation to testify truthfully under oath.  As a result of Vukasin's dissembling, the Court gives her testimony no probative weight, unless it is corroborated by other credible evidence in the record.  By contrast, Plaintiff failed to impeach Hannah or Robbins, and the Court finds that they both are credible witnesses.  They freely admitted mistakes they made and, unlike Vukasin, did not attempt to whitewash problems.

As for Dick, the Court finds that Dick was not a credible witness when he testified that he signed Ex. 35 at Potts' office on March 25, 2009.  PMB's counsel impeached Dick at trial with

73

his deposition testimony that he could have been mistaken when he claimed that he signed it at Potts' office on March 25, 2009. Hannah and Robbins each testified that Dick signed Ex. 35 at PMB on March 24, 2009. Vukasin also testified that Dick signed Ex. 35 at PMB on March 24, 2009, and while Vukasin is not credible her testimony provides some corroboration to the testimony of Hannah and Robbins.

By contrast, Dick is alone in testifying that he signed Ex. 35 at Potts' office on March 25, 2009. In addition to being impeached by his deposition testimony, Tr., pp. 357-58, Dick's testimony at trial is vague and evasive. He testified that he could not "place himself" at PMB when he signed Ex. 35. He places himself at Potts' office. No witness corroborated Dick's testimony that he signed Ex. 35 at Potts' office, and the Court finds that Dick is not credible. Dick testified that his wife accompanied him to Potts' office where he signed Ex. 35, but Plaintiff did not call Dick's wife to testify and corroborate Dick's testimony. Jack testified that he could not remember, so he provided no corroboration for Dick.

Potts directly contradicted Dick's testimony. Potts testified that Dick did not come to his office on March 25, 2009. In addition, no evidence exists in the record placing the notary Robbins at Potts' office on March 25, 2009, or at any time. Hannah and Robbins testified that Dick signed Ex. 35 at PMB on March 24, 2009, at which location and on which date Robbins notarized his signature on Ex. 35.

Robbins testified that she has not notarized any documents other than at her place of employment, and would not have notarized Dick's signature if he had brought the TI to her already signed, and she further testified that PMB never placed her in the situation of being asked to notarize a document which was already signed. Her testimony is corroborated by Hannah, and

74

the Court finds that it is credible.

Further evidence that Dick signed Ex. 35 at PMB is provided by Hannah's testimony that she reviewed the loan documents, and only released the loan proceeds when she determined that she had all required signatures, including Dick's.  Ex. 51, which is Plaintiff's own evidence, corroborates Hannah's testimony by showing the release of the $741,041.10 note advance on March 24, 2009.  Hannah denied the suggestion by Plaintiff's counsel that PMB made a mistake and released the loan funds prematurely, before Dick signed Ex. 35.  There is no credible evidence that PMB released the loan funds without Dick's signature on Ex. 35, and Plaintiff's suggestion that PMB mistakenly released the loan is attorney argument which is not admissible in evidence and therefore not relevant.  *Hurley v. Student Loan Acquisition Auth. of Ariz.* (*In re Hurley*), 258 B.R. 15, 23 (Bankr. D. Mont. 2001) (An attorney's argument is not evidence); *United States v. Velarde-Gomez*, 224 F.3d 1062, 1073 (9th Cir. 2000).

As a result, the Court finds and concludes that Dick signed Ex. 35 at PMB's place of business on March 24, 2009.  Dick's handwritten date of "3/25/9" on page 16 of Ex. 35 is a mistake by Dick, and Plaintiff's contention that Ex. 35 fails for lack of consideration is not supported by a preponderance of credible evidence.

### Steven Potts

Plaintiff argues that Potts was the Barnes family lawyer and represented Barnes, Inc., and B-Bar Tavern, but that Potts did not advise Dick that Potts was a shareholder of PMB, that Potts did not have a written waiver of conflict of interest and did not advise Dick of the financial restructure of Barnes Inc., when Dick signed Ex. 35.  PMB argues that Potts formed the idea to create the two new entities and transfer ownership of Barnes, Inc.,  properties before any

75

discussion with Vukasin, in order to address the lending limit issues and for tax purposes and liquor license issues.  PMB argues that it played no part in the creation of the two Prospector entities and did not pay Potts for that work.

As stated above, Plaintiff's claims against Potts are for an appropriate forum other than this adversary proceeding.  Potts testified that he formed the new LLC's acting as attorney for Barnes, Inc.  No evidence exists in the record to the contrary.  Plaintiff's Ex. 43 is Potts' billing invoices to PMB, and it does not show that Potts billed PMB for any portion of the formation of the new LLC's for Barnes, Inc.  Plaintiff's contentions that Potts was acting as counsel for PMB in forming the new LLC's is speculative and wholly attorney argument.

The only evidence tying PMB to the formation of the new LLC's is Potts' testimony that Vukasin offered for PMB to pay Potts for his time spent forming the new LLC's.  Vukasin denied making that offer, but she is not a credible witness.  In the end, however, no evidence exists in the record that PMB in fact paid Potts for forming the new LLC's.  Ex. 43 does not show that Potts billed PMB for those services, and Potts testified that PMB did not pay him for those services.  In balancing the equities in this case, with both Jack and Dick testifying that PMB fully performed its obligations in loaning money to Barnes, Inc., the Court finds no countervailing weight in an unfulfilled promise by Vukasin to pay Potts for forming the new LLC's.

Potts testified that he was acting as attorney for Barnes, Inc., in forming the new LLC's. He consulted with Barnes, Inc's accountant Koontz in preparing the formation of new LLC's, and Jack went along with the strategy.  Plaintiff does not explain how the PMB's acceptance of the proposal coming from Jack to transfer Barnes, Inc.'s properties to the new LLC's was

inequitable conduct.  As Potts explained, and Vukasin grudgingly conceded, PMB was required

by law to stay within its loan limits.  PMB's acceptance of the transfer proposal cannot be

inequitable conduct by PMB with respect to Dick, who several times testified that he was willing

to help his brother.

Potts testified that Dick's recourse, in the event of foreclosure, was against Jack, who did

not disclose to Dick that Jack had transferred Barnes, Inc.'s properties to the new LLC's.

Plaintiff argues that PMB did not explain the transfers to Dick, but Hannah testified that she did

explain to Dick about the transfers of Barnes, Inc.'s properties to the new LLC's when Hannah

gave Dick the second "Dutch Uncle" talk when he signed Ex. 35.[37]  Dick disagreed, though he

admitted that he was given the "Dutch Uncle" talks, but they did not "soak in."

### Settlement Agreement

Plaintiff admits that it entered into a Settlement Agreement with PMB, Ex. Q, releasing

PMB from any claims and acknowledging that the loan documents were valid, binding and

enforceable.  However, Plaintiff argues that the Settlement Agreement and release predated the

above-captioned bankruptcy, and that the Plaintiff as debtor-in-possession has strong arm powers

under § 544(a)(1), which are not subject to the Settlement Agreement.  PMB contends that

Plaintiff bears the burden of proof that it is not bound by the settlement agreement, and that

Plaintiff provided no authority for its contention that it is not bound as the debtor-in-possession.

By reply, Plaintiff cites 11 U.S.C. § 1107 which gives a debtor in possession a trustee's

avoiding powers as a judicial lien creditor under § 544(a)(1) to avoid a lien that can be preempted

---

[37]For what it is worth, Vukasin corroborated Hannah's testimony that she told Dick about
the transfers at PMB on March 24, 2009.

by a judgment lien creditor.  Plaintiff contends that since PMB's TI is invalid for the defects discussed above,[38] PMB's lien is trumped by the Debtor-in-Possession as subsequent judgment creditor.

This Court agrees that Plaintiff's statutory trustee powers as debtor-in-possession are not subject to the Settlement Agreement, which predated the filing of the petition which commenced the case under Title 11 and empowered the Plaintiff under § 544(a).  Plaintiff did not have strong arm powers at the time of the Settlement Agreement, and nothing in the Settlement Agreement, Ex. Q, purports to waive the provisions of the Bankruptcy Code.[39]

Count Five of the complaint is based on § 544(a) which provides in pertinent part:

(a) The trustee shall have, as of the commencement of the case, and without any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by –

   (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

   * * * *

   (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

---

[38]The alleged defects being:  Non-existence of the debt identified on the TI as being secured, Dick's execution of the TI in an individual not representative capacity, and the inadequate acknowledgment.

[39]Any such provision waiving rights under the Bankruptcy Code would be suspect as akin to an ipso facto clause, and rejected as against public policy embodied in the Bankruptcy Code. Bankruptcy policy generally prevents enforcement of *ipso facto* clauses.  *See, e.g.*, 11 U.S.C. § 365(b)(2) & (e); 3 COLLIER ON BANKRUPTCY ¶ 365.08[1] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed., 2013)

Plaintiff as Trustee has "strong-arm powers" which include a perfected lien on the real property as a judicial lien creditor under 11 U.S.C. § 544(a)(1), and in addition hypothetical status as a BFP of real property to avoid any transfer of property of the debtor that is voidable by a bona fide purchaser of real property under § 544(a)(3). *Simmons*, 2012 WL 1899375 at * 7; *Brandt v. Esplanade of Cent. Mont., Inc. (In re Esplanade of Cent. Mont., Inc.)*, 19 Mont. B.R. 162, 175-76 (Bankr. D. Mont. 2001); *Robinson v. Nichols*, 16 Mont. B.R. 27, 33-34 (Bankr. D. Mont. 1997).

Count Five seeks lien avoidance § 544(a)(1) & (a)(3). Section 541(a)(1) allows a trustee in bankruptcy rights as a judicial lien creditor to avoid unperfected interests in real and personal property. *Simmons* at * 7; *Brandt*, 19 Mont. B.R. at 175; *Richardson v. Nichols*, 16 Mont. B.R. at 33. State law determines whether a trustee's status as a BFP will defeat the rights of persons against whom a trustee seeks to assert his or her powers under § 544(a)(3). *Simmons*, 2012 WL 1899375 at * 8; *Brandt*, 19 Mont. B.R. at 176; *In re Prof'l. Inv. Props. of Am.*, 955 F.2d 623, 627 (9th Cir. 1992), *cert. denied*, 506 U.S. 818, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992).

Above, this Court concluded that PMB failed to satisfy the requirements of Montana's mortgage and acknowledgment statutes in completing execution of Ex. 35. That failure means that Ex. 35 did not satisfy Montana law for recording the mortgage under MCA § 70-21-203. Subject to the Court's decision on PMB's counterclaim seeking reformation, PMB's lien is subject to avoidance by the Debtor-in-Possession under § 544(a). The release provision of the Settlement Agreement, Ex. Q, did not deprive the Debtor-in-Possession of the strong arm powers of § 544(a).

**Reformation**

79

PMB's counterclaim for reformation is based on MCA § 28-2-1611, which provides:

**When written contract may be revised by court**.  When, through fraud or a mutual mistake of the parties or a mistake of one party while the other at the time know or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons in good faith and for value.

*Estate of Irvine v. Oaas*, 2013 MT 271, ¶ 14, 372 Mont. 49, 309 P.3d 986; *E.H Oftedal & Sons v. State*, 2002 MT 1, ¶ 47, 308 Mont. 50, 40 P.3d 349.

The Montana Supreme Court wrote:

A court is not limited only to correcting errors in the language of the instrument, but may inquire into the intended meaning and effect of the instrument. Section 28–2–1613, MCA. The mutual intent of the parties serves as the standard from which the instrument may be reformed. *Sullivan v. Marsh,* 124 Mont. 415, 422, 225 P.2d 868, 872 (1950). A court may not, therefore, create a " 'new and different' " contract or make " 'significant additions.' " *Rogers v. Relyea*, 184 Mont. 1, 10, 601 P.2d 37, 42 (1979) (quoting S*ullivan*, 124 Mont. at 422, 225 P.2d at 872).

*Estate of Irvine v. Oaas*, 2013 MT at ¶ 14.

Plaintiff argues that PMB is not entitled to reformation of the TI to change the definition of "Secured Debt" in the TI because of PMB's bad conduct.  Plaintiff cites *E.H Oftedal & Sons* for the proposition that reformation belongs to the aggrieved party who is laboring under a mistake known or suspected by the other party.  The court in *E.H. Oftedal and Sons* distinguished a party who is laboring under a mistake known or suspected by the other party as opposed to an aggrieved party who knew of the mistake prior to signing the contract while the other party had no knowledge.  *E.H Oftedal & Sons,* 2002 MT 1 at ¶ 48, 308 Mont. 50, 40 P.3d 349.  In the instant case Plaintiff offered no evidence that PMB knew of the mistakes in execution of Ex. 35 prior to signing the contract while B-Bar Tavern had no knowledge, so *E.H Oftedal & Sons* does

80

not support Plaintiff's contention.  The court found that negligence by the party seeking reformation does not preclude relief.  *E.H  Oftedal & Sons,* 2002 MT 1 at  ¶¶ 52, 54.

Plaintiff cites *Rase v. Castle Mountain Ranch*, 193 Mont. 209, 220, 631 P.2d 680, 686 (1981), that although parol evidence may be permitted under MCA § 28-2-905 when mistake or the validity of the agreement is called into question, it cannot be used to vary what appears on the instrument's face.  Plaintiff misstates *Rase*.  In *Rase* the validity of the agreement was a fact in dispute, so parol evidence was admissible, not to vary the terms of the instrument, but to show that what appears on its face as a valid, binding contract is in fact no such thing.  193 Mont. at 220, 631 P.2d at 686.  In the instant case, by contrast, PMB does not seek to show that Ex. 35 is not a valid, binding contract.  On the contrary PMB seeks to enforce Ex. 35 as valid, but seeks to reform it to correct mistakes.  MCA § 28-2-905(1)(a) allows extrinsic evidence of the terms of the agreement other than the writing "when a mistake or imperfection of the writing is put in issue by the pleadings."  Mistakes have been put in issue in the instant case, and shown by the evidence, consisting of the identity of the borrower at paragraph 4 on page 2 of Ex. 35, Dick's mistakes in not signing page 11 as president of B-Bar Tavern and writing a mistaken date, and PMB's mistake on page 12 of the acknowledgment by not entering Dick's name and representative capacity as president of B-Bar Tavern.

Plaintiff argues that Ex. 35 is unambiguous and no parol evidence should be allowed to alter the meaning of the TI to include a debt of Barnes Inc., which is not mentioned anywhere in the TI.  Plaintiff contends that parole evidence cannot be used to create an ambiguity.  PMB argues that MCA § 28-2-1611 provides for a written contract to be revised on application of an aggrieved party when the contract does not truly express the intention of the parties through

81

mutual mistake; and cites MCA § 28-2-1613 that in revising a written instrument the court may inquire what the instrument was intended to mean and what were intended to be its legal consequences. *Estate of Irvine v. Oaas*, 2013 MT 271 at ¶ 19.

PMB argues that the other information in the TI regarding the loan amount, interest rate and due date in the TI are correct and that the testimony of Vukasin, Hannah, and Dick shows that PMB did not intend to list B-Bar Tavern in the "Secured Debt" paragraph. PMB contends that it is entitled to the remedy of reformation under MCA § 28-2-1611 to correct the mutual mistake in the TI, which has B-Bar Tavern's name typed at paragraph 4 of Ex. 35 where the name of the obligor Barnes, Inc., would appear. The Court agrees. Not only MCA § 28-2-1613, but also MCA § 28-2-905(1)(a) authorizes a court, in cases of mistake, to depart from the parole evidence rule and to consider evidence other than the contents of the writing.

The evidence shows that PMB intended to list Barnes, Inc., at paragraph 4 of Ex. 35, and therefore a mutual mistake exists which entitles PMB to reformation rather than allowing the mistake to be perpetuated by hiding behind the parole evidence rule and/or the integration clause. Similarly, PMB is entitled to reformation to correct Dick's signature on page 11 of Ex. 35, to accurately reflect his representative capacity as president of B-Bar Tavern, and to correct the date of Dick's signature to March 24, 2009. Lastly, PMB is entitled to reformation on the acknowledgment page 12 of Ex. 35, to add Dick's name and representative capacity in the business or entity acknowledgment above the name of B-Bar Tavern.

Next, Plaintiff argues that the two year period of limitations for relief grounded upon mistake has run, MCA § 27-2-203, MCA. *Johnson v. Dist. VII, HRDC*, 2009 MT 86, ¶ 22, 349 Mont. 529, 204 P.3d 714. PMB responds that Plaintiff waived the statute of limitations by

failing to raise it in its answer to PMB's counterclaim as required by Rule 8(c), Fed. R. Civ. P. In addition PMB argues that since Plaintiff failed its burden of showing when PMB discovered the mistake in the TI, it failed to show when the cause of action was deemed to have accrued starting the running of the two year statute of limitations.

MCA § 27-2-203 prescribes a 2 year period for commencement of an action for relief on the ground of mistake, but further provides "the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake. The Court agrees that Plaintiff failed to show by a preponderance of the evidence when PMB's cause of action was deemed to have accrued. In addition, Plaintiff's answer to PMB's counterclaim (Doc. 8) lists several affirmative defenses at pages 3-4, but does not invoke the affirmative defense of statute of limitations. Rule 7008, F.R.B.P., applies Rule 8, Fed. R. Civ. P. in adversary proceedings. Rule 8(c)(1) states that in responding to a pleading a party "must affirmatively state any avoidance or affirmative defense, including: . . . statute of limitations."

Plaintiff failed to state the statute of limitations defense in its answer to PMB's counterclaim. Plaintiff reserved the right to amend its answer, but did not. The approved Pre-Trial Order superseded the pleadings and does not include Plaintiff's statute of limitations defense anywhere. The Court finds that Plaintiff's statute of limitations defense was not raised properly under Rule 8(c)(1), and it is deemed waived and denied.

Next, Plaintiff argues that PMB is not entitled to the equitable remedy of contract reformation because PMB has unclean hands due to its participation in the financial restructure of Barnes Inc., the spinoff of Barnes, Inc's real estate into new entities to meet PMB's loan limits, Potts' participation in accomplishing the restructure, and PMB's failure to inform Dick

and B-Bar Tavern of these material changes to the true condition of Barnes, Inc., which increased the risk to Plaintiff.  In its reply Plaintiff argues that the restructure resolved the lending limit issue but increased Barnes, Inc.'s debt to equity ratio from 68% to 185% after the restructure and refinance, which were arranged by Potts who was PMB's attorney and was discussing the loan issue with PMB while PMB knew he had a relationship with Barnes, Inc.  Plaintiff argues that its risk measured by loan to value ratio increased by almost 300% after the Barnes Inc., property was conveyed to the Prospector entities.

PMB argues that Plaintiff bears the burden of proof to show unclean hands by PMB, and cannot meet that burden.  PMB denies that the changes in the restructuring increased Plaintiff's risk.  PMB denies that it set the amount of the loans to the two Prospector entities, and refers to the contradictory testimony of Potts and Koontz that the other set the loan amounts, and Hannah's testimony that Jack provided PMB with the amounts.  Plaintiff's reply argues that PMB's interpretation is implausible because PMB's attorney Potts worked on other loan limit problems for PMB, and Potts testified that PMB offered to pay the fees of organizing the Prospector entities.  Since the restructure was submitted to PMB's board of directors as a way to meet the lending limit issues, Plaintiff argues, it is logical that the restructure was done for the benefit of and at the behest of PMB.

PMB argues that the security for the October 2008 loan and the March 2009 loan consisted of Plaintiff's property and the personal guarantees of Jack and Dick, and those two loans were not secured by any property or assets of Barnes, Inc., and no equity existed in Barnes, Inc., after it failed.  PMB describes the value of Barnes, Inc.'s assets as a red herring.  Further, PMB argues that the amount of the loan decreased from $850,000 to $741,041.10, reducing the

risk to Dick and B-Bar Tavern by $108,958.90, which clearly benefitted Plaintiff. PMB contends that its need to look to Plaintiff for its collateral after Jack's entities failed to repay the loans does not create unclean hands.

Plaintiff argues that PMB's president Vukasin is not credible in denying that the restructure was done for PMB's benefit and tied to PMB's lending limit problem, and that Potts' and Koontz's testimony shows that the restructure was done for PMB's benefit. Plaintiff's reply cites Vukasin's denial of a lending limit problem under questioning by Plaintiff's counsel, followed by her answer to PMB's counsel that it is correct that the $1.8 million exceeded PMB's lending limits. Tr. 173, pp. 6-8; 187, 188.

PMB responds that it played no part in the restructuring, of which Potts was the architect on behalf of Barnes, Inc., and that Plaintiff is "making up facts" to try to support its claim of unclean hands. PMB cites Potts' testimony that he was motivated in the restructure by tax concerns and Jack's desire to transfer his business to his family. Plaintiff's reply brief admits that Jack authorized Potts to organize the Prospector entities, but Plaintiff nevertheless argues that Jack did not request Potts organize them.

In its reply brief, in support of its contention that PMB has unclean hands, Plaintiff quotes Potts' testimony that Vukasin told him about the loan limit issue because the other participant banks did not want to participate in a "termed out loan" or a "takeout loan" after the construction was completed. As a result of PMB's actions, Plaintiff argues that PMB has unclean hands and is not entitled to the equitable remedy of reformation based on mistake to correct the TI.

In considering the record, the Court concludes that the equities weigh heavily in favor of PMB. Dick and Jack testified that PMB fulfilled all its obligations to Jack and fully performed

under the Settlement Agreement.  A common maxim of equity states that "one seeking equity must do equity."  *In re Marriage of Cox* (1994), 266 Mont. 67, 71, 878 P.2d 903, 906 (1994).  The Court sees no evidence of inequitable conduct by PMB in this record.  PMB's acquiescence in Potts' strategy was done to comply with its loan limit requirements under law.  Potts' actions in forming the new LLC's and transferring Barnes, Inc.'s properties into them was as counsel for Barnes, Inc., and Jack agreed.  Tr., pp. 35-37.   Hannah informed Dick about Jack's financial restructure in her second "Dutch uncle" talk with him on March 24, 2009.

Plaintiff cites Dick's testimony that no one told him the Barnes, Inc., property had been conveyed to the Prospector entities, and contends that PMB's failure to inform Dick of this change in circumstances establishes PMB's unclean hands.  PMB argues that Hannah explained to Dick that PMB would look to Richard and B-Bar Tavern for payment if Barnes, Inc., defaulted, and argues that Richard's failure to comprehend Hannah's explanation does not evidence unclean hands by PMB.  Neither, PMB argues, was its decision to commence foreclosure against B-Bar Tavern after the default of the Barnes, Inc., loan wrongful because the other entities had filed bankruptcy.

In considering the record, the Court concludes that the equities weigh heavily in favor of PMB.  Dick and Jack testified that PMB fulfilled all its obligations to Jack and fully performed under the Settlement Agreement.  A common maxim of equity states that "one seeking equity must do equity."  *In re Marriage of Cox* (1994), 266 Mont. 67, 71, 878 P.2d 903, 906 (1994).  The Court sees no evidence of inequitable conduct by PMB shown by this record.  PMB's acquiescence in Potts' strategy was done to comply with its loan limit requirements under law.  Potts' actions in forming the new LLC's and transferring Barnes, Inc.'s properties into them was

86

as counsel for Barnes, Inc., and Jack agreed.  Hannah informed Dick about Jack's financial restructure in her second "Dutch Uncle" talk with him on March 24, 2009.

### Economic Duress

Plaintiff contends that, even if it is bound by the Settlement Agreement, that agreement was the result of economic duress which left B-Bar Tavern in an inextricable financial crisis with no other meaningful choice so is invalid, and that the settlement fails for lack of consideration. Plaintiff argues that Dick was "considerably unsophisticated" because he did not have a need for bank financing in the recent past, and saw no other remedy because he did not know of the flaws in the TI at the time.  PMB contends that Dick and B-Bar Tavern both were represented by counsel, Brion Lindseth, when Dick signed the settlement agreement, and that Plaintiff filed to introduce evidence of any wrongful act by PMB that would create economic duress.  Given the testimony regarding Dick's extensive business experience, the Court rejects the suggestion that Dick is unsophisticated.  The evidence shows that Dick has worked in the bar and casino business for decades, owned businesses, worked with regulatory agencies, employed attorneys and an accountant, and borrowed money from banks.

Plaintiff argues that the facts of this case are similar to *Litten v. Jonathan Logan*, *Inc.*, 286  A.2d 913 (Pa. Super. 1971).  PMB contends they are not.  In *Litten* an inextricable financial crisis was created when the defendant, a purchaser of corporations from plaintiffs, failed to pay the corporations' creditors and they threatened the plaintiffs with bankruptcy, forcing plaintiffs into a second agreement which the defendant also breached.  286 A.2d at 916.  In the instant case no evidence exists in the record of breached agreements by PMB corresponding to the breached agreements in *Litten*.  Plaintiff argues that PMB's financial restructure of Barnes, Inc., to stay

87

within lending limits, and PMB's failure to inform Dick that B-Bar Tavern's property was the intended source of payment, are equivalent to the buyers' breach of two written agreements in *Litten*. The Court finds that Plaintiff failed to show any breach of an agreement by PMB. PMB fully performed and funded several loans, and looked to B-Bar Tavern for satisfaction of the TI only after Barnes, Inc. defaulted.

Plaintiff argues that it was coerced into the Settlement Agreement because it was close to losing everything over a loan from which it received no benefit. The truth, however, is that Dick signed the TI on behalf of Plaintiff to help his brother Jack, and received the benefit of that help. "A person who takes the benefit shall bear the burden." MCA § 1-3-212, MCA. This Court sees little in PMB's actions which approach the facts that were found to constitute economic duress in *Litten*.

PMB cites the holding of *Hoven v. First Bank (N.A.)–Billings*, 244 Mont. 229, 234, 797 P.2d 915, 919 (1990), as supporting their position that pressure of financial circumstances to secure a release and waiver of causes of action was insufficient to establish economic duress. PMB argues that Plaintiff implicitly admitted its allegations are insufficient to support a claim because PMB never brought suit against PMB. PMB denies committing any wrongful acts required as an element of economic duress under *Hoven*, and argues that Plaintiff offered no evidence that its financial distress was caused by PMB instead of simply poor economic fortune, citing *Stanley v. Holms*, 1999 MT 41, 293 Mont. 343, 975 P.2d 1242.

*Hoven* quotes *Aldrich & Co. v. Donovan*, 238 Mont. 431, 778 P.2d 397 (1989), that it is not sufficient to prove economic duress that a consent was secured by the pressure of financial circumstances, or that one of the parties merely insisted on its legal right to require security

88

before extending further credit.  *Hoven*, 244 Mont. at 235, 797 P.2d at 919.  As in *Hoven,* the financial circumstances which Dick found himself in when Jack's businesses failed and he failed to pay the Barnes, Inc., loan are not sufficient to prove a claim of economic duress against PMB when it insisted on a release in the Settlement Agreement.

PMB contends that Plaintiff's allegation that PMB failed to take a security interest in Barnes, Inc's collateral is contradicted by the evidence that PMB tried to take a security interest on Barnes, Inc.'s liquor license but Jack refused.  PMB repeats that it was not involved in dividing Barnes, Inc's assets, and that Barnes, Inc.'s assets never secured any loan which Plaintiff also secured.  PMB denies committing a wrongful act of beginning foreclosure against Plaintiff before seeking to collect from Barnes, Inc., and the Prospector entities, explaining that those entities of Jack Barnes all had filed bankruptcy.  Therefore, collection against those entities was prohibited by the automatic stay of § 362(a).  The Court finds no merit in Plaintiff's claim of economic duress.

### Attorney Fees.

Both parties at various times in their pleadings requested awards of attorneys' fees and costs.  They did not include their requests for attorneys' fees in the Pretrial Order.

Under the "American Rule," a prevailing litigant ordinarily is not entitled to collect attorneys' fee from the loser except when authorized by contract or statute.  *Travelers*, 549 U.S. at 448.  *Travelers* directed courts to look to state law when determining claims, including the award of attorneys fees.  549 U.S. at 448, quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).   Accordingly, this Court applies Montana state law to determine the parties' eligibility to collect attorneys' fees.

89

The Montana Supreme Court stated Montana law in *Harding v. Savoy*, 2004 MT 280, ¶

68-69, 323 Mont. 261, 277-78, 100 P.3d 976, 986-87 as follows:

> The longstanding rule in Montana, also known as the American Rule, is absent a
> contractual or statutory provision to the contrary, attorney fees will not be
> awarded to the prevailing party in a lawsuit. *Pankratz Farms, Inc. v. Pankratz*,
> 2004 MT 180, ¶ 93, 322 Mont. 133, ¶ 93, 95 P.3d 671, ¶ 93 (citing *Erker v.
> Kester*, 1999 MT 231, ¶ 43, 296 Mont. 123, ¶ 43, 988 P.2d 1221, ¶ 43). In the
> present case, neither a statutory nor contractual basis for an award of attorney fees
> exists; however, in rare instances a district court may award attorney fees to an
> injured party under its equity powers. *Pankratz*, ¶ 93 (citing [*Foy v. Anderson*
> (1978), 176 Mont. 507, 511-12, 580 P.2d 114, 116-17.]
>
> ¶ 69 We have recognized equitable exceptions to the American Rule. See,
> e.g., *Mt. W. Farm Bureau Mut. Ins. Co. v. Hall*, 2001 MT 314, ¶ 14, 308 Mont.
> 29, ¶ 14, 38 P.3d 825, ¶ 14 (awarding attorney fees when a party incurs legal fees
> to establish a common fund which avails non-participating beneficiaries);
> *Montanans for the Responsible Use of the School Trust v. State ex rel. Bd. of Land
> Commr's*, 1999 MT 263, ¶ 67, 296 Mont. 402, ¶ 67, 989 P.2d 800, ¶ 67 (awarding
> attorney fees pursuant to the private attorney general theory). In addition, we have
> awarded attorney fees when a party has been forced to defend against a wholly
> frivolous or malicious action. *Foy*, 176 Mont. at 511, 580 P.2d at 117. However,
> such awards are determined on a case-by-case basis. *Pankratz*, ¶ 93 (citing *Foy*,
> 176 Mont. at 511, 580 P.2d at 117). We have specifically declined to adopt a
> malicious or bad faith equitable exception to the American Rule. *Goodover v.
> Lindey's* (1992), 255 Mont. 430, 448, 843 P.2d 765, 776; *Erker*, ¶ 44. Further, we
> have held where a party chooses to institute a suit against others, an award of
> attorney fees to the plaintiff will normally be precluded. *Goodover*, 255 Mont. at
> 447, 843 P.2d at 775; *Youderian Constr. v. Hall* (1997), 285 Mont. 1, 15, 945
> P.2d 909, 917.

*See also Trs. of Ind. Univ. v. Buxbaum*, 2003 MT 97, ¶ 19, 315 Mont. 210, 215-16, ¶ 19, 69 P.3d

663, 666-67, ¶ 19; *see also Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 97, 303 Mont. 274,

305, ¶ 97 16 P.3d 1002, 1022, ¶ 97; *Hickingbotham v. Duncan* (1995), 271 Mont. 525, 531, 898

P.2d 1215, 1219; *Ehly v. Cady* (1984), 212 Mont. 82, 687 P.2d 687.

In *Schuff* the court quoted the United States Supreme Court holding that: "[T]he argument

that attorneys' fees must be added to a plaintiff's recovery if the award is truly to make him whole

90

is contrary to the generally applicable American Rule." *Schuff* ¶ 97, *quoting Norfolk & W. Ry. Co. v. Liepelt* (1980), 444 U.S. 490, 495, 100 S.Ct. 755, 758, 62 L.Ed.2d 689.

In the instant case, Ex. 35 includes a provision at paragraph 18 on page 7 for an award of attorneys' fees and costs in enforcing the TI. Montana statute, MCA § 28-3-604, MCA, treats a contractual right to attorney fees as reciprocal. *Hoff v. Lake County Abstract & Title Co.*, 2011 MT 118, ¶ 37, 360 Mont. 461, 255 P.3d 137. Plaintiff prevailed under Montana's mortgage and acknowledgment statutes in showing that Ex. 35 is invalid, as discussed above. Therefore, PMB cannot win an award of attorneys' fees based on Ex. 35. But, PMB prevailed in its counterclaim for reformation under MCA § 28-2-1611, and the net result is that Ex. 35 will be reformed and Plaintiff is not a prevailing party.

PMB cites no statutory provision which entitles it to an award of attorneys' fees in a reformation action based on MCA § 28-2-1611, and the Court is unaware of any such statute. Therefore, under the American Rule applicable in Montana under the holding of *Harding v. Savoy*, 2004 MT 280 at ¶ 68-69, PMB is not entitled to an award of attorneys' fees. This Court will not apply the relief awarded to PMB under its reformation counterclaim retroactively to allow PMB to request an award of attorneys' fees and costs under the reformed TI, because the Court in its discretion deems such an award inequitable. The parties shall be responsible for their own attorneys' fees and costs in this adversary proceeding.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the above-captioned Chapter 11 case and Debtor's Objection to PMB's Proof of Claim under 28 U.S.C. § 1334(a).

2. Debtor's Objection to PMB's Claim and request to avoid PMB's lien are core

proceedings under 28 U.S.C. § 157(b)(2)(B) and (K).

3.   The Trust Indenture between the parties admitted into evidence as Ex. 35, as written, is invalid under Montana law governing real estate trust indentures and mortgages, and in addition for failure to satisfy Montana acknowledgment statutes, and as such is invalid and unenforceable.

4.   Plaintiff failed to satisfy its burden of proof by a preponderance of the evidence that the Trust Indenture is invalid for lack of consideration.  Dick Barnes executed Ex. 35 on March 24, 2009.

5.   The Trust Indenture, Ex. 35, is subject to the "strong arm" powers of 11 U.S.C. § 544(a).

6.   The Settlement Agreement between the parties did not waive or release Plaintiff's claims based upon § 544(a).  Pre-petition waiver or release of bankruptcy relief by a debtor is void against public policy.

7.   Defendant is entitled to the equitable remedy of reformation.

8.   Both sides prevailed in part under separate theories and defenses pleaded in this adversary proceeding.  The requests for an award of attorneys' fees by each side are a wash. Each side shall be responsible for their own attorneys' fees and costs.

**IT IS ORDERED** a separate Judgment shall be entered (1) in favor of Plaintiff B-Bar Tavern Inc. and against Prairie Mountain Bank in part, sustaining Plaintiff's Objection to PMB's Claim and disallowing Proof of Claim No. 1 filed by PMB, but providing the general rule that PMB's lien shall pass through the above-captioned Chapter 11 bankruptcy unaffected; and (2) against Plaintiff B-Bar Tavern, Inc., in favor of PMB, and the "Real Estate Trust Indenture"

between the parties dated 03-24-2009, and admitted into evidence as Exhibit 35, shall be reformed as follows:

1. At page 2 of 12, paragraph 4A, the words "B-Bar Tavern, Inc." are replaced by "Barnes, Inc.";

2. At page 11 of 12, the handwritten signature below the Entity Name near the bottom "Richard J. Barnes" is replaced by "Richard J. Barnes, President of B-Bar Tavern, Inc."; and the date "3/25/9" is replaced by "March 24, 2009."

3. At page 12 of 12, the "Business or Entity Acknowledgment" is amended to read: "This instrument was acknowledged before me this 24th day of March, 2009, by Richard J. Barnes, President (Title(s)) of B-Bar Tavern, Inc. (Name of Business or Entity) a Montana Corporation on behalf of the business or entity."

**IT IS FURTHER ORDERED** the Judgment shall provide that each party shall bear its own attorneys' fees and costs incurred in this adversary proceeding.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana